UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AURELIUS CAPITAL MASTER, LTD.,

               Plaintiff,

               v.

THE REPUBLIC OF ARGENTINA,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Case No.:  1:19-CV-00351 (LAP)

The Honorable Loretta A. Preska

**ORAL ARGUMENT REQUESTED**


# DEFENDANT THE REPUBLIC OF ARGENTINA'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT


Robert J. Giuffra, Jr.
Sergio J. Galvis
Joseph E. Neuhaus
Thomas C. White
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:   (212) 558-4000
Facsimile:   (212) 558-3588

*Counsel for The Republic of Argentina*

April 18, 2019

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ........................................................................................1

BACKGROUND ..........................................................................................................4

    A.    The Parties ........................................................................................4

    B.    The 2005 and 2010 Debt Exchanges ..................................................5

    C.    The GDP-Linked Securities ...............................................................6

    D.    The Ministry of Economy's Exclusive Authority Over "All" GDP-Related "Calculations" .................................................................................8

    E.    INDEC Changes the Year of Base Prices for Calculating Real GDP...................11

    F.    The Complaint ...............................................................................12

ARGUMENT .............................................................................................................13

I.    THE MINISTRY OF ECONOMY'S CALCULATIONS ARE "BINDING" ON AURELIUS ABSENT "BAD FAITH," "WILLFUL MISCONDUCT," OR "MANIFEST ERROR," WHICH THE COMPLAINT DOES NOT ALLEGE ...............................................................................................13

II.    IN ANY EVENT, AURELIUS'S ERRONEOUS CALCULATIONS OF ARGENTINA'S GDP ARE CONTRARY TO THE GLOBAL SECURITY'S TERMS AND ECONOMIC COMMON SENSE .......................................................18

CONCLUSION ...........................................................................................................21

# TABLE OF AUTHORITIES

*Page(s)*

## CASES

*Ashcroft* v. *Iqbal*, 556 U.S. 662 (2009)........................................................................17

*Bank of Am. Nat'l Ass'n* v. *AIG Fin. Prods. Corp.*, 509 F. App'x 24 (2d Cir. 2013)...................14

*Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544 (2007)..........................................................17

*Chleck* v. *Gen. Elec. Co.*, 2004 WL 2375803 (S.D.N.Y. 2004) ...................................17

*Cifarelli* v. *Vill. of Babylon*, 93 F.3d 47 (2d Cir. 1996)................................................16

*In re Tribune Media Co.*, 799 F.3d 272 (3d Cir. 2015) ....................................................4

*In re Oi Brasil Holdings Cooperatief U.A.*, 578 B.R. 169 (Bankr. S.D.N.Y. 2017) ......................5

*Lightwater Corp. Ltd.* v. *Republic of Argentina*, 2003 WL 1878420 (S.D.N.Y.
Apr. 14, 2003).......................................................................................................5

*Mortimer Off Shore Servs.* v. *Fed. Republic of Germany*, 615 F.3d 97 (2d Cir.
2010) ...................................................................................................................21

*NML Cap., Ltd.* v. *Republic of Argentina*, No. 12-105, Dkt. 827538 (2d Cir. Jan.
25, 2013) .............................................................................................................6

*Richman* v. *Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261 (S.D.N.Y. 2012)............................4

*Rogers Revocable Tr.* v. *Bank of Am., N.A.*, 2008 N.Y. Misc. LEXIS 7471 (N.Y.
Sup. Ct. Nov. 13, 2008) ...........................................................................15, 16, 17

*Sempra Energy Trading Corp.* v. *BP Prods. N. Am., Inc.*, 860 N.Y.S.2d 71 (1st
Dep't 2008) .........................................................................................................17

*Structured Credit Partners, LLC* v. *PaineWebber Inc.*, No. 602112/2001 (N.Y.
Sup. Ct. July 2, 2002)......................................................................................14, 15

*Taylor Precision Prods., Inc.* v. *Larimer Grp., Inc.*, 2018 WL 4278286 (S.D.N.Y.
Mar. 26, 2018).....................................................................................................17

*Toledo Fund, LLC* v. *HSBC Bank USA, Nat'l Ass'n*, 2012 WL 2850997 (S.D.N.Y.
July 9, 2012).........................................................................................................14

*VCG Special Opportunities Master Fund Ltd.* v. *Citibank, N.A.*, 594 F. Supp. 2d.
334 (S.D.N.Y. 2008) ............................................................................................16

*Versatile Housewares & Gardening Sys., Inc.* v. *Thill Logistics, Inc.*, 819 F. Supp.
2d 230 (S.D.N.Y. 2011) ................................................................................................16

*Wells Fargo Bank, N.A.* v. *Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156
(S.D.N.Y. 2015) ...............................................................................................................4

*White Hawthorne, LLC* v. *Republic of Argentina*, 2016 WL 7441699 (S.D.N.Y.
Dec. 22, 2016) ..................................................................................................................4

*World Wide Polymers, Inc.* v. *Shinkong Synthetic Fibers Corp.*, 2010 WL
3155176 (S.D.N.Y. July 30, 2010) ...............................................................................16

**OTHER AUTHORITIES**

Black's Law Dictionary (10th ed. 2014) ...........................................................................17

Fed. R. Civ. P. 12(b) .................................................................................................4, 17

## PRELIMINARY STATEMENT

Plaintiff Aurelius Capital Master, Ltd. ("Aurelius")—a hedge fund that specializes in acquiring distressed debt to pursue litigation—seeks an impermissible windfall from acquiring securities issued by The Republic of Argentina (the "Republic" or "Argentina"). These securities ("GDP-linked Securities") provide for annual payments tied to the Republic's gross domestic product ("GDP").  But the clear terms of the governing document—the "Global Security"—bar Aurelius's flawed theory for why the Republic should pay it an additional $60 million.

