UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                       :

AURELIUS CAPITAL MASTER, LTD.,      :

                                       :

                Plaintiff,      :

                                       :        No. 19 Civ. 351 (LAP)

        - against -             :

                                       :

THE REPUBLIC OF ARGENTINA,        :

                                       :

                Defendant.     :

                                       :

---------------------------------------------------------------x

 

**PLAINTIFF AURELIUS CAPITAL MASTER, LTD.'S
MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS**

 

FRIEDMAN KAPLAN SEILER &
  ADELMAN LLP

Edward A. Friedman
Daniel B. Rapport
Michael S. Palmieri
7 Times Square
New York, NY  10036-6516
(212) 833-1100

June 3, 2019                *Attorneys for Plaintiff
Aurelius Capital Master, Ltd.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITES ................................................................................................... ii

PRELIMINARY STATEMENT ......................................................................................... 1

ALLEGATIONS OF THE COMPLAINT ......................................................................... 3

      The Payment Amount for Reference Year 2013 Was Positive ................................. 4

      All the Conditions for Payment in Section 2(b) of the
      Global Security Were Satisfied for Reference Year 2013 .................................... 7

ARGUMENT ...................................................................................................................... 7

I.     UNDER THE TERMS OF THE GLOBAL SECURITY, WHEN THE YEAR OF
       BASE PRICES HAS CHANGED, "BASE CASE GDP GROWTH" IS
       CALCULATED BASED ON ADJUSTED BASE CASE GDP FIGURES ...................... 7

      A.     Plaintiff's Calculation of "Base Case GDP Growth"
            Follows the Terms of the Global Security ............................................... 8

      B.     The Ministry's Determination of "Base Case GDP Growth"
            Is Not Binding and Is Contrary to the Terms of the Global Security ................... 11

      C.     Argentina's Argument that Base Case GDP Growth Based on
            Adjusted Base Case GDP Is "Anemic" and Not Reflective of the
            "Commercial Deal" Is Irrelevant and Incorrect ....................................... 15

II.    BECAUSE INDEC FAILED TO PUBLISH A NECESSARY INPUT TO
       ADJUST BASE CASE GDP, PLAINTIFF USED THE BEST AVAILABLE
       INDEC DATA ............................................................................................ 19

CONCLUSION ................................................................................................................. 21

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Allied Irish Banks, p.l.c v. Bank of Am., N.A.*,
    875 F. Supp. 2d 352 (S.D.N.Y. 2012)......................................................................8

*Chesapeake Energy Corp. v. Bank of New York Mellon Trust Co.*,
    773 F.3d 110 (2d Cir. 2014)...........................................................................10

*Cities Serv. Co., Inc. v. Derby & Co., Inc.*,
    654 F. Supp. 492 (S.D.N.Y. 1987) ..................................................................13

*Lear Siegler Aerospace Prods. Holding Corp. v. Smiths Indus., Inc.*,
    No. 88 Civ. 1528, 1990 WL 422417 (S.D.N.Y. Mar. 16, 1990) ...........................13

*Newman Myers Kreines Gross Harris, P.C. v. Great N. Ins. Co.*,
    17 F. Supp. 3d 323 (S.D.N.Y. 2014)................................................................10

*Rogers Revocable Trust v. Bank of Am., N.A.*,
    2008 N.Y. Misc. LEXIS 7471 (N.Y. Sup. Ct. Nov. 13, 2008) .............................14

*State v. R.J. Reynolds Tobacco Co.*,
    304 A.D.2d 379 (1st Dep't 2003) ...................................................................10

*Structured Credit Partners, LLC v. PaineWebber Inc.*,
    No. 602112/2001, slip op. (N.Y. Sup. Ct. July 2, 2002)......................................13

*Sunbelt Rentals, Inc. v. Charter Oak Fire Ins. Co.*,
    839 F. Supp. 2d 680 (S.D.N.Y. 2012)................................................................8

*USI Ins. Servs. LLC v. Miner*,
    801 F. Supp. 2d 175 (S.D.N.Y. 2011)...............................................................12

3445559.1

Plaintiff Aurelius Capital Master, Ltd. ("Plaintiff") respectfully submits this memorandum of law in opposition to the motion to dismiss filed by defendant the Republic of Argentina (the "Republic" or "Argentina").

## PRELIMINARY STATEMENT

This is a straightforward contract action to collect a payment due for 2013 under the clear contractual provisions of GDP Warrants issued by the Republic.  Using Argentina's own data and following the exact words of the contract, the complaint:  (1) calculates Base Case GDP and Base Case GDP Growth for 2013; (2) calculates Excess GDP and Payment Amount for 2013; and (3) shows that for 2013 Actual Real GDP exceeded Base Case GDP, and Actual Real GDP Growth exceeded Base Case GDP Growth.  These facts as alleged in the complaint establish that Argentina was required to make a payment on the GDP Warrants for 2013.

Argentina's motion sets forth three arguments for dismissal:  (1) the complaint misconstrues the definition of Base Case GDP Growth; (2) the complaint fails to allege that Argentina's calculation of Base Case GDP Growth for 2013 entails manifest error, bad faith or willful misconduct; and (3) the complaint relies on the wrong GDP figures to determine Actual Real GDP in 1993 prices for 2013, a necessary input to calculate an adjusted Base Case GDP figure required by the contract.  These three arguments require little scrutiny to fail.[1]

The first argument fails because Base Case GDP Growth is a defined term in the contract, and Argentina's supposed calculation is contrary to that definition.  The contract defines "Base Case GDP Growth" as "for any Reference Year [i.e., a calendar year], the percentage change in Base Case GDP for such Reference Year, as compared to Base Case GDP

---

[1] Plaintiff will not stoop to respond to Argentina's *ad hominem* attacks.  Argentina's resort to such irrelevancies manifests unease with the merits of its position and disrespect for the Court's responsibility to rule dispassionately.

for the immediately preceding Reference Year . . . ."  This definition uses the term "Base Case GDP," which the contract defines as a certain initial value for each Reference Year set forth in a table in the contract, subject to adjustment when the Year of Base Prices (i.e., the year of constant prices used to calculate real GDP) changes.  Here, the Year of Base Prices changed from 1993 to 2004, so the contract requires the adjustment to the Base Case GDP figures, and Base Case GDP Growth must be calculated based on the adjusted Base Case GDP figures.

Argentina does not dispute the existence or meaning of the adjustment provision in the definition of Base Case GDP.  Argentina's position is that Base Case GDP Growth for 2013 is "specified" to be 3.22%, i.e., a fixed figure for 2013 regardless of adjustments to the Base Case GDP figures required by virtue of a change in the Year of Base Prices.  According to Argentina, the contractually-mandated adjustment to Base Case GDP does not apply to Base Case GDP as used in the definition of Base Case GDP *Growth* because the adjustment language is not repeated therein.  This is nonsense.  There was no reason to repeat the adjustment language in the definition of Base Case GDP Growth because it was already incorporated by that definition's use of the defined term Base Case GDP.

As for its second argument, Argentina claims that its determination as to Base Case GDP Growth is binding absent manifest error, willful misconduct or bad faith, which the complaint supposedly does not allege.  But the contractual language Argentina relies upon appears only in the definitions of Excess GDP and Payment Amount, not Base Case GDP Growth.  And even if that language applied, it would not permit Argentina to deviate from the contractually-mandated formula for calculating Base Case GDP Growth, as it has done here by disregarding the contractually-prescribed adjustment to Base Case GDP.  Nor can Argentina take refuge in the extra-contractual documents cited in its motion, such as the prospectus for some of

the GDP Warrants.  None of these documents is a governing document for the GDP Warrants, so none of them could supersede the express terms of the contract even if (as is not the case) they were in conflict.

Finally, with respect to its third argument, Argentina admits that it did not publish full-year Actual Real GDP for 2013 in 1993 prices, although it published Actual Real GDP in 1993 prices for the first three quarters of 2013.  Under the circumstances, Argentina's failure to publish the full-year figure is of no consequence.  This is because, as explained in Plaintiff's complaint, full-year Actual Real GDP for 2013 in 1993 prices can in fact be determined from other GDP data Argentina published for 2013 that historically tracked Actual Real GDP in 1993 prices and incorporated the Actual Real GDP data in 1993 prices that Argentina had published for the first three quarters of 2013.

## ALLEGATIONS OF THE COMPLAINT

Argentina issued U.S. Dollar-Denominated GDP-Linked Securities governed by New York law (the "GDP Warrants") in 2005 and 2010 as part of exchange offers pursuant to which defaulted debt previously issued by Argentina was exchanged for new securities issued by Argentina.  (Compl. ¶¶ 1-2.)  In the exchange offers, holders of defaulted bonds received new bonds representing a steep "haircut" from the face amount (or interest coupon) of the bonds they were tendering, plus GDP Warrants providing for contingent additional payments of up to $8.1 billion based on the performance of the Argentine economy through 2035.  (*Id*. ¶¶ 2-3.)  The GDP Warrants were an important part of that bargain.  (*Id*. ¶ 3.)[2]  Even if the GDP Warrants

---

[2] Argentina inaccurately states that Plaintiff previously described the GDP Warrants as a mere "sweetener" having little value.  (Arg. Br. at 6.)  The brief cited by Argentina makes clear that Plaintiff was simply repeating the characterization in an amicus brief submitted in support of Argentina by the former head of its central bank.  Plaintiff went on in the same paragraph to say that GDP Warrants were "a large inducement to buyers" in the 2005 and 2010 exchanges.  *NML Capital, Ltd. v. Republic of Argentina*, No. 12-105, Dkt. 827538, at 48 (2d Cir. Jan. 25, 2013).

3

eventually pay the $8.1 billion maximum payout, the value of those payments would be less than the steep haircuts bondholders took in the 2005 and 2010 exchange offers.  (Compl. ¶ 3.)

The contractual documents for the GDP Warrants (the "Governing Documents") are enumerated in the complaint and include the Global Securities for the 2005 and 2010 GDP Warrants, which are substantially the same and referred to herein collectively as the "Global Security."  (*Id*. ¶¶ 14-15.)[3]  The Global Security specifies the calculations for determining the Payment Amount for any Reference Year.  If the Payment Amount is positive, it is due if three conditions specified in Section 2(b) of the Global Security are met.  For Reference Year 2013, the Payment Amount was positive and all three conditions were satisfied.  (*Id*. ¶¶ 16-19.)

**The Payment Amount for Reference Year 2013 Was Positive**

The Payment Amount is based upon GDP data published by the National Institute of Statistics and Censuses (known by its Spanish acronym, INDEC), the Argentine government agency officially responsible for publishing economic data for the country.  INDEC publishes data reflecting Actual Real GDP, which under the Global Security "means for any Reference Year the gross domestic product of Argentina for such Reference Year measured in constant prices for the Year of Base Prices, as published by INDEC."  (*Id*. ¶ 21; Exs. B & D at R-2.)

Year of Base Prices as defined in the Global Security "means the year 1993; *provided* that if the calendar year employed by INDEC for purposes of determining Actual Real

---

Indeed, in his amicus brief the former head of the central bank admitted that the GDP Warrants played a "critical role" in the exchange offers because they "reduced the losses for the bondholders that accepted the exchange."  *Id*. Dkt. 808522, at 4 (2d Cir. Jan. 4, 2013).

[3] Contrary to Argentina's assertion (*see* Arg. Br. at 7, n.4), the prospectuses for the exchange offers are *not* Governing Documents.  The Global Security specifically identifies the Governing Documents, and those do not include the prospectuses.  (Compl. Exs. B & D at 2 & R-1.)

GDP shall at any time be a calendar year other than the year 1993, then the Year of Base Prices shall mean such other calendar year." (*Id*. ¶ 22; Ex. B at R-5; Ex. D at R-4 (italics in original).)

The Global Security for the 2005 GDP Warrants defines Base Case GDP as follows:

"<u>Base Case GDP</u>" means, for any Reference Year, the amount set forth in the chart below for such year:

| Reference Year | Base Case GDP (in millions of constant 1993 pesos) | Reference Year | Base Case GDP (in millions of constant 1993 pesos) |
|---|---|---|---|
| 2005 | 287,012.52 | 2020 | 458,555.87 |
| 2006 | 297,211.54 | 2021 | 472,312.54 |
| 2007 | 307,369.47 | 2022 | 486,481.92 |
| 2008 | 317,520.47 | 2023 | 501,076.38 |
| 2009 | 327,968.83 | 2024 | 516,108.67 |
| 2010 | 338,675.94 | 2025 | 531,591.93 |
| 2011 | 349,720.39 | 2026 | 547,539.69 |
| 2012 | 361,124.97 | 2027 | 563,965.88 |
| 2013 | 372,753.73 | 2028 | 580,884.85 |
| 2014 | 384,033.32 | 2029 | 598,311.40 |
| 2015 | 395,554.32 | 2030 | 616,260.74 |
| 2016 | 407,420.95 | 2031 | 634,748.56 |
| 2017 | 419,643.58 | 2032 | 653,791.02 |
| 2018 | 432,232.88 | 2033 | 673,404.75 |
| 2019 | 445,199.87 | 2034 | 693,606.89 |

*provided* that, if the Year of Base Prices employed by INDEC for determining Actual Real GDP shall at any time be a calendar year other than the year 1993, then the Base Case GDP for each Reference Year shall be adjusted to reflect any such change in the Year of Base Prices by multiplying the Base Case GDP for such Reference Year (as set forth in chart above) by a fraction, the numerator of which shall be the Actual Real GDP for such Reference Year measured in constant prices of the Year of Base Prices, and the denominator of which shall be the Actual Real GDP for such Reference Year measured in constant 1993 prices.

(*Id*. Ex. B at R-2-3.)  The Global Security for the 2010 GDP Warrants has the same definition of Base Case GDP, except that the table starts with Reference Year 2009.  (*Id*. Ex. D at R-2.)

Because the Year of Base Prices was 1993 when Argentina issued the GDP Warrants, the initial Base Case GDP figures in the above table are measured using constant 1993 prices.  (*Id*. ¶ 22.)  The definition of Base Case GDP also provides that if INDEC changes the Year of Base Prices, then the figures in the table will be adjusted by a fraction, the numerator of which is Actual Real GDP using the *revised* Year of Base Prices, and the denominator of which is Actual Real GDP using the *original* Year of Base Prices (1993).  The adjustment ensures that the contractually-required comparison of Base Case GDP to Actual Real GDP, and Base Case GDP Growth to Actual Real GDP Growth, will be "apples to apples."  (*Id*. ¶¶ 22, 24.)

In early 2014, prior to the November 1, 2014 Calculation Date for Reference Year 2013, INDEC announced that it had changed the Year of Base Prices to 2004.  Thus, to determine whether a payment was due for 2013, the initial Base Case GDP figures for 2012 and 2013 needed to be adjusted by a prescribed fraction for each Reference Year:  Actual Real GDP in 2004 prices for that Reference Year in the numerator, and Actual Real GDP in 1993 prices for that Reference Year in the denominator.  (*Id*. ¶¶ 22, 24.)

INDEC published both of those figures for 2012.  With respect to 2013, INDEC published the figure for the numerator; it did not publish Actual Real GDP in 1993 prices for the full year, but it did do so for the first three quarters of 2013.  INDEC also published an index of economic activity based upon constant 1993 prices (the "EMAE Index") for the full year 2013.  The EMAE Index for 2013 incorporated the three quarters of Actual Real GDP data that INDEC had already published, and was a reliable figure from which Actual Real GDP could be derived.  INDEC had published the full-year EMAE Index every year from 1993 to 2012.  The full-year EMAE Index for all these years exactly tracks and correlates to full-year Actual Real GDP measured in constant 1993 prices.  Since the full-year 2013 EMAE Index based on constant 1993 prices was 4.914% greater than that of 2012, full-year 2013 Actual Real GDP in constant 1993 prices is 4.914% greater than that of 2012.  Thus, based upon data INDEC published, the complaint sets forth full-year Actual Real GDP for Reference Year 2013 measured in constant 1993 prices.  (*Id*. ¶ 25, n.3; Ex. E Rows 1-5; Ex. F.)

With the Actual Real GDP figures and the adjusted Base Case GDP figures, the Payment Amount for Reference Year 2013 can be calculated, and the complaint sets forth the steps in that calculation.  Not including pre-judgment interest of 9%, the Payment Amount for

2013 is roughly $1.3 billion for all outstanding GDP Warrants, and $61.2 million for the GDP

Warrants that are the subject of this action.  (*Id.* ¶¶ 26-31; Ex. E Rows 16-29.)

**All the Conditions for Payment in Section 2(b) of the**
**Global Security Were Satisfied for Reference Year 2013**

Section 2(b) of the Global Security provides that holders of the GDP Warrants are

only entitled to receive the Payment Amount if:  (i) Actual Real GDP was greater than Base Case

GDP; (ii) Actual Real GDP Growth was greater than Base Case GDP Growth; and (iii) the

aggregate payments from inception of the GDP Warrants do not exceed the Payment Cap.  For

Reference Year 2013, all three of these conditions were satisfied.  (*Id.* ¶ 32; Exs. B & D at R-5.)

As to the first condition, Actual Real GDP for 2013 (in constant 2004 prices)

exceeded Base Case GDP (adjusted as required by the definition of Base Case GDP).  (*Id.* ¶ 33.)

As to the second condition, Actual Real GDP Growth for 2013 (in constant 2004

prices) was 2.925% (*id.* ¶ 36)—a figure Argentina agrees with in its motion (Arg. Br. at 2, 10).

The complaint shows that Base Case GDP Growth for 2013, based upon the adjusted Base Case

GDP figures, is 1.263%.  (Compl. ¶ 38.)  Because Actual Real GDP Growth was greater than

Base Case GDP Growth, the second condition was satisfied.

As to the third condition, the Payment Amount for 2013 was well within the

remaining Payment Cap, satisfying the third condition.  (*Id.* ¶ 39.)

## ARGUMENT

### I.

### UNDER THE TERMS OF THE GLOBAL SECURITY, WHEN THE YEAR OF BASE PRICES HAS CHANGED, "BASE CASE GDP GROWTH" IS CALCULATED BASED ON ADJUSTED BASE CASE GDP FIGURES

Plaintiff's complaint sets forth the definition of "Base Case GDP Growth" and

explains how that figure should be calculated for Reference Year 2013 in accordance with the

terms of the Global Security, including using adjusted Base Case GDP figures as required by the definition of "Base Case GDP." (*Id.* ¶¶ 37-38.)  Argentina's motion does not explain how the definitions of "Base Case GDP Growth" or "Base Case GDP" support its view that Base Case GDP Growth for 2013 should be based on unadjusted Base Case GDP figures.  Instead, it advances contorted and legally unsupportable arguments lacking any basis in the text of the definitions.  Argentina also contends that the Ministry of Economy has the discretion to exercise its "judgment" as to how Base Case GDP Growth should be calculated and that Plaintiff's interpretation does not reflect the commercial deal behind the GDP Warrants.  No part of the Republic's argument is correct.

A.     **Plaintiff's Calculation of "Base Case GDP Growth"**
       **Follows the Terms of the Global Security**

The Global Security defines "Base Case GDP Growth" as "for any Reference Year, the percentage change in *Base Case GDP* for such Reference Year, as compared to *Base Case GDP* for the immediately preceding Reference Year . . . ." (*Id.* Exs. B and D at R-3 (emphases added).)  The Global Security also defines "Base Case GDP," which includes an adjustment when INDEC uses a Year of Base Prices other than 1993, as was the case as of the Calculation Date for Reference Year 2013.  (*Id.* Ex. B at R-2-3; Ex. D at R-2.)  Since the definition of "Base Case GDP Growth" uses the defined term "Base Case GDP," and since INDEC had changed the Year of Base Prices by the pertinent Calculation Date, Base Case GDP Growth for Reference Year 2013 must be calculated using Base Case GDP figures that have been adjusted as required by the definition of "Base Case GDP."  *See Allied Irish Banks, p.l.c v. Bank of Am., N.A.*, 875 F. Supp. 2d 352, 355, 357-58 (S.D.N.Y. 2012) (interpreting contract provision in light of other contractually-defined terms incorporated into provision); *Sunbelt Rentals, Inc. v. Charter Oak Fire Ins. Co.*, 839 F. Supp. 2d 680, 689-90 (S.D.N.Y. 2012) (same).

3445559.1

In accordance with the plain terms of the Global Security, the complaint alleges how the Base Case GDP figures for Reference Years 2012 and 2013 should be adjusted. (*Id*. ¶¶ 24-25, 38; Ex. E Rows 6-15.)[4]  Argentina agrees with Plaintiff that the adjustment needs to be made and how it should be calculated.[5]  Taking into account the adjusted Base Case GDP figures, the complaint alleges that Base Case GDP Growth for Reference Year 2013 is 1.263%, less than Actual Real GDP Growth of 2.925%, thus satisfying the second condition in Section 2(b) of the Global Security.  (Compl. ¶ 38; Ex. E Rows 32-33.)

Argentina's motion does not dispute the correctness of Plaintiff's arithmetic calculations.  Rather, Argentina disputes the use of *adjusted* Base Case GDP figures to calculate Base Case GDP Growth.  Argentina argues that *unadjusted* Base Case GDP figures should be used to calculate Base Case GDP Growth, even though Base Case GDP (according to its definition) must be adjusted.  In effect, Argentina contends that when "Base Case GDP" is used in the definition of "Base Case GDP Growth," a major portion of the definition of "Base Case GDP" should be ignored.

The only rationale offered by Argentina is that the definition of "Base Case GDP Growth" does not repeat the adjustment that appears in the definition of "Base Case GDP." (Arg. Br. at 12, 18.)  Of course, that repetition would have been purposeless because the

---

[4] When the Year of Base Prices changes, then "Base Case GDP for any given Reference Year will be adjusted by a ratio of two different measures of Actual Real GDP for that Reference Year—using the revised Year of Base Prices to determine the Actual Real GDP for the numerator, and using the original Year of Base Prices (1993) to determine it for the denominator." (*Id*. ¶ 24.)

[5] When the Year of Base Prices changes, "the definition of 'Base Case GDP' includes a proviso stating that Base Case GDP figures must be adjusted by a fraction, the numerator of which is real GDP in the new year of base prices (here, 2004) and the denominator of which is real GDP in the old year of base prices, 1993." (Arg. Br. at 12.)

adjustment is already baked into the definition of "Base Case GDP."  The whole point of defining terms in a contract is to allow them to be used throughout the document without having to repeat in each instance the verbiage contained in the definition.  Moreover, if it were necessary for one portion of the definition of "Base Case GDP" to be repeated as Argentina contends, why would it not also be necessary for the rest of the definition to be so repeated?

The defined term "Base Case GDP" is used not only in the definition of "Base Case GDP Growth," but also in the definition of "Nominal Base Case GDP" and the first condition in Section 2(b).  (Compl. Exs. B & D at R-3-5.)  Basic canons of contractual construction require that the same term be given the same meaning wherever used in a contract, particularly where that term is defined in the contract.  *Chesapeake Energy Corp. v. Bank of New York Mellon Trust Co.*, 773 F.3d 110, 116-17 (2d Cir. 2014) (rejecting interpretation that would cause term to have different meanings); *Newman Myers Kreines Gross Harris, P.C. v. Great N. Ins. Co.*, 17 F. Supp. 3d 323, 332 n.6 (S.D.N.Y. 2014) (term "should be construed to have a consistent meaning"); *State v. R.J. Reynolds Tobacco Co.*, 304 A.D.2d 379, 379-80 (1st Dep't 2003) (term should have "same meaning" throughout contract).

It makes no sense to contend, as Argentina does, that where the Year of Base Prices has changed, "Base Case GDP" should take the prescribed adjustment into account when the term is used in some provisions, but not in others.  For example, Argentina's motion does not dispute the complaint's assertion that adjusted Base Case GDP should be used in the calculation of Nominal Base Case GDP, which is ultimately incorporated into the calculation of the Payment Amount.  (Compl. ¶¶ 28-31.)  Indeed, if *unadjusted* Base Case GDP were used instead, the Payment Amount for Reference Year 2013 would be $3.1 billion—much worse for Argentina than the $1.3 billion alleged in the complaint.  Similarly, Argentina's motion does not dispute the

10

complaint's use of adjusted Base Case GDP for the threshold in the first condition of Section 2(b).  If *unadjusted* Base Case GDP were used instead, the threshold would have been far lower than the complaint asserts—making it much easier for that condition to be satisfied, hence much worse for Argentina.  (*Id*. Ex. E Rows 14-15, 30-31.)  Thus, Argentina evidently believes that the adjustment to Base Case GDP should be recognized when it favors the Republic and disregarded when it does not.

## B.    The Ministry's Determination of "Base Case GDP Growth" <u>Is Not Binding and Is Contrary to the Terms of the Global Security</u>

Argentina contends that the Ministry of Economy determined that Base Case GDP Growth for 2013 is 3.22%, the growth rate based upon unadjusted Base Case GDP figures. Argentina claims that Plaintiff is bound by this decision, even though there had been a change in the Year of Base Prices, because the Ministry of Economy was entitled to exercise its "judgment as to how to calculate GDP Growth."  (Arg. Br. at 14.)

To justify its contention, Argentina points to language in the definitions of "Excess GDP" and "Payment Amount" (*id*. at 8-9)—not a general provision applicable to calculations in respect of all the other defined terms in the Global Security.  Specifically, Argentina relies upon the language italicized below:

> "<u>Excess GDP</u>" means, for any Reference Year, the amount (expressed in billions of Argentine pesos), if any, by which Actual Nominal GDP for such Reference Year exceeds the Nominal Base Case GDP for such Reference Year.  *All calculations necessary to determine Excess GDP based on the information published by INDEC will be performed by the Ministry of Economy, and such calculations shall be binding on the Trustee, the Registrar, the trustee paying agent and each other trustee paying agent and all Holders of this Security, absent bad faith, willful misconduct or manifest error on the part of the Ministry of Economy and Production of the Republic.*

> "<u>Payment Amount</u>" means, for any Payment Date, an amount equal to (i) the Available Excess GDP (converted into U.S. dollars)

for the Reference Year corresponding to such Payment Date,
multiplied by (ii) the notional amount of this Security outstanding
as of such Payment Date; *provided* that, if for any Payment Date,
the Payment Amount determined in accordance with the foregoing
would, when added to all prior Payment Amounts paid by the
Republic hereunder, exceed the Payment Cap, the Payment
Amount for such Payment Date shall instead be an amount equal to
the Payment Cap *minus* the sum of all such prior Payment
Amounts. *The Payment Amount shall be determined by the
Ministry of Economy on the Calculation Date preceding the
relevant Payment Date.  All calculations made by the Ministry of
Economy hereunder shall be binding on the Trustee, the Registrar,
the trustee paying agent and each other trustee paying agent and
all Holders of this Security, absent bad faith, willful misconduct or
manifest error on the part of the Ministry of Economy.*

(Compl. Ex. B at R-3-4, italics added, except "*provided*" and "*minus*" italics in original; Ex. D at

R-3-4.)  The language Argentina relies upon appears nowhere else in the Global Security,

including most importantly, the definition of "Base Case GDP Growth."  Simply put, nothing in

the Global Security binds holders if the Ministry, as here, misinterprets the Base Case GDP

Growth definition in the Global Security.[6]

Even if the "binding" language in the definitions of Excess GDP and Payment

Amount could somehow be construed to apply to the calculation of Base Case GDP Growth, it

would not help Argentina.  Whatever deference that language grants cannot extend to

interpreting the contract itself.  Argentina is expected to make calculations in accordance with

the formulae prescribed in the contract, not make up the formulae themselves.  In this case,

---

[6] To the extent the Republic suggests that the language in the definition of Payment Amount
should apply to all "GDP-related" calculations (Arg. Br. at 8), such an interpretation would make
the comparable language in the definition of Excess GDP surplusage.  *See USI Ins. Servs. LLC v.
Miner*, 801 F. Supp. 2d 175, 184 (S.D.N.Y. 2011).  The better read that gives meaning to all the
words in the Global Security is that the binding effect language in each definition applies to the
calculation that each definition vests in the Ministry—i.e., to calculate Excess GDP and Payment
Amount.  Moreover, if the intent were to grant the Ministry discretion with respect to all
calculations under the Global Security, one would normally expect a standalone provision to that
effect with language making clear that the provision applies throughout the contract.

Argentina has admitted that the formula it is using to calculate Base Case GDP Growth ignores the adjustment to Base Case GDP that is prescribed by the definition thereof (and indeed that Argentina itself acknowledges should be made when the Year of Base Prices changes).

In support of the Ministry's supposed "judgment" call to ignore the adjustment, Argentina contends that the Global Security "specifies" a Base Case GDP Growth rate of 3.22% for Reference Year 2013, regardless of changes in the Year of Base Prices.  (Arg. Br. at 2.)  The Global Security does no such thing.  Rather, the Global Security sets forth Base Case GDP figures in constant 1993 prices.  (Compl. Ex. B at R-2-3; Ex. D at R-2.)  Without a change in the Year of Base Prices, Base Case GDP Growth for 2013 would have been 3.22%.  That is simply a mathematical fact.  But the Global Security nowhere "specifies" what Base Case GDP Growth will be because the Base Case GDP numbers will change if the Year of Base Prices changes, and Base Case GDP Growth will change correspondingly.

New York law does not permit a party otherwise afforded discretion to make "binding" calculations to do so in a manner that contravenes the terms of the contract.  *See Lear Siegler Aerospace Prods. Holding Corp. v. Smiths Indus., Inc.*, No. 88 Civ. 1528, 1990 WL 422417, at *5 (S.D.N.Y. Mar. 16, 1990) ("[N]o proof of bad faith is necessary" where party "failed to follow the standards or procedures prescribed in the contract.").  *See also Cities Serv. Co., Inc. v. Derby & Co., Inc.*, 654 F. Supp. 492, 500-01 (S.D.N.Y. 1987) (same).  So too here, Argentina cannot claim any protection from the "binding" language in the Global Security (even assuming it applied to the calculation of Base Case GDP Growth) because the Ministry failed to follow the express language of the Global Security.

Argentina's reliance on *Structured Credit Partners, LLC v. PaineWebber Inc.*, No. 602112/2001, slip op. at *2-4 (N.Y. Sup. Ct. July 2, 2002) (Giuffra Decl. Ex. 33), and

13

*Rogers Revocable Trust v. Bank of Am., N.A.*, 2008 N.Y. Misc. LEXIS 7471 (N.Y. Sup. Ct. Nov. 13, 2008), is misplaced.  Both cases involved disputes over the interpretation and application of terms not defined in the contract, and in neither case was the defendant accused of having performed a calculation in contravention of an express contractual term.  Here, Plaintiff alleges that the Ministry has not followed the plain terms of the Global Security, and therefore its determination of Base Case GDP Growth is not binding.[7]

Finally, the Republic points to extra-contractual documents, but they do not support Argentina's position either.  (Arg. Br. at 7-8.)  None of them are Governing Documents.[8] And none of them contradict the plain language of the Global Security.  For example, the 2010 prospectus has a chart that sets forth Base Case GDP figures in constant 1993 prices, the same numbers that appear in the definition of Base Case GDP in the Global Security, set forth *supra* at p. 5.  The 2010 prospectus (but not the Global Security, nor the 2005 prospectus) also includes a column next to the Base Case GDP figures in constant 1993 prices labeled "Base Case Growth Rate (%)."  (Giuffra Decl. Ex. 9 at S-108.)  The extra column in the 2010 prospectus merely reflects the mathematical calculation of the percent change in the unadjusted Base Case GDP figures based on constant 1993 prices in the adjoining column.  Moreover, the 2010 prospectus

---

[7] To the extent that the Republic complains that the complaint does not use the words *en haec verba* "bad faith," "willful misconduct" and "manifest error," the Court should deny the motion to dismiss even if it finds that language is applicable to the calculation of Base Case GDP Growth.  The complaint provides notice of the facts—Argentina's dereliction from the express terms of the Global Security—that support the conclusion it breached the contract, all that is required under the Federal Rules of Civil Procedure.  If the Court believes it necessary that the complaint contain the words "bad faith," "willing misconduct" and "manifest error," Plaintiff respectfully requests the opportunity to file an amended complaint to that effect.

[8] Argentina points to three documents:  an 18-K/A filed with the SEC and a presentation to investors before the 2005 exchange offer, and the prospectus for the 2010 exchange offer.  None of these are Governing Documents for the GDP Warrants, (Compl. Exs. B & D at 2 & R-1), and Argentina does not even claim that the first two are Governing Documents (Arg. Br. at 7, n.4).

goes on to acknowledge that the Base Case GDP numbers will be adjusted in the event of a change in the Year of Base Prices.  (*Id.*)  Thus, the 2010 prospectus is consistent with and does not contradict the express terms of the Global Security and its requirement that adjusted Base Case GDP figures be used when the Year of Base Prices has changed.[9]

### C.    Argentina's Argument that Base Case GDP Growth Based on Adjusted Base Case GDP Is "Anemic" and Not Reflective of the "Commercial Deal" Is Irrelevant and Incorrect

Adhering to the terms of the Global Security, including its requirement to adjust Base Case GDP figures when the Year of Base Prices has changed, Plaintiff's complaint demonstrates that properly calculated Base Case GDP Growth for 2013 is 1.263%. (Compl. ¶ 38; Ex. E Row 33.)  Argentina argues that whereas 3% would be a "healthy" growth trigger, 1.263% is an "anemic" growth trigger that does not reflect the "economic reality of the commercial deal" underlying the GDP Warrants.  (Arg. Br. at 3, 19.)  Argentina's views as to what is healthy, anemic, or the commercial deal are irrelevant—the issue before the Court is the proper interpretation of the words of the Global Security as written—and incorrect.  It makes perfect commercial sense to calculate Base Case GDP Growth based upon adjusted Base Case GDP when the Year of Base Prices has changed.

Real GDP measures the value of goods and services produced in constant prices—i.e., eliminating the effects of inflation since the Year of Base Prices.  For like reason, the growth in real GDP also disregards the effects of inflation.  A change in the Year of Base Prices almost always causes real GDP and real GDP growth to be higher or lower than they

---

[9] As the Republic repeatedly acknowledged—in sections of the prospectuses that Argentina chose to exclude from the excerpts included in its motion papers—the prospectuses only "summarize" the terms of the GDP Warrants and refer investors to the Global Security and other Governing Documents for their complete terms.  (Friedman Decl. Ex. A at S-61 & Ex. B at S-103.)

would have been if the change had not occurred.  The underlying economic activity is unchanged; only the measure of it has changed.

   This principle is illustrated by the following example of a simplified economy consisting entirely of two goods.  Real GDP is measured two ways:  in constant 1993 prices (blue) and in constant 2004 prices (orange).

| Year | Good A | | Good B | | Constant 1993 Prices | | Constant 2004 Prices | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Units | Price | Units | Price | Real GDP (units x 1993 prices) | Real GDP Growth | Real GDP (units x 2004 prices) | Real GDP Growth |
| 1993 | 100 | $50.00 | 300 | $20.00 | $11,000 | | | |
| 1994 | 105 | $52.50 | 303 | $24.00 | $11,310 | 2.8% | | |
| 1995 | 110 | $55.13 | 306 | $28.80 | $11,633 | 2.9% | | |
| 1996 | 116 | $57.88 | 309 | $34.56 | $11,970 | 2.9% | | |
| 1997 | 122 | $60.78 | 312 | $41.47 | $12,321 | 2.9% | | |
| 1998 | 128 | $63.81 | 315 | $49.77 | $12,687 | 3.0% | | |
| 1999 | 134 | $67.00 | 318 | $59.72 | $13,070 | 3.0% | | |
| 2000 | 141 | $70.36 | 322 | $71.66 | $13,468 | 3.1% | | |
| 2001 | 148 | $73.87 | 325 | $86.00 | $13,884 | 3.1% | | |
| 2002 | 155 | $77.57 | 328 | $103.20 | $14,319 | 3.1% | | |
| 2003 | 163 | $81.44 | 331 | $123.83 | $14,772 | 3.2% | | |
| 2004 | 171 | $85.52 | 335 | $148.60 | $15,246 | 3.2% | $64,363 | |
| 2005 | 180 | $89.79 | 338 | $178.32 | $15,740 | 3.2% | $65,592 | 1.9% |
| 2006 | 189 | $94.28 | 341 | $213.99 | $16,257 | 3.3% | $66,862 | 1.9% |
| 2007 | 198 | $99.00 | 345 | $256.78 | $16,797 | 3.3% | $68,176 | 2.0% |
| 2008 | 208 | $103.95 | 348 | $308.14 | $17,360 | 3.4% | $69,535 | 2.0% |
| 2009 | 218 | $109.14 | 352 | $369.77 | $17,950 | 3.4% | $70,941 | 2.0% |
| 2010 | 229 | $114.60 | 355 | $443.72 | $18,566 | 3.4% | $72,398 | 2.1% |
| 2011 | 241 | $120.33 | 359 | $532.47 | $19,210 | 3.5% | $73,906 | 2.1% |
| 2012 | 253 | $126.35 | 362 | $638.96 | $19,883 | 3.5% | $75,468 | 2.1% |
| 2013 | 265 | $132.66 | 366 | $766.75 | $20,588 | 3.5% | $77,087 | 2.1% |

In this example, the quantity of goods sold and the nominal (i.e., not adjusted for inflation) prices charged are the same regardless of whether real GDP is measured in constant 1993 prices or constant 2004 prices.  Nonetheless, the change from constant 1993 prices to constant 2004 prices greatly *increases* real GDP and greatly *decreases* real GDP growth.  For example, real GDP for 2013 was $20,588 if measured in constant 1993 prices, but increased to $77,087 if measured in

16

constant 2004 prices; and real GDP growth for 2013 was 3.5% if measured in constant 1993 prices, but decreased to 2.1% if measured in constant 2004 prices.[10]

When INDEC in fact switched the Year of Base Prices, Actual Real GDP for 2013 almost doubled (from 491.3 billion pesos measured in constant 1993 prices to 869.5 billion pesos measured in constant 2004 prices); and Actual Real GDP Growth for 2013 fell by roughly half (from 4.914% measured in constant 1993 prices to 2.925% measured in constant 2004 prices). (Compl. ¶¶ 25, n.3, 36; Ex. E. Rows 3, 11, 12, 32.) Of course, Argentina's economic activity did not suddenly double, and its annual growth rate did not suddenly drop in half. However, the "measuring rod" changed.

Under the terms of the GDP Warrants, Actual Real GDP and Actual Real GDP Growth are compared to their corresponding "base case" values (Base Case GDP and Base Case GDP Growth) in order to determine whether and in what amount a payment should be made on the GDP Warrants. (*Id*. ¶¶ 32-34; Exs. B & D at R-5.) When Argentina issued the GDP Warrants, the Year of Base Prices was 1993 and thus, the "measuring rod" was constant 1993 prices. The initial values for Base Case GDP (and Base Case GDP Growth based on those initial values), measured in constant 1993 prices, were premised on the assumption that Actual Real GDP and Actual Real GDP Growth would also be measured in constant 1993 prices. Since that assumption was unlikely to hold for the full life of the GDP Warrants, the definition of Base Case GDP explicitly prescribed the formulaic adjustments to those initial values that would be made following a change in the Year of Base Prices when the "measuring rod" changed.

---

[10] The table above is not intended to suggest that a change in the Year of Base Prices will always increase real GDP and decrease real GDP growth (although that is what occurred in the case now before the Court). The point is rather that a change in the Year of Base Prices can (and almost always does) change these figures even though the underlying economic activity remains the same.

The adjustment ensures that the comparison of Actual Real GDP to Base Case GDP, and Actual Real GDP Growth to Base Case GDP Growth, is "apples to apples." As long as the Year of Base Prices remained 1993, the contract required that Actual Real GDP be compared to unadjusted Base Case GDP (both measured in constant 1993 prices), and Actual Real GDP Growth be compared to Base Case GDP Growth based on unadjusted Base Case GDP (again, both measured in constant 1993 prices). When Argentina announced that the Year of Base Prices had changed to 2004, the contract required for subsequent Calculation Dates that Actual Real GDP in 2004 prices be compared to Base Case GDP adjusted to reflect the new Year of Base Prices; and Actual Real GDP Growth in 2004 prices be compared to Base Case GDP Growth based upon adjusted Base Case GDP reflecting the new Year of Base Prices.[11]

Argentina's view—Actual Real GDP measured in 2004 prices should be compared to *adjusted* Base Case GDP, but Actual Real GDP Growth measured in 2004 prices should be compared with *unadjusted* Base Case GDP Growth measured in 1993 prices—is (in addition to being contradicted by the plain language of the contract) internally inconsistent and commercially senseless. It would mean that the comparison between actual and base case figures is no longer "apples to apples," but rather "apples to oranges."

The actual experience for Reference Year 2013 demonstrates why it makes commercial sense to carry the Base Case GDP adjustment through to Base Case GDP Growth— because the adjustment to Base Case GDP helps maintain the relationship between Actual Real

---

[11] For the same reason, Actual Real GDP Growth is calculated by comparing Actual Real GDP for the current and prior Reference Years both measured in constant prices for the new Year of Base Prices. (*Id.* Exs. B & D at R-2.) If Actual Real GDP Growth were calculated by comparing Actual Real GDP for the current Reference Year measured in constant prices for the *new* Year of Base Prices to Actual Real GDP for the prior Reference Year measured in constant prices for the *old* Year of Base Prices, it would be an "apples to oranges" comparison.

GDP Growth and Base Case GDP Growth.  If the Year of Base Prices had remained 1993, then Actual Real GDP Growth would have exceeded Base Case GDP Growth (4.914% v. 3.22%), just as it did when the Year of Base Prices changed to 2004 (2.925% v. 1.263%).  The adjustment to Base Case GDP means that the Base Case GDP Growth threshold for 2013 correspondingly decreases as Actual Real GDP Growth decreases with the change from constant 1993 prices to constant 2004 prices.

In short, the original deal behind the GDP Warrants was based on the relationship between Actual and Base Case GDP and between Actual and Base Case GDP Growth, as measured in constant 1993 prices, subject to adjustment where there has been a change in the Year of Base Prices.  Using adjusted Base Case GDP figures to determine Base Case GDP Growth is essential to maintaining that relationship when the Year of Base Prices changes.

## II.

### BECAUSE INDEC FAILED TO PUBLISH A NECESSARY INPUT TO ADJUST BASE CASE GDP, PLAINTIFF USED THE BEST AVAILABLE INDEC DATA

Argentina does not dispute that, in order to make the calculations for Reference Year 2013, the Global Security requires that the Base Case GDP figures in the Global Security be multiplied by an adjustment factor, the numerator of which is Actual Real GDP in the new Year of Base Prices (2004), and the denominator of which is Actual Real GDP in the original Year of Base Prices (1993).  (Arg. Br. at 12, 18; Compl. ¶¶ 24-25; Ex. E Rows 11-15.)

Although INDEC published Actual Real GDP in constant 1993 prices for the first three quarters of 2013, Argentina admits that INDEC failed to publish a full-year figure for 2013 Actual Real GDP by the Calculation Date.  (Arg. Br. at 18.)  Plaintiff used the EMAE Index data (based on constant 1993 prices) to determine full-year Actual Real GDP for 2013 in constant 1993 prices because it was the best data published by INDEC (and available as of the Calculation

Date for 2013) for this purpose.  Indeed, from 1993 to 2012, the EMAE Index exactly tracked and correlated to full-year Actual Real GDP in constant 1993 prices.  (Compl. ¶ 25, n.3; Ex. F.)

Argentina criticizes Plaintiff's use of the EMAE Index because it is not Actual Real GDP data and because it is "provisional" when initially published.  (Arg. Br. at 19-20.) However, INDEC published Actual Real GDP for the first three quarters of 2013, so the EMAE Index data set forth in the complaint had been updated to conform to INDEC's published Actual Real GDP for three-fourths of 2013.  (Compl. ¶ 25, n.3.)  As for the fourth quarter, the EMAE Index is reliable because updates and revisions to the EMAE Index since the issuance of the GDP Warrants have usually been relatively small, and mostly upward.  Upward revisions would favor Plaintiff, and a downward revision of the magnitude necessary to change the outcome here would have been unprecedented.[12]  Of course, any debate or disagreement concerning the reliability of the EMAE Index is beyond the proper scope of a motion addressed to the face of the complaint.

Ultimately, the Republic had the power to ensure that INDEC continued to publish the Actual Real GDP data in constant 1993 prices required by the Global Security. Argentina cannot complain, unilaterally modify the terms of the Global Security, or seek relief from its contractual obligations because a part of its own government failed to perform as required by the contract.

---

[12] The EMAE Index data published by INDEC showed real GDP growth in the fourth quarter of 2013 of *positive* 2.701%.  To change the outcome here, i.e., for Actual Real GDP Growth to be less than Base Case GDP Growth, INDEC would have had to downwardly revise fourth quarter results to show a contraction of economic activity of at least *negative* 3.852%—an overall reduction of 6.553% from the figures available as of the Calculation Date.  Since the GDP Warrants were issued, INDEC has never (according to historical data published by INDEC) made a revision to the EMAE Index in constant 1993 prices of that magnitude.  In addition, the Global Security required that calculations for Reference Year 2013 be made as of the Calculation Date (November 1, 2014), so revisions subsequent to that date would be disregarded.

## CONCLUSION

For the foregoing reasons, Argentina's motion to dismiss should be denied.

Dated:   New York, New York
         June 3, 2019

Respectfully submitted,

FRIEDMAN KAPLAN SEILER &
  ADELMAN LLP

*Edward A. Friedman*

Edward A. Friedman
Daniel B. Rapport
Michael S. Palmieri
7 Times Square
New York, New York  10036-6516
(212) 833-1100

*Attorneys for Plaintiff*
*Aurelius Capital Master, Ltd.*

21