UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AURELIUS CAPITAL MASTER, LTD.,

                Plaintiff,

                v.

THE REPUBLIC OF ARGENTINA,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Case No.: 1:19-CV-00351 (LAP)

The Honorable Loretta A. Preska

**ORAL ARGUMENT REQUESTED**

## DEFENDANT THE REPUBLIC OF ARGENTINA'S REPLY
## IN SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT

Robert J. Giuffra, Jr.
Sergio J. Galvis
Joseph E. Neuhaus
Thomas C. White
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:   (212) 558-4000
Facsimile:   (212) 558-3588

*Counsel for The Republic of Argentina*

July 2, 2019

## TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ............................................................................................1

ARGUMENT .................................................................................................................3

I.    AURELIUS CANNOT ESCAPE THE BINDING EFFECT CLAUSE,
      WHICH REQUIRES DISMISSAL OF ITS COMPLAINT ..........................................3

II.   AURELIUS'S ALTERNATIVE GDP CALCULATIONS ARE
      ERRONEOUS AND VIOLATE THE GLOBAL SECURITY'S TERMS ..................6

CONCLUSION ..............................................................................................................10

# TABLE OF AUTHORITIES

*Page(s)*

## CASES

*Atlas Partners, LLC* v. *STMicroelectronics, Int'l N.V.*, 2015 WL 4940126
(S.D.N.Y. Aug. 10, 2015) ........................................................................................8

*Chleck* v. *Gen. Elec. Co.*, 2004 WL 2375803 (S.D.N.Y. Oct. 22, 2004) .......................................6

*Cities Service Co., Inc.* v. *Derby & Co., Inc.*, 654 F. Supp. 492 (S.D.N.Y. 1987).........................6

*Collins* v. *Harrison-Bode*, 303 F.3d 429 (2d Cir. 2002)................................................................7

*Deeper Life Christian Fellowship, Inc.* v. *Sobol*, 948 F.2d 79 (2d Cir. 1991) ..............................6

*In re Coudert Bros.*, 487 B.R. 375 (S.D.N.Y. 2013) ......................................................................8

*In re Tamoxifen Citrate Antitrust Litig.*, 466 F.3d 187 (2d Cir. 2006)..........................................10

*Lear Siegler Aerospace Prods. Holding Corp.* v. *Smiths Indus., Inc.*, 1990 WL
422417 (S.D.N.Y. Mar. 16, 1990) ..........................................................................6

*Marx* v. *Gen. Revenue Corp.*, 568 U.S. 371 (2013)........................................................................4

*Rogers Revocable Tr.* v. *Bank of Am., N.A.*, 2008 N.Y. Misc. LEXIS 7471 (N.Y.
Sup. Ct. Nov. 13, 2008) ........................................................................................5, 6

*Sharon Steel Corp.* v. *Chase Manhattan Bank*, 691 F.2d 1039 (2d Cir. 1982) .............................4

*Structured Credit Partners, LLC* v. *PaineWebber Inc.*, No. 602112/2001 (N.Y.
Sup. Ct. July 2, 2002)............................................................................................5, 6

## OTHER AUTHORITIES

Am. Bar Found., Commentaries on Model Indenture Provisions (1971).......................................4

Fed. R. Civ. P. 15.........................................................................................................................10

Restatement (Second) of Contracts § 202 (1981) .........................................................................8

## PRELIMINARY STATEMENT

Aurelius's Opposition confirms that its breach of contract claim—which turns entirely on its own, alternative calculations of amounts owed under Argentina's GDP-linked Securities—must fail in light of the Global Security's "binding effect" clause.  By its terms, this clause provides that "[*a*]*ll calculations* made by the Ministry of Economy *hereunder* shall be binding on . . . all Holders of this Security, *absent bad faith, willful misconduct or manifest error* on the part of the Ministry of the Economy."  (Compl. Ex. B § 1(e) at R-4 (emphasis added).)  This Court should dismiss the Complaint, because Aurelius, as it fatally concedes, does not even allege that any of the exceptions to the binding effect clause apply here (Opp. at 14 & n.7), let alone plead facts plausibly supporting its breach of contract claim.

To save its Complaint, Aurelius urges the Court to disregard the binding effect clause because the clause appears only in the definitions of "Payment Amount" and "Excess GDP"—as opposed to in a "standalone provision" giving the Ministry of Economy discretion over "all GDP-related calculations."  (Opp. at 12 & n.6.)  This Court should reject Aurelius's theory for two reasons.  *First*, the binding effect clause expressly applies to "[a]ll calculations" of the Payment Amount (Compl. Ex. B § 1(e) at R-4)—the provision authorizing payments under the Global Security.  *Second*, this clause governs "all calculations . . . hereunder," and the Trust Indenture clearly requires that references to "hereunder" mean to the Indenture "as a whole and not to any particular Article, Section or other subdivision."  (Compl. Ex. A, § 1.1 at 1.)  The Global Security is an exhibit to (and thus part of) the Indenture and explicitly incorporates its terms.  Therefore, the binding effect clause in the definition of Payment Amount makes clear that the Ministry of Economy has final say over "all calculations" under the Indenture.

This is a paradigmatic case showing why the parties included the binding effect clause in the Global Security.  Aurelius concedes that (i) the Global Security requires the use of

GDP data published by INDEC; and (ii) for 2013, INDEC discontinued calculating Actual Real GDP in 1993 prices.  (Opp. at 4, 6.)  Actual Real GDP in 1993 prices is one of the necessary components of the formula Aurelius uses for its preferred alternative GDP calculations.  Thus, even under Aurelius's theory, the exercise of judgment was required as to how to address the discontinuance of this "necessary input."  (Opp. at 19.)  The binding effect clause entrusts those judgments to the Ministry of Economy—and does not permit Aurelius or any of the other thousands of holders of Global Securities to "derive" their own calculation of the Republic's GDP.  Aurelius has no way around the controlling cases from the First Department sustaining similar exercises of judgment by "calculation agents" contractually entrusted with such discretion.  *See infra* pp. 5-6.

Seemingly recognizing its inability to get around New York law, which governs the Global Security (*see* Compl. ¶ 13), Aurelius devotes the bulk of its Opposition to defending its own alternative GDP calculations, which rest on an interpretation of the term "Base Case GDP Growth" that Aurelius claims is "mandated" by Global Security's "express terms."  (Opp. at 2-3.)  But Aurelius glosses over that INDEC's discontinuance of its calculation of Actual Real GDP in 1993 prices means that the Global Security's "express terms" cannot mandate Aurelius's method of calculation for 2013 and thereafter, leaving the binding effect clause to control here.

In any event, as shown below (*infra* pp. 7-10), Aurelius's interpretation misconstrues the Global Security by misreading the adjustment proviso, ignores the context for the Base Case GDP Growth payment trigger, and leads to economically irrational results that the parties clearly did not intend, including paying GDP-linked Securities holders even if Argentina achieved negative Base Case GDP Growth (*see* App'x A hereto).  Moreover, the EMAE Index—a monthly *estimate* of economic activity (Arg. Br. at 19) that Aurelius uses to "derive" its own

calculations—is contrary to the Global Security's terms, which mandate calculations based on "the *gross domestic product* of Argentina."  (Compl. Ex. B, § 1(e) at R-2 (emphasis added).)

## ARGUMENT

### I.   AURELIUS CANNOT ESCAPE THE BINDING EFFECT CLAUSE, WHICH REQUIRES DISMISSAL OF ITS COMPLAINT.

The binding effect clause is clear:  "*All calculations* made by the Ministry of Economy *hereunder* shall be binding on . . . all Holders of this Security, *absent bad faith, willful misconduct or manifest error* on the part of the Ministry of Economy."  (Compl. Ex. B, § 1(e) at R-4 (emphasis added).)  Aurelius concedes that its Complaint does not allege (or even "use the words") "bad faith," "willful misconduct," or "manifest error."  (Opp. at 14 n.7.)  This concession confirms why the Court should dismiss the Complaint.  (*See* Arg. Br. at 13-17.) Rather than pointing to well-pled allegations showing a basis to set aside the Ministry of Economy's judgment, Aurelius tries to evade the binding effect clause altogether through various unsupported theories.  None has merit.

Aurelius speculates that the "intent" of the Global Security was not "to grant the Ministry discretion with respect to all calculations under the Global Security," because the binding effect clause appears "only" in the definitions of "Excess GDP" and "Payment Amount" and not in its own "standalone provision."  (Opp. at 2, 11-12 & n.6.)  Relatedly, Aurelius claims that the binding effect clause would constitute "surplusage" in the definition of Excess GDP if the discretion conferred on the Ministry in the definition of Payment Amount "appl[ied] to all 'GDP-related' calculations."  (Opp. at 12 n.6.)  These arguments are wrong.

As a threshold matter, this entire dispute turns on whether a "Payment Amount" is due under the Global Security.  Aurelius's bottom-line contention is that "the *Payment Amount* was due December 15, 2014" (Compl. ¶ 19 (emphasis added)), and under its theory, Aurelius

calculates the Payment Amount it claims is due (*id.* ¶¶ 25-26, 31; Compl. Ex. E). Aurelius invokes the term "Payment Amount" 25 times in the Complaint. Accordingly, even if the Ministry of Economy's discretion were limited to "all calculations" giving rise to the Payment Amount, the binding effect clause controls here.

In any event, Aurelius's attempt to limit the scope of the Ministry of Economy's discretion is foreclosed by Section 1.1 of the Trust Indenture, which provides that "[t]he words 'herein,' 'hereof' and '*hereunder*' and other words of similar import refer to *this Indenture as a whole and not to any particular Article, Section or other subdivision*." (Compl. Ex. A, § 1.1 at 1 (emphasis added).) The Global Security, which is an exhibit to and part of the Trust Indenture, states that it is "governed by" the Trust Indenture and incorporates its terms. (Compl. Ex. B at 2; *id.* at § 1, R-1 (holders will "be bound by . . . all of the provisions of the Indenture")).) Thus, the binding effect clause in the definition of Payment Amount—which applies to "all calculations" the Ministry makes "hereunder"—makes the Ministry the final arbiter of *all* of the disputed calculations Aurelius challenges here.[1]

Aurelius's "surplusage" argument (Opp. at 12 n.6) also cannot be squared with Section 1.1 of the Indenture. As the Supreme Court has recognized, "redundancies . . . are not unusual events in drafting," *Marx* v. *Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013), as shown by other terms of the Global Security itself, *see, e.g.*, Compl. Ex. B, § 1(e), R-4, R-6 (requirement that payments under the GDP-linked Securities "not exceed the Payment Cap" included in the definitions of "Expiration Date" and "Payment Amount" as well as the conditions for payment).

---

[1] Section 1.1 of the Indenture is a "standardized boiler-plate provision[]." Am. Bar Found., Commentaries on Model Indenture Provisions 15 (1971). Such provisions must be strictly and uniformly interpreted to avoid "enduring uncertainties" and "impair[ing] the efficient working of capital markets." *Sharon Steel Corp.* v. *Chase Manhattan*, 691 F.2d 1039, 1048 (2d Cir. 1982).

Deference to the Ministry of Economy is particularly important because INDEC discontinued calculating GDP in constant 1993 prices (a data point that Aurelius refers to as a "necessary input").  (Opp. at 19; Arg. Br. at 18.)  In resolving that issue, the Ministry of Economy is not arbitrarily "interpreting the contract" (Opp. at 12), but exercising the discretion afforded it under the Global Security to make "[*a*]*ll* calculations" under the Global Security.

In a single sentence, Aurelius dismisses the cases upholding similar judgments made by other "calculation agents" under New York law.  *See Rogers Revocable Tr.* v. *Bank of Am., N.A.*, 2008 N.Y. Misc. LEXIS 7471 (N.Y. Sup. Ct. 2008), *aff'd*, 881 N.Y.S.2d 298 (1st Dep't 2009); *Structured Credit Partners* v. *PaineWebber*, No. 602112/2001 (N.Y. Sup. Ct. 2002) (Arg. Br. Ex. 33), *aff'd*, 760 N.Y.S.2d 316 (1st Dep't 2003).  (*See* Arg. Br. at 14-16.)  Aurelius claims that "[b]oth cases involved disputes over the interpretation and application of terms not defined in the contract, and in neither case was the defendant accused of having performed a calculation in contravention of an express contractual term."  (Opp. at 14.)  Not so.  The plaintiff in *Rogers*—represented by the same law firm representing Aurelius here—unsuccessfully made the very same arguments in seeking to overturn the calculation agent's decisions.

In *Rogers*, the plaintiff sued after Bank of America ("BoA") adjusted the "call price" under a derivative contract to increase the value to BoA by $8 million; the trial court sustained BoA's calculation under a binding effect clause essentially identical to the clause here, emphasizing that the binding effect clause gave BoA "the sole discretion and authority" to adjust the call price.  *See* 2008 N.Y. Misc. LEXIS 7471, at *9, *12.  On appeal, the *Rogers* plaintiff contended—as Aurelius now does—that the contract "constrain[ed] [BoA] to follow a specific 'recipe'" to calculate an adjustment, and urged reversal on the grounds that BoA did not have discretion to depart from the supposed terms of the contract or that it was "manifest error" to do

so. (Ex. 1 (Br. for Pl.-Appellant, *Rogers*) at 24-27 (citing the same cases Aurelius now cites in

its Opposition (at 13)). The First Department flatly rejected these arguments, because there was

no evidence of bad faith, and BoA's adjustment was not "manifest error." 881 N.Y.S.2d at 298

(citing *Structured Credit*, 760 N.Y.S.2d 316). *Rogers* and *Structured Credit* are controlling here.

*See Deeper Life Christian Fellowship, Inc.* v. *Sobol*, 948 F.2d 79, 84 (2d Cir. 1991) (Appellate

Division interpretation of New York law is binding absent contrary "persuasive data").[2]

## II.   AURELIUS'S ALTERNATIVE GDP CALCULATIONS ARE ERRONEOUS AND VIOLATE THE GLOBAL SECURITY'S TERMS.

The Court should also dismiss the Complaint because Aurelius's alternative

calculations are themselves erroneous and violate the Global Security's terms. Aurelius's

calculations presuppose that INDEC's decision to change the Year of Base Prices from 1993 to

2004 required re-calculating the *growth rate* payment trigger annually. According to Aurelius,

because the definition of "Base Case GDP Growth" uses the defined term "Base Case GDP," the

Global Security "mandate[s]" re-calculating the growth rate payment trigger, essentially writing

into the definition of the term "Base Case GDP Growth" the "proviso" underneath the table of

Base Case GDP figures on page R-3 of the Global Security. (Opp. at 2.) Aurelius then spends the

bulk of its brief justifying its alternative calculations under its theory. (*See* Opp. at 8-11, 15-20.)

---

[2]    To try to avoid this binding New York law, Aurelius cites inapposite cases. (*See* Opp. at 13.) *Lear Siegler* v. *Smiths Indus., Inc.*, 1990 WL 422417 (S.D.N.Y. Mar. 16, 1990) (Cannella, J.), did not involve a contract with a binding effect clause like the one at issue here (or in *Rogers*). *Cities Service Co., Inc.* v. *Derby & Co., Inc.* involved a contract that "specifie[d] test methods" that were to be used in a determination relating to the testing of crude oil, but which were not followed, 654 F. Supp. 492, 501 (S.D.N.Y. 1987) (Kram, J.), and has been questioned in any event for importing a "gross error" exception into a clause calling for a finding to be "conclusive and binding." *Chleck* v. *Gen. Elec. Co.*, 2004 WL 2375803, at *2 (S.D.N.Y. Oct. 22, 2004) (Rakoff, J.) (rejecting "*Cities Service* gloss on New York law").

In light of the binding effect clause, the Court need not resolve whether Aurelius's interpretation of Base Case GDP Growth is correct, but in any event Aurelius's interpretation is legally flawed:

*First*, Aurelius posits that whenever the parties used the term Base Case GDP, they intended to incorporate the "proviso" specifying how to adjust the Base Case GDP figures when INDEC changed the Year of Base Prices.  (*Id.* at 10.)  Aurelius fails to point out, however, that the *proviso itself* uses the defined term Base Case GDP to refer *only* to the Base Case GDP figures on the table above the proviso on the top of page R-3.[3]  Here, the correct reading of the Global Security is that, when the parties used the term Base Case GDP in the definition of Base Case GDP Growth, they were referring to the Base Case GDP figures appearing in the table *above* the proviso on page R-3 and did not intend to incorporate the proviso itself.  *See Collins* v. *Harrison-Bode*, 303 F.3d 429, 433 (2d Cir. 2002) (contract should not be interpreted "isolated from . . . context" when defined term is "used in a number of ways throughout the agreement").

*Second*, Aurelius's interpretation would mean that the Base Case GDP Growth trigger would be recalculated by a different factor each year, and the growth rate trigger could vary widely from year to year.  But a core economic assumption underlying the Global Security was that the Base Case GDP Growth "payment trigger" would be a specified, predictable rate that would always remain at or above 3%, as reflected in Argentina's SEC filings and other public statements made before the securities were offered, including the 2010 prospectus for the securities.  (Arg. Br. at 8.)  Tellingly, Aurelius's only response is that none of these SEC filings and public statements are "Governing Documents."  (Opp. at 14-15.)  But Aurelius misses the

---

[3]     The proviso states, in relevant part, that if there is a change in Year of Base Prices, "then the Base Case GDP for each Reference Year shall be adjusted to reflect any such change in the Year of Base Prices by multiplying the *Base Case GDP* for such Reference Year (as set forth in chart above) . . . ."  (Compl. Ex. B, § 1(e) at R-3 (emphasis added).)

point.   These undisputed and judicially noticeable facts show the context for the Global Security's terms.   This context must be considered (even in the absence of an ambiguity), because courts should interpret a contract in light of "the entire situation, as it appeared to the parties."   Restatement (Second) of Contracts § 202 cmt. b (1981); *accord In re Coudert Bros.*, 487 B.R. 375, 393 (S.D.N.Y. 2013) (Engelmayer, J.).

*Third*, Aurelius's "commercially unreasonable" interpretation is contrary to New York law.  *Atlas Partners* v. *STMicroelectronics*, 2015 WL 4940126, at *12 (S.D.N.Y. Aug. 10, 2015) (Marrero, J.).   The growth rate Aurelius calculates (1.263%) is inconsistent with the clear purpose of the trigger, which is to ensure the Republic is growing at a healthy rate before sweetener payments are made to holders of the Global Security.  (Arg. Br. at 7.)  By any stretch of the imagination, a growth rate of 1.263% is not healthy.   (*See* Ex. 2 (The Economist) (describing United States's 1.6% GDP growth as "paltry"); Ex. 3 (Bloomberg) ("Latin America's largest economy grew a paltry 1.1 percent in 2017 and in 2018.").)  Aurelius also presents a chart purporting to show for "a simplified economy" that, using its approach, a change in Base Year would be expected to result in changes to GDP Growth and, in its example, to consistently lower growth rates. (Opp. at 15-16.)  But in the real world, Aurelius's calculation would have resulted in wildly fluctuating Base Case GDP Growth for the period when GDP growth figures are available in both 1993 and 2004 prices, ranging from *negative* 3.6% to positive 4.2%:



*See* App'x A hereto.  No rational parties would have intended to pay out on the GDP Warrants when there was negative growth.

      *Fourth*, Aurelius's use of the EMAE Index to "derive" its alternative GDP calculations is contrary to the terms of the Global Security.  Aurelius concedes that, for 2013, INDEC discontinued calculating Actual Real GDP in constant 1993 prices, which was a "necessary input" for its calculations.  (*See* Opp. at 6, 19.)  Aurelius offers what it subjectively considers the "best available" proxy for real GDP.  (Opp. at 19-20.)  But the Global Security requires that the GDP calculations be based on "the gross domestic product of Argentina . . . as published by INDEC."  (Opp. at 4; Compl. Ex. B, § 1(e) at R-2.)  Because Aurelius did not rely on INDEC-published GDP figures to perform its alternative calculations (Opp. at 20), its preferred method of calculation violates the Global Security's terms.  Aurelius's only response, without pointing to any covenant in the governing documents, is that "the Republic had the power to ensure that INDEC continued to publish the Actual Real GDP data in constant 1993 prices."  (Opp. at 20.)  But the governing documents did not obligate the Republic to require INDEC to keep calculating Actual Real GDP in constant 1993 prices.  Indeed, the Global Security distinguishes between the Republic's and the Ministry of Economy's rights and responsibilities and INDEC's role in determining Actual Real GDP.  (*See* Compl. Ex. B, § 1(e) at R-4 (separately defining "INDEC" and "Ministry of Economy"); *see also id.* at R-3 ("All calculations necessary to determine Excess GDP based on the information published by INDEC will be performed by the Ministry of Economy."); Ex. 4 (INDEC, Statistical Good Practices Guiding the INDEC) (discussing the agency's "[p]rofessional independence").)

      *Finally*, Aurelius does not deny that the EMAE Index is based on "partial and very provisional information" (Arg. Br. at 20), but claims that it has a high degree of confidence

that any adjustments to track actual GDP in 2013 would have been small.  (Opp. at 20.)  Even if this were true, other investors might come up with some other proxy for 2013, and, in any case, INDEC discontinued calculating the EMAE Index in 1993 prices for subsequent years,[4] so Aurelius's "fix" for 2013 says nothing about how the lack of the "necessary input" should be addressed for future years.  This is not what the Global Security contemplates, and underscores why the Court should enforce the binding effect clause:  to ensure uniformity among holders, and not have each holder come up with its own calculations using what it considers to be the "best available" data.  (Opp. at 19.)[5]

## CONCLUSION

For the reasons set forth here and in the Motion to Dismiss, Argentina requests that the Court dismiss the Complaint with prejudice.

---

[4]      Ex. 5 (INDEC, Información de Archivo Cuentas Nacionales, EMAE – Serie Histórica).

[5]      In a footnote, Aurelius concedes that "the complaint does not use the words *en haec verba* 'bad faith,' 'willful misconduct' and 'manifest error,'" but requests leave to amend "if the Court believes it necessary."  (Opp. at 14 n.7.)  Aurelius's conditional, "informal[]" request is improper.  *In re Tamoxifen Citrate Antitrust Litig*., 466 F.3d 187, 220 (2d Cir. 2006) (upholding denial of leave to amend when plaintiffs' request "appeared in a footnote in the middle of their" opposition brief).  Indeed, the Republic's April 18 motion squarely presented Aurelius's failure to plead "bad faith, willful misconduct, or manifest error," but Aurelius chose not to amend when faced with that motion as contemplated by Rule 15.  *See* Fed. R. Civ. P. 15(a)(1)(B) ("A party may amend its pleading once as a matter of course within . . . 21 days after service of a motion under Rule 12(b).").  Finally, Aurelius proffers no basis to allege that any of the exceptions to the binding effect clause applies here, and thus amendment would be futile.  (Arg. Br. at 21 n.10.)

Respectfully submitted,

*/s/ Robert J. Giuffra, Jr.*
Robert J. Giuffra, Jr.
Sergio J. Galvis
Joseph E. Neuhaus
Thomas C. White

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:      (212) 558-4000
Facsimile:      (212) 558-3588

*Counsel for The Republic of Argentina*

Dated:  July 2, 2019