Most fundamentally, the Global Security provides that "[*a*]*ll calculations* made by [the Republic's] Ministry of Economy hereunder *shall be binding*" unless made in "*bad faith*" or the product of "*willful misconduct or manifest error* on the part of the Ministry of Economy." (Compl. Ex. B (2005 Global Security), § 1(e) at R-4 (emphasis added).)  In its Complaint— which consists entirely of second-guessing the Ministry of Economy's GDP calculations— Aurelius does not mention (even once) this "binding effect" provision (Section 1(e)), much less plead, as it must to bring this action, that the Ministry's calculations were made in "bad faith" or were the product of "willful misconduct or manifest error."

By way of background, in late 2001, a severe crisis in Argentina led to record levels of unemployment and poverty.  By December 2001, the Republic was effectively bankrupt and declared a moratorium on payments on approximately $81 billion of its debt.  In January 2005 and again in 2010, to resolve the large number of claims arising out of its 2001 default, the Republic launched voluntary "debt exchanges," allowing creditors to trade in 152 different series of nonperforming bonds for three new types of performing bonds with lower interest rates, reduced principal, and/or longer maturities.  The Republic's exchange offers were largely successful, with an over-91% participation rate.

The exchange offers included what Aurelius itself has called a "sweetener bonus"—the GDP-linked Securities.  These securities provide for annual payments tied to Argentina's real (*i.e.*, inflation-adjusted) GDP for the prior calendar year *only if* the Republic's real GDP and real GDP growth rates exceed an agreed-upon "base case."  As specified in the Global Security, the "base case" real GDP growth rate was slightly above 3% for the early years in the life of the GDP-linked Securities (2005 to 2014), but evened out to exactly 3% from 2015 to 2034 (when the securities expire).  Since their 2005 issuance, Argentina has made all required payments—nearly $10 billion—under these securities.  The Republic made no payments in 2009 and 2012 when its growth rate was 0.85% and 1.9%, respectively.

The Global Security specifies that payment amount calculations will be based on the GDP figures published by the Republic's national statistical agency, the *Instituto Nacional de Estadística y Censos* ("INDEC").  INDEC had been measuring real GDP in constant 1993 prices, but concluded in 2014 that measuring real GDP in constant 1993 prices no longer accurately reflected the Republic's economy.  INDEC thus moved to constant 2004 prices, and, for that reason, 2012 was the last year INDEC calculated GDP in constant 1993 prices.  (Compl. ¶ 25 n.3.)  This change was permitted by the Global Security and was consistent with standard international practice; governments around the world periodically change the base year prices in which real GDP is expressed.

In December 2014, the Republic announced that the "growth rate" condition under the GDP-linked Securities was not met for 2013 and thus no payment was due.  The Republic's growth rate was 2.925%—below the 3.22% "base case" specified in the Global Security for 2013.  Over four years later, Aurelius filed this lawsuit.

In its Complaint, Aurelius seizes on INDEC's move to constant 2004 prices in calculating GDP to perform *its own* calculation of a *new* "base case" GDP growth rate under the Global Security.  But Aurelius's calculation is not based on INDEC's calculation of GDP and does not result in an economically reliable measure of the Republic's GDP.  Tellingly, Aurelius's calculation proposes that the Republic make a payment under the GDP-linked Securities, even if the Republic's growth rate were only 1.26%.  That is an anemic growth rate by any economic standard and far below the 3.22% "base case" rate for 2013 specified in the Global Security.

This Court should reject as a matter of law Aurelius's flawed effort to try to secure an unwarranted payment of $60 million for 2013 for two reasons:

*First*, Aurelius makes no effort to plead that the Ministry performed its calculations for calendar year 2013 in "bad faith" or engaged in "willful misconduct, or manifest error."  The Global Security's "binding effect" provision (Section 1(e)) limited the risk of future litigation with the many thousands of holders of these securities.  This risk was particularly acute (and the "binding effect" clause all the more important) because GDP calculations involve subjective judgments about how to weigh the economic activities of the country, and those metrics change over time.  Aurelius ignores the "binding effect" clause, but New York courts routinely enforce similar provisions providing, as here, that one party's calculations of some financial metric will control.  (*Infra* pp. 14-16.)

*Second*, the Court should reject the Complaint's erroneous, alternative calculation of the real GDP "base case" growth trigger.  Aurelius purports to reduce the payment trigger for 2013 to only 1.26%—down from the 3.22% "base case" growth rate condition in the Global Security.  This level of GDP growth cannot be squared with the "base case" growth rate condition of at least 3% per year for this "sweetener" security.  To try to justify its anemic

growth rate, Aurelius uses a shortcut to *estimate* Argentina's real GDP—the "EMAE Index"—even though the Global Security provides that calculations must be based on "*the gross domestic product* of Argentina . . . as published by INDEC." (Compl. Ex. B (2005 Global Security), § 1(e) at R-2 (emphasis added).) The EMAE Index is *not* a measure of Argentina's GDP and, as shown below, is not an economically reliable proxy for GDP growth.

## BACKGROUND

### A.    The Parties

Argentina is home to approximately 44 million people. (Ex. 1 (2017 18-K) at D-20.)[1] Since December 2015, when President Mauricio Macri assumed office, Argentina has redoubled its efforts to rebuild its relationships with the global financial community, attract foreign investment, resolve disputes with creditors, and reinforce its historically strong ties with the United States. (*See id.* at D-36-42.) After more than a decade of litigation, the 2016 global settlement with "holdout" creditors, including Aurelius, was part of this larger effort to provide Argentina with a clean slate. (*See id.* at D-6.) Judge Griesa recognized that Argentina's new administration has "consistently declared its desire to resolve . . . disputes," "mark[ing] a turning point in [Argentina's] attitude and actions." *White Hawthorne, LLC* v. *Republic of Argentina*, 2016 WL 7441699, at *2 (S.D.N.Y. Dec. 22, 2016).

Plaintiff Aurelius is "a hedge fund specializing in [acquiring] distressed debt." *In re Tribune Media Co.*, 799 F.3d 272, 275 (3d Cir. 2015). Courts have "refuse[d] to countenance"

---

[1]    References to "Ex." are to exhibits accompanying the Declaration of Robert J. Giuffra, Jr. This Court "can take judicial notice of SEC filings" as well as the Republic's public statements and other governmental publications on this Rule 12(b)(6) motion. *Richman* v. *Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 273 n.3 (S.D.N.Y. 2012) (Crotty, J.); *see Wells Fargo Bank, N.A.* v. *Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015) (Engelmayer, J.) ("Courts routinely take judicial notice of . . . governmental records" retrieved "from official government websites.").

its litigation tactics.  *In re Oi Brasil Holdings Coöperatief U.A.*, 578 B.R. 169, 242-43 (Bankr. S.D.N.Y. 2017) (Lane, J.) (describing how Aurelius "weaponized" American bankruptcy law). Aurelius was a long-time "holdout" creditor of the Republic on pre-crisis bonds before settling its disputes in 2016.  In now belatedly seeking payments for calendar year 2013 under the GDP-linked Securities (Compl. ¶¶ 5-6), Aurelius does not plead when it acquired these securities.

**B.     The 2005 and 2010 Debt Exchanges**

Throughout the 1990s, Argentina generally ran primary budget surpluses.  But the growing size of net interest payments on the country's debt—which ballooned from $2.9 billion (1.2% of GDP) in 1993 to $10.2 billion (3.8% of GDP) in 2001, an increase of 249%—became unsustainable.  (Ex. 2 (2008 18-K) at 11.)  By late 2001, Argentina had entered the "worst economic crisis in its history."  *Lightwater Corp. Ltd.* v. *Republic of Argentina*, 2003 WL 1878420, at *2 (S.D.N.Y. Apr. 14, 2003) (Griesa, J.).  Because there is no bankruptcy regime for sovereign issuers, the Republic—which was essentially bankrupt—declared in December 2001 that it would defer interest and principal payments to its bondholders, while at the same time pursuing an equitable debt restructuring that would lay the groundwork for durable economic growth.  *See id.* at *2 (describing the Republic's restructuring efforts after 2001 "with representatives of bond holders from various countries").

The Republic's default prompted extensive litigation.  "By late 2004, almost 140 lawsuits, including 15 class action suits, . . . had been filed against Argentina in New York, Italy, and Germany."  (Ex. 3 (Sturzenegger & Zettelmeyer) at 75.)  On January 14, 2005, to try to resolve this widespread litigation in a way that gave Argentina a chance to return to solvency and restore sustainable growth to its economy, the Republic launched a voluntary debt exchange (the "2005 Exchange").  This exchange involved trading in non-performing securities (which encompassed 152 different bonds, originally issued in 14 different currencies) for three different

types of securities (2033 Discount Bounds; 2038 Par Bonds; and 2045 Quasi-Par Bonds).  (Ex. 1 (2017 18-K) at D-150.)[2]

Approximately 76% of the aggregate value of eligible securities was exchanged under these terms.  (Ex. 5 (2011 18-K) at 16.)  The Republic launched a similar exchange in 2010 ("2010 Exchange"), which raised the participation rate to over 91% of eligible securities. (*Id.* at 17.)  Together, the 2005 and 2010 Exchanges represented the largest sovereign debt restructuring in history.  (*See* Ex. 6 (Int'l Fin. L. Rev).)

### C.      The GDP-Linked Securities

In addition to the three types of bonds described above, the 2005 and 2010 Exchanges included GDP-linked Securities.  These securities were considered a "sweetener bonus," as Aurelius put it when describing the securities to the Second Circuit.[3]  Indeed, in contrast to the securities described above, "the GDP-linked [Securities] were viewed by Argentina's creditors, as well as by the financial markets, as having very little value."  (Ex. 7 (Griffith-Jones & Hertova) at 35.)  The GDP-linked Securities were intended to provide participants in the 2005 and 2010 exchange offers the opportunity to participate in the "increase in [Argentina's] payment capacity resulting from the higher GDP growth."  (Ex. 4 (2005 Exchange Offer Presentation) at 25.)

---

[2]      The discount bonds reflected a significant haircut on their face value but had higher interest rates; the par bonds maintained their face value but carried a lower interest rate; and the quasi-par bonds, which were offered only in Argentine pesos, maintained most of their face value and carried a slightly larger interest rate than the pars but lower than the discounts.  (Ex. 4 (2005 Exchange Offer Presentation) at 9.)

[3]      *See NML Cap., Ltd.* v. *Republic of Argentina*, No. 12-105, Dkt. 827538, at 48 (2d Cir. Jan. 25, 2013).

The governing documents (including the Global Security)[4] for the GDP-linked Securities strike a balance between establishing a manageable debt burden for the Republic and providing holders the opportunity to benefit from increased growth in the Argentine economy. Holders may receive a "Payment Amount" tied to the Republic's real GDP, provided that (i) for a given calendar year (or "Reference Year") the Republic's (a) *real GDP* and (b) *real GDP growth rate* each exceeds a "base case" defined in the Global Security; and (ii) the payments to date are below a cap specified in the Global Security.  (Compl. Ex. B (2005 Global Security), § 2(b) at R-5-6; Compl. Ex. D (2010 Global Security), § 2(b) at R-5.)

These conditions thus ensure that the Republic will make payments only if it is wealthy enough (as measured by its real GDP) and is growing at a healthy enough rate (as measured by its real GDP growth rate).  The Republic's June 2004 SEC report describing the GDP-linked Securities reflected a 3% rate as a "base case" for GDP growth.  Specifically, the section entitled "Final Proposed Terms and Conditions of New GDP-linked Units" describes the payment trigger and base case GDP as follows:

- "Payment trigger:  Actual GDP (expressed in constant pesos) as of the reference date exceeds the base case GDP, *and the annual growth rate exceeds 3%*"; and

- "Base case GDP:  Projected real GDP from December 31, 2004, *at an annual growth rate of 3%.*"

(Ex. 10 (2004 18-K/A) at Annex D (emphasis added).)

---

[4]    These include:  (i) June 5, 2005 Trust Indenture (Compl. Ex. A); (ii) the 2005 Form of Registered Security (the "2005 Global Security") (Compl. Ex. B); (iii) the April 30, 2010 First Supplemental Indenture (Compl. Ex. C); (iv) the 2010 Form of Registered Security (the "2010 Global Security") (Compl. Ex. D); (v) the December 27, 2004 Prospectus with January 10, 2005 Supplement (Ex. 8 hereto); and (vi) the April 13, 2010 Prospectus with April 28, 2010 Supplement (Ex. 9 hereto).

The "base case" growth rate of at least 3% as a "payment trigger" for these securities was ultimately reflected in the governing documents (as shown in the table below from the 2010 Prospectus):

| Reference Year | Base Case GDP (1993 pesos in millions) | Base Case Growth Rate (%) | Reference Year | Base Case GDP (1993 pesos in millions) | Base Case Growth Rate (%) |
|---|---|---|---|---|---|
| 2009 | 327,968.83 | 3.29% | 2022 | 486,481.92 | 3.00% |
| 2010 | 338,675.94 | 3.26% | 2023 | 501,076.38 | 3.00% |
| 2011 | 349,720.39 | 3.26% | 2024 | 516,108.67 | 3.00% |
| 2012 | 361,124.97 | 3.26% | 2025 | 531,591.93 | 3.00% |
| 2013 | 372,753.73 | 3.22% | 2026 | 547,539.69 | 3.00% |
| 2014 | 384,033.32 | 3.03% | 2027 | 563,965.88 | 3.00% |
| 2015 | 395,554.32 | 3.00% | 2028 | 580,884.85 | 3.00% |
| 2016 | 407,420.95 | 3.00% | 2029 | 598,311.40 | 3.00% |
| 2017 | 419,643.58 | 3.00% | 2030 | 616,260.74 | 3.00% |
| 2018 | 432,232.88 | 3.00% | 2031 | 634,748.56 | 3.00% |
| 2019 | 445,199.87 | 3.00% | 2032 | 653,791.02 | 3.00% |
| 2020 | 458,555.87 | 3.00% | 2033 | 673,404.75 | 3.00% |
| 2021 | 472,312.54 | 3.00% | 2034 | 693,606.89 | 3.00% |

(Ex. 9 (2010 Prospectus) at S-108; *see also* Compl. Ex. B (2005 Global Security), § 1(e) at R-3; Ex. 4 (2005 Exchange Offer Presentation) at 26.)

### D. The Ministry of Economy's Exclusive Authority Over "All" GDP-Related "Calculations"

The Global Security vests the Republic's Ministry of Economy with the power to make "[a]ll calculations" thereunder and to base those calculations exclusively on GDP data published by INDEC—"the only institution in Argentina with the statutory authority to produce official nationwide statistics." (Ex. 1 (2017 18-K) at D-14.) Specifically, the Global Security provides that: "*All calculations* made by the Ministry of Economy hereunder *shall be binding* on . . . *all Holders of this Security, absent bad faith, willful misconduct or manifest error* on the part of the Ministry of Economy." (Compl. Ex. B (2005 Global Security), § 1(e) at R-4 (emphasis added); Compl. Ex. D (2010 Global Security), § 1(d) at R-3-4 (emphasis added).)

The definition of "Excess GDP"—the difference between the published real GDP and the "base case" in the Global Security—similarly provides that "[a]ll of the Ministry's "calculations" will be controlling absent "bad faith, willful misconduct or manifest error":

> *All calculations* necessary to determine Excess GDP based on the information *published by INDEC* will be performed by the Ministry of Economy, and such calculations *shall be binding* on . . . all Holders of this Security, *absent bad faith, willful misconduct or manifest error on the part of the Ministry of Economy.*

(Compl. Ex. B (2005 Global Security), § 1(e) at R-3 (emphasis added); Compl. Ex. D (2010 Global Security), § 1(d) at R-3 (emphasis added).)  The definition of "Actual Real GDP"—the amount used in the calculations to determine the Payment Amount —requires that calculations be based on the "gross domestic product of Argentina . . . as published by INDEC." (Compl. Ex. B (2005 Global Security), § 1(e) at R-2; Compl. Ex. D (2010 Global Security), § 1(d) at R-2 (same).)

These provisions are essential to a workable security by ensuring uniformity in GDP and GDP growth rate calculations and protecting the Republic from becoming enmeshed in rounds of litigation.  If even a small fraction of the many thousands of holders of these securities could perform their own calculations of GDP and GDP growth rate—as Aurelius claims a right to do here—the Republic could be drawn into multiple lawsuits.  This risk is compounded by the fact that calculating GDP is not a simple arithmetic exercise; judgments are required at virtually every step.[5]

---

[5]     In calculating GDP, the country must first choose from among three accepted methodologies for measuring GDP (the "income," "expenditures," and "value-added" approaches).  (Ex. 11 (United States Bureau of Economic Analysis, *Measuring the Economy:  A Primer on GDP and the National Income and Product Accounts*) at 3-4.)  Next, the country must select the sources of data it will use (including potentially other governmental entities and private

*(footnote continued . . .)*

Because of the degree of judgment involved in GDP calculations, such calculations are typically "calculated by the national statistical agency"—as INDEC does for the Republic.  (Ex. 17 (IMF, *Gross Domestic Product: An Economy's All*).)  Commentators have recognized that the sovereign's involvement in the GDP calculation can be a drawback for buyers of GDP-linked securities, on the theory that the sovereign might have an incentive to understate its GDP.  (Ex. 18 (Borensztein & Mauro) at 198.)  Here, however, the Republic has paid nearly $10 billion to holders of GDP-linked Securities (*see* Ex. 7 (Griffith-Jones & Hertova) at 36), and prior to 2013, paid holders each year except 2009 and 2012 (when the Republic's growth rate was below the applicable triggers):

| Reference Year | Real GDP Growth * | Payment Amount** | Reference Year | Real GDP Growth * | Payment Amount** |
|---|---|---|---|---|---|
| 2005 | 9.179% | $395,426,918 | 2010 | 9.161% | $2,478,655,114 |
| 2006 | 8.466% | $810,888,443 | 2011 | 8.870% | $3,535,530,707 |
| 2007 | 8.653% | $1,300,053,094 | 2012 | 1.900% | No Payment |
| 2008 | 6.758% | $1,420,152,532 | 2013 | 2.925% | No Payment |
| 2009 | 0.850% | No Payment | | | |

* *See* Compl. ¶¶ 25 & n.3; 36 & Ex. F; Ex. 19 hereto (INDEC, GDP Growth in 1993 Prices).

** Exs. 20-25 (Ministry of Economy Press Releases); Ex. 7 (Griffith-Jones & Hertova) at 36.

---

( . . . *continued footnote*)

industry) and "fill [any] gaps" as it sees fit.  (Ex. 12 (United States Bureau of Economic Analysis, *The Making of GDP*).)  The country must then assign weights to that data.  (Ex. 13 (Steindel) at 1; Ex. 14 (Motley) at 3-4, 6.)  All of these decisions "involve[] subjective judgments about what to include and how to weight different components."  (Ex. 15 (Kubiszewski et al.) at 58.)  For example, France recently adjusted its GDP to include what it considered to be part of its "underground economy," which led to an increase of 4% in its reported GDP.  (Ex. 16 (OECD, *Understanding National Accounts*) at 40.)

E.       **INDEC Changes the Year of Base Prices for Calculating Real GDP.**

Generally speaking, GDP can increase in one of two ways:  (i) prices can increase or (ii) an economy can produce more goods and services.  (Ex. 26 (Fed. Res. Bank of St. Louis, *GDP: Does It Measure Up?*).)  Real GDP uses a set of "constant" prices—prices from a "base" year—to control for inflation in order to achieve comparability across different periods.  (*Id.*)  It is widely accepted that countries should periodically "rebase" their GDP.  For example, five intergovernmental organizations[6] publish a standard set of recommendations on the methodology for measuring economic activity called the *System of National Accounts* (the "SNA").  A new edition was published in 2008—the first since 1993—which introduced changes impacting the calculation of GDP (including, for example, the treatment of intellectual property, financial services, and the underground economy), and recommended that countries periodically re-base their GDP.  (Ex. 27 (System of National Accounts 2008) at xlviii-xlvix, 299.)

Here, in 2014, after an extensive three-year study, INDEC announced that it was replacing its calculation of real GDP in constant 1993 prices and, effective 2013, would base it on constant 2004 prices.  (Ex. 28 (INDEC March 27, 2014 Press Release); Compl. ¶¶ 22, 25 n.3; Ex. 29 (INDEC Website).)  After changing the year of base prices, INDEC discontinued the calculation of the Republic's real GDP in constant 1993 prices.  (Compl. ¶ 25 n.3; Ex. 29 (INDEC Website).)  Many other countries rebased their GDP during this time.[7]

---

[6]      The United Nations, International Monetary Fund, World Bank, Organization for Economic Co-operation and Development, and European Commission.

[7]      In 2014, South Africa, for example, re-based its GDP, changing from constant 2005 prices to constant 2010 prices, and did not calculate real GDP for 2014 using constant 2005 prices.  (Ex. 30 (Statistics South Africa, *Statistical Release; Gross Domestic Product*) at 6, 29-40.)  Likewise, Kenya, Nigeria, Tanzania, Uganda, and Zambia all completed rebasing exercises in that year.  (Ex. 31 (Brookings Inst., *Are African Countries Rebasing GDP in 2014 Evidence of*

(*footnote continued . . .*)

The Global Security permits and contemplates this change in INDEC's calculation of Argentina's GDP.  (Compl. ¶ 22 & Ex. B (2005 Global Security), § 1(e) at R-5.)  Specifically, when the year of base prices changes, the definition of "Base Case GDP" includes a proviso stating that Base Case GDP figures must be adjusted by a fraction, the numerator of which is real GDP in the new year of base prices (here, 2004) and the denominator of which is real GDP in the old year of base prices, 1993.  (Compl. Ex. B (2005 Global Security), § 1(e) at R-3.)  Tellingly, that proviso does not appear in the definition of Base Case GDP Growth.  (*See id.*)

F.     **The Complaint**

From 2012 to 2013, the Republic's real GDP growth was 2.925% (below the 3.22% trigger specified in the governing documents for 2013).  (*See* Compl. ¶ 36.)   On December 12, 2014, Argentina's Ministry of Economy announced that no payment was due under the GDP-linked Securities for 2013, because the "growth rate" condition for payment was not satisfied:

> The annual growth in Actual Real GDP (as such term is defined in the terms and conditions of GDP-Linked Securities) for 2013 did not exceed the growth rate in Base Case GDP (as such term is defined in the terms and conditions of GDP-Linked Securities) for that year.

(Ex. 32 (Ministry of Economy Press Release (Dec. 12, 2014).)[8]

---

( . . . *continued footnote*)

*Structural Transformation?*).)  The United States uses a "chain-weighted" approach to real GDP which requires re-basing each year.  (*See* Ex. 13 (Steindel).)

[8]      The Ministry issued brief press releases with the results of its calculations under the Global Security in prior years.  *See, e.g.*, Ex. 20 (Nov. 10, 2006); Ex. 21 (Nov. 30, 2007); Ex. 22 (Nov. 27, 2008); Ex. 23 (Nov. 27, 2009); Ex. 24 (Dec. 14, 2011); Ex. 25 (Dec. 14, 2012).

More than four years later, Aurelius filed this Complaint alleging a single breach of contract claim.  (*See* Compl. ¶¶ 40-43.)   Aurelius contends that, according to its own alternative calculations, it was entitled, as a "beneficial owner" of the GDP-linked Securities, to over $60 million for the 2013 Reference Year.  (*See id.* ¶¶ 5-7.)

As shown below (*infra* pp. 18-20), Aurelius's erroneous calculations rest on a purported resetting of the base case GDP growth rate into 2004 constant dollars that results in a trigger of 1.263%—less than half of the 3.22% specified in the governing documents for 2013. In performing its calculations, Aurelius uses a Monthly Economic Activity Estimator (*Estimador Mensual de Actividad Económica*), or "EMAE Index," to *estimate* a hypothetical 2013 real GDP in constant 1993 prices.  (Compl. ¶ 25 n.3.)   Aurelius alleges that the EMAE Index is a permissible proxy for GDP numbers because it is published by INDEC and historically "tracks and correlates" to the Republic's own published GDP figures, but this index is *not* a measure of GDP and its growth has tracked published GDP figures **only** because INDEC retroactively adjusted the index to do so.

## ARGUMENT

I.   **THE MINISTRY OF ECONOMY'S CALCULATIONS ARE "BINDING" ON AURELIUS ABSENT "BAD FAITH," "WILLFUL MISCONDUCT," OR "MANIFEST ERROR," WHICH THE COMPLAINT DOES NOT ALLEGE.**

By its terms, the Global Security forbids the many thousands of holders of the Republic's GDP-linked Securities from running to court, each with their own (potentially inconsistent) calculations of the amount (if any) owed to holders.  Instead, the Global Security unambiguously states that the calculations are to be made by the Republic's Ministry of Economy, and that such calculations "shall be binding" on the holders "absent bad faith, willful misconduct or manifest error."  (Compl. Ex. B (2005 Global Security), § 1(e), at R-4 (emphasis added).)   The definition of "Excess GDP"—the amount available annually for payouts—also

provides that "[a]ll calculations necessary to determine Excess GDP based on the information published by INDEC will be performed by the Ministry of Economy, and such calculations shall be binding . . . absent bad faith, willful misconduct or manifest error." (*Id.* at § 1(e), at R-3.)

As a consequence, when INDEC moved from 1993 to 2004 prices for purposes of calculating real GDP, the Ministry had to make a judgment as to how to calculate GDP growth for purposes of the payment trigger. Under the terms of the Global Security, absent "bad faith, willful misconduct or manifest error," the Ministry's calculation controls. Tellingly, even though Aurelius's theory of liability rests on its claim that the Ministry of Economy's calculations were wrong (Compl. ¶¶ 5, 37-38), the Complaint does not even acknowledge the existence of the "binding effect" clause, much less claim any of the "bad faith" exceptions to that clause.

"It is a well-established rule in this Circuit that the interpretation of Indenture provisions is a matter of basic contract law." *Bank of Am. Nat'l Ass'n* v. *AIG Fin. Prods. Corp.*, 509 F. App'x 24, 26 (2d Cir. 2013). While recognizing that contractual provisions (like those in the Global Security) providing that one of the parties to the contract will be responsible for calculating amounts due under a contract "cede[] an extraordinary amount of discretion and control" to the calculating party, courts routinely enforce such provisions. *Toledo Fund, LLC* v. *HSBC Bank USA, Nat'l Ass'n*, 2012 WL 2850997, at *7 (S.D.N.Y. July 9, 2012) (Forrest, J.) (defendant with "sole discretion" of "critical determinations" under a contract did not breach its contractual obligations where defendant "did not act arbitrarily or irrationally in exercising that discretion and control").

For example, in *Structured Credit Partners, LLC* v. *PaineWebber Inc.*, the parties entered into a contract in which they agreed to split arbitrage profits "attributable" to the sale of

securities according to an agreed-upon formula.  No. 602112/2001, slip op. at *2-4 (N.Y. Sup.

Ct. July 2, 2002) (Ex. 33).  Plaintiff alleged that the defendant, PaineWebber, decided to keep

certain securities for its own account by transferring a portion of them "from the trading desk

managing the [at-issue] transaction to the trading desk managing another [transaction]," thereby

"account[ing] for the profits" in such a way as to reduce plaintiff's expected profit by 75%.  (*Id.*

at 4.)  In dismissing plaintiff's claim, Justice Ramos relied on the parties' agreement to "extend[]

broad discretion to PaineWebber, absent 'manifest error,' to calculate the arbitrage profit."  (*Id.*

at 6-7.)  The First Department affirmed "in view of the provisions in the parties' agreements that

defendant's . . . calculations 'shall be binding and final absent manifest error' and that defendant

would not be liable to plaintiff absent willful misconduct, bad faith or gross negligence."  760

N.Y.S.2d 316, 316 (1st Dep't 2003).

Similarly, in *Rogers Revocable Trust* v. *Bank of America, N.A.*, plaintiff brought a

breach of contract claim against Bank of America in connection with a "collar transaction,"

pursuant to which (i) plaintiff was protected from share price decreases with a "put" option at a

certain strike price ($32.8 per share), and (ii) BofA could benefit from share price increases with

a "call" option at a higher price ($75.9 per share).  2008 N.Y. Misc. LEXIS 7471 (N.Y. Sup. Ct.

Nov. 13, 2008), *aff'd*, 881 N.Y.S.2d 298 (1st Dep't 2009).  After a merger involving the shares at

issue, BofA adjusted the "call price" to $58.4 per share—an adjustment that "clearly and

significantly benefitted BofA."  *Id.* at *5-6.  Plaintiff claimed that BofA "did not have the

authority" to make the adjustment, but Justice Cahn rejected plaintiff's challenge in light of the

contract's provision that allowed BofA—as the "Calculation Agent"—to do so in its "sole

discretion" provided that its calculations were not "manifest error" or made "in bad faith."  *Id.* at

*7, 12.  Plaintiff "failed to establish that BofA's adjustment was a manifest error, negating its sole discretion."  *Id.* at *13-14.  The First Department again affirmed.  881 N.Y.S.2d at 298.[9]

Like the contracts in these "calculation agent" cases, the Global Security specifies that the Ministry of Economy is to make the payment calculations and that its calculations control unless Plaintiff shows that the calculations were made in "bad faith" or were the product of "willful misconduct or manifest error."  (Compl. Ex. B (2005 Global Security), § 1(e), at R-3-4.)  Fatally, Aurelius makes no effort to plead that any of these exceptions apply.

None of these phrases—"bad faith," "willful misconduct," or "manifest error"—even appear in the Complaint.  As was contemplated when the GDP-linked Securities were issued, those exceptions set a high bar to any challenge to the Ministry's calculations.  New York law, which governs here (*see* Compl. Ex. B (2005 Global Security), § 16 at R-14), makes clear that Aurelius must plead "dishonest purpose," "reckless disregard for the rights of others," or a "palpable and incontrovertible error" to defeat the Ministry's calculations:

- **Bad faith**—"New York law makes plain that bad faith requires a dishonest purpose." *Cifarelli* v. *Vill. of Babylon*, 93 F.3d 47, 52 (2d Cir. 1996) ("In breach of contract context, 'bad faith requires an extraordinary showing of a disingenuous or dishonest failure to carry out a contract.'"); *Versatile Housewares & Gardening Sys., Inc.* v. *Thill Logistics, Inc.*, 819 F. Supp. 2d 230, 246 (S.D.N.Y. 2011) (Karas, J.) ("Bad faith 'is not simply bad judgment or negligence, but rather it implies the conscious doing

---

[9]     *See also VCG Special Opportunities Master Fund Ltd.* v. *Citibank, N.A.*, 594 F. Supp. 2d 334, 344 (S.D.N.Y. 2008) (Jones, J.) (dismissing breach of implied covenant of good faith and fair dealing claim where plaintiff did not "adduce specific facts of arbitrary or irrational conduct relating to [defendant's] position as Calculation Agent"), *aff'd*, 355 F. App'x 507 (2d Cir. 2009); *World Wide Polymers, Inc.* v. *Shinkong Synthetic Fibers Corp.*, 2010 WL 3155176, at *12-14 (S.D.N.Y. July 30, 2010) (Preska, J.) (defendant did not breach contract by selling to a "protected customer" where "discretionary clause" granted defendant discretion to approve "protected customers").

of a wrong because of dishonest purpose or moral obliquity; it contemplates a state of mind affirmatively operating with furtive design or ill will.'").

- **Willful misconduct**—requires well-pleaded facts showing "conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing." *Taylor Precision Prods., Inc.* v. *Larimer Grp., Inc.*, 2018 WL 4278286, at *18 (S.D.N.Y. Mar. 26, 2018) (Carter, J.).

- **Manifest error**—is "[a]n error that is plain and indisputable."   Black's Law Dictionary (10th ed. 2014); *see Rogers*, 2008 N.Y. Misc. LEXIS, at *13 (manifest error "is 'something which is apparent by an examination . . . needing no evidence to make it more clear.  That which is open, palpable, and . . . incontrovertible'").   *See also Sempra Energy Trading Corp.* v. *BP Prods. N. Am., Inc.*, 860 N.Y.S.2d 71, 72-73 (1st Dep't 2008) (alleged error in inspector's report of fuel oil specifications not "manifest error" despite subsequent report showing oil had different specifications); *Chleck* v. *Gen. Elec. Co.*, 2004 WL 2375803, at *1 (S.D.N.Y. 2004) (Rakoff, J.) (if "disagreements over how certain accounting methods were applied" amounted to manifest error, "'final and binding' would in practice mean transient and litigable, and the contractual language and intent would be rendered nugatory").

Under Rule 12(b)(6), this Court must dismiss the Complaint if it does not plead "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007), including sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).  Because the Global Security provides that the Ministry of Economy's calculations "shall be binding" "absent bad faith, willful misconduct or manifest error," and Aurelius fails to plead that any of these exceptions apply, the Complaint must be dismissed for this reason alone.

**II.     IN ANY EVENT, AURELIUS'S ERRONEOUS CALCULATIONS OF ARGENTINA'S GDP ARE CONTRARY TO THE GLOBAL SECURITY'S TERMS AND ECONOMIC COMMON SENSE.**

The Court can also dismiss the Complaint for the additional reason that Aurelius's proposed real GDP calculations are themselves manifestly erroneous and contrary to the Global Security's terms.

As described above (*supra* pp. 7-8), the governing documents have two separate triggers before the Ministry of Economy may authorize any Payment Amount under the GDP-linked Securities:  (i) a "Base Case GDP" trigger (expressed in "1993 pesos") and (ii) a "Base Case GDP Growth" trigger (expressed as a percentage, which is at least 3% for each Reference Year).   INDEC's decision to change the year of base prices (from 1993 to 2004 constant prices) mandates re-calculating the Base Case GDP trigger using a formula prescribed in the governing documents.   (Compl. Ex. B (2005 Global Security), § 1(e) at R-3.)   Because INDEC discontinued calculating real GDP in constant 1993 prices (one of the inputs in the formula), Aurelius used a shortcut—the EMAE Index, which Aurelius claims "tracks and correlates to full-year Actual Real GDP measured in constant 1993 prices."  (*Id.* ¶ 25 n.3.)

Aurelius then goes further and claims that INDEC's discontinuation of the use of constant 1993 prices *also* requires changing the Base Case GDP *Growth* trigger from the 3.22% listed on page S-108 of the 2010 prospectus to a new fraction (which Aurelius calculates to be 1.263%).  (*Id.* ¶ 38.)  Aurelius makes this second adjustment even though the formula that it uses to adjust changes in a base year—the ratio of real GDP in constant 2004 prices over real GDP in constant 1993 prices—does not appear in the definition of the critical measure of Base Case GDP *Growth*.  Instead, Aurelius's preferred formula appears only in the definition of Base Case GDP.  (*Id.* Ex. B (2005 Global Security), § 1(e) at R-3.)

There are three fundamental problems with Aurelius's method of calculation:

*First*, the Global Security mandates calculations based on "the *gross domestic product* of Argentina . . . *as published by INDEC*." (Compl. Ex. B (2005 Global Security), § 1(e) at R-2 (emphasis added).) The EMAE figures Aurelius uses are not even GDP figures, but rather, as the name indicates, an index. For example, the Complaint reports that in 2012, the Republic's real GDP (as published by INDEC) was 468 billion pesos, while the EMAE Index was simply "198.0." (Compl. Ex. F.) Aurelius's calculations are thus directly contrary to the terms of the Global Security.

*Second*, Aurelius's reliance on the EMAE Index does not reflect the economic reality of the commercial deal when the GDP-linked Securities were issued. Aurelius's proposed "base case" real GDP growth rate trigger of merely 1.263% (Compl. ¶ 38) is less than half of the 3.22% base case growth rate for 2013 specified in the Global Security. (*See* Ex. 9 (2010 Prospectus) at S-108; Compl. Ex. B (2005 Global Security), § 1(e) at R-3 (base case GDP for 2013 (372,753,730,000 pesos) is 3.22% greater than 2012 (361,124,970,000 pesos)).) Aurelius's 1.263% GDP rate growth trigger also does not come close to the healthy 3% growth rate reflected in, among other things, the governing documents and the Republic's SEC filing preceding the exchange offer. (*See supra* pp. 7-8.) The Complaint makes no effort to explain how this anemic 1.263% GDP growth rate makes any economic sense for "sweetener" securities that were intended to require payment only when the Republic's economy was strong enough to make those payments.

*Third*, Aurelius's rationale for using the EMAE Index—that that index has historically tracked changes in the Republic's GDP—is demonstrably circular. The EMAE Index reflects only a monthly *estimate* of economic activity. As the official description of the Index states, the EMAE is intended to reflect a "very provisional *forecast* of the quarterly GDP,"

and as such, "the objective is [to identify] a pattern of the behavior of actual economic activity for a period shorter than the quarterly GDP at constant prices."  (Ex. 34 (INDEC, *Sistema de Cuentas Nacionales Argentinas: Año Base 1993*) at 1 (emphasis added).)  This figure is "developed from *partial and very provisional information* and even using some sources different from those used in the estimation of the quarterly GDP," and the official description cautions that "differences between the variations of both indicators will be likely observed."  (*Id.*)

Because the EMAE Index is comprised of only "very provisional" numbers, INDEC subsequently "adjust[s]" those numbers "*to the result* yielded by the quarterly GDP," and adjusts the EMAE Index *again* at the end of the year based on full-year GDP.  (*Id.* at 12 (emphasis added); *see also* Ex. 35 (INDEC, *Cuentas Nacionales: Metodología de Estimación*) at 94 ("All estimates may be revised during [a given year].").)  As a result of these retroactive adjustments, percentage changes in the full-year EMAE Index have historically "track[ed] and correlate[d]" to percentage changes in the Republic's published real GDP figures.  But because INDEC calculated the 2013 real GDP data in 2004 constant prices—as Aurelius concedes (Compl. ¶ 25 n.3)—INDEC did not make the year-end adjustment to the 2013 EMAE Index that relied on constant 1993 prices.  That means the numbers Aurelius relies on were still "partial and very provisional."  (Ex. 34 (INDEC, *Sistema de Cuentas Nacionales Argentinas: Año Base 1993*) at 1.)  Thus, Aurelius cannot save its legally flawed Complaint by pointing to its alternative calculations, which are themselves manifestly erroneous and contrary to the Global Security's terms.

**CONCLUSION**

Argentina requests that the Court dismiss the Complaint with prejudice.[10]

Respectfully submitted,

/s/ Robert J. Giuffra, Jr.
Robert J. Giuffra, Jr.
Sergio J. Galvis
Joseph E. Neuhaus
Thomas C. White

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:     (212) 558-4000
Facsimile:      (212) 558-3588

*Counsel for The Republic of Argentina*

Dated:  April 18, 2019

---

[10]     Leave to amend should be denied because further amendment would be futile.  *Mortimer Off Shore Servs.* v. *Fed. Republic of Germany*, 615 F.3d 97, 114 (2d Cir. 2010) ("One good reason to deny leave to amend is when such leave would be futile.").