

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

AURELIUS CAPITAL MASTER, LTD.,

                  Plaintiff,

-against-

THE REPUBLIC OF ARGENTINA,

                  Defendant.

---

19 Civ. 351 (LAP)

OPINION & ORDER

LORETTA A. PRESKA, Senior United States District Judge:

Before the Court is Defendant Republic of Argentina's
("Defendant" or "the Republic") motion to dismiss Plaintiff
Aurelius Capital Master, Ltd.'s ("Plaintiff" or "Aurelius")
breach of contract suit related to various U.S. dollar tied,
GDP-linked securities issued by the Republic in 2005 and 2010.
Specifically, Aurelius's complaint alleges that the Republic
failed to make approximately $61 million in payments as required
by the terms of the relevant securities.  At the center of the
dispute is a Byzantine mathematical calculation set forth in the
documents governing the securities that determines whether the
Republic's payment obligations for a given year are triggered.
The parties fundamentally disagree as to how the core machinery
of that equation is meant to function under the terms of the
securities' controlling documents.

Stripped down to the studs, this is a dispute about
contractual interpretation.  This, of course, is "a question of

1

law . . . suitable for disposition on a motion to dismiss."
Medtech Prods. Inc. v. Ranir, LLC, 596 F. Supp.2d 778, 807
(S.D.N.Y. 2008)(citations omitted).  Here, the Republic has
argued that this case may be dismissed as a matter of law
because (1) the Republic's calculations relevant to determining
its payment obligations are "binding" upon Aurelius absent proof
of bad faith, willful misconduct, or manifest error and (2) data
relied upon by Aurelius in arguing that the payment obligation
was triggered is different from the data prescribed by the terms
of the securities' governing documents.

This Court "may dismiss a breach of contract claim only if the
terms of the contract are unambiguous."  Orchard Hill Master
Fund Ltd. V. SBA Commc'ns Corp., 830 F.3d 152, 156 (2d Cir.
2016).  Here, the relevant contractual terms clearly and plainly
indicate that the calculations material to Aurelius's breach of
contract claim must rely on enumerated economic metrics produced
by the Argentinian government.  Aurelius, however, has rested
its claim on data not contemplated by the plain terms of the
relevant contract and has argued for an interpretation of that
contract that allows use of alternate statistics.  Aurelius
could have bargained for a contract that required the use of the
specific metrics "or the closest equivalent," "or the stated
successor," but it did not.  Thus, Aurelius is stuck with the
enumerated metrics and, accordingly, the Republic of Argentina's

motion to dismiss is GRANTED.   However, that dismissal is without prejudice, and Plaintiff will be granted leave to amend its complaint.

I.   FACTUAL BACKGROUND

The facts below are drawn from Aurelius's complaint and, where necessary, from the parties' briefing on the instant motion. (See Complaint ("Compl."), dated January 14, 2019 [dkt. no. 1]); (see also Republic's Memorandum of Law in Support of Motion to Dismiss ("MTD"), dated April 18, 2019 [dkt. no. 17]); (see also Aurelius's Memorandum of Law in Opposition to Motion to Dismiss ("Opp."), dated June 3, 2019 [dkt. no. 18]); (see also Republic's Reply to Aurelius Opposition ("Reply"), dated July 2, 2019 [dkt. no. 21]).   Of course, the Court must accept as true all factual allegations in the complaint and must draw all reasonable inferences in favor of Plaintiff.   Marbi Corp. of New York v. Puhekker, 9 F. Supp.2d 425, 427 (S.D.N.Y. 1998).

a. The Argentinian Debt Crisis

The story of the Argentinian financial crisis is, to put it mildly, familiar to this Court.   Between 1993 and 2001, the net interest payments on the Republic's sovereign debt increased sharply, rising from approximately $2.9 billion (1.2 percent of GDP) to $10.2 billion (3.8 percent of GDP).   (MTD at 5). Due to the strain of its exploding debt load, the Republic announced a moratorium on its debt service payments in December 2001.   See

3

EM Ltd. v. Republic of Arg., 473 F.3d 463, 466 (2d Cir. 2007).
That default spurred seemingly endless rounds of litigation
relating to unpaid amounts on the distressed debt.  (See MTD at
5).

   In 2005 and 2010, the Republic launched voluntary debt
exchanges whereby owners of the country's defaulted debt could
exchange their non-performing bonds for new securities. (See
Compl. ¶ 2); (see also MTD at 5).  Because the new bonds issued
in the debt exchanges represented a "steep haircut" from the
face value of the bonds tendered by participants, (see Compl.
¶ 2), the Republic coupled the new bonds with GDP-linked
securities that provided for contingent additional payments to
bondholders--made yearly through 2035--based on the performance
of the Republic's economy.  (Id.).[1]   In essence, participants in
the 2005 and 2010 exchanges "bought in" to the Argentinian
economy; they "provided Argentina many billions of dollars in
debt relief in return for [] participation in the ensuing growth
of Argentina's economy."  Id.

      b. The Global Security

---

[1] Together, the securities issued in the 2005 and 2010 exchanges
shall be referred to as "the GDP-Linked Securities."  The
documents governing the GDP-Linked Securities are substantially
the same, and thus the two sets of securities can be dealt with
in tandem.

Holders of the GDP-Linked Securities do not automatically receive a cut of the Republic's economic output.  Instead, whether the Republic's payment obligations are (or are not) triggered in a given year is determined by a labyrinthine set of definitions and equations set forth in the securities' governing documents.  The governing documents for the GDP-Linked Securities include: (i) the June 5, 2005 Trust Indenture (see Compl. Ex. A); (ii) the 2005 Form of Registered Security (the "2005 Global Security") (see Compl. Ex. B); (iii) the April 30, 2010 First Supplemental Indenture (see Compl. Ex. C); and (iv) the 2010 Form of Registered Security (the "2010 Global Security") (see Compl. Ex. D).[2]

Some table setting is in order.  At the most basic level, the Global Security lays out methods for determining whether a payment is due "in respect of Argentina's economic performance in any given year," which the GDP-Linked Securities refer to as a "Reference Year."  (Compl. ¶ 4).  However, the deadline for

---

[2] The 2005 Global Security and 2010 Global Security contain the same material terms, so the Court will cite to one "Global Security" throughout this opinion for simplicity's sake.  For the same reason, the Court will cite to a singular "Indenture." Finally, the Court declines to consider the prospectuses attached to the Republic's motion to dismiss "governing documents."  (See MTD Exs. 8 & 9).  As Aurelius accurately points out in its opposition papers, the "Global Security specifically identifies the Governing Documents, and those do not include the prospectuses."  (See Opp. at 4 n.3 (citing Global Security at 2 & R-1)).

the Republic to make payment for a given Reference Year is
delayed by one year.  (Global Security § 1(e) at R-4) (defining
"Payment Date" as "for any Reference Year, the 15th of December
of the calendar year following such Reference Year.").  So, a
payment for Reference Year 2013 would come due on December 15,
2014, a payment for Reference Year 2014 would come due on
December 15, 2015, and so on.

The Global Security lays out two tests for determining
whether a payment is due for a given Reference Year.  First, the
Security requires that the "Payment Amount" for the relevant
Reference Year must be positive.  The Payment Amount is
determined by comparing various GDP figures for the Reference
Year to determine "Excess GDP," which is then subject to certain
further adjustments to arrive at the Payment Amount figure.
(See Compl. ¶ 17).  The parties do not dispute that the Payment
Amount for 2013 was positive, and so the Court will not saddle
readers of this opinion with the technical details of its
calculation.

The critical theater in this dispute is the second test.  That
test includes three subtests whereby a Payment Amount is only
due for a given year if (i) Actual Real GDP exceeds Base Case
GDP for the relevant Reference Year (the "GDP Subtest"); (ii)
Actual Real GDP Growth exceeds Base Case GDP Growth for the
Reference Year (the "GDP Growth Subtest"); and (iii) the total

payments made to date under the GDP-Linked Securities and the Payment Amount do not exceed a contractually-defined "Payment Cap." (Compl. ¶ 18). Only the GDP Subtest and the GDP Growth Subtest are at issue in this case. Explanations of the relevant terms follow.

The various calculations required to assess the Republic's economic performance against the GDP Subtest and the GDP Growth Subtest rely on multiple metrics. Most important among these metrics, at least for purposes of the present dispute, is the Republic's Actual Real Gross Domestic Product ("Actual Real GDP"). Actual Real GDP is a price-adjusted measure of the Republic's total economic output that "uses a set of 'constant' prices—prices from a 'base' year—to control for inflation in order to achieve comparability across different periods." (MTD at 11). Under the terms of the Global Security, that "base year," referred to by the Security as a "Year of Base Prices," is 1993. Importantly, the Global Security only allows Actual Real GDP figures that are calculated and published by the Republic's *Instituto Nacional de Estadistica y Censos* ("INDEC")—the Argentinian government agency officially responsible for publishing the country's economic data—to be used in the relevant calculations. (See Global Security § 1(e) at R-2 (Defining Actual Real GDP as "for any Reference Year, the gross domestic product of Argentina for such Reference Year measured

7

in constant prices for the Year of Base Prices, <u>as published by INDEC</u>.") (Emphasis added)).

Similarly, the GDP Subtest requires that the Republic's actual economic output exceed a "Base Case GDP." Base Case GDP functions as a contractually-defined benchmark against which the Republic's economic performance for a Reference Year can be measured. Base Case GDP is specifically listed for every Reference Year in a chart in the Global Security. (<u>See</u> Global Security § 1(e) at R-3) (Pictured below in Figure 1)).

Figure 1: Base Case GDP for Each Reference Year as Listed in Global Security

| Reference Year | Base Case GDP (in millions of constant 1993 pesos) | Reference Year | Base Case GDP (in millions of constant 1993 pesos) |
|---|---|---|---|
| 2005 | 287,012.52 | 2020 | 458,555.87 |
| 2006 | 297,211.54 | 2021 | 472,312.54 |
| 2007 | 307,369.47 | 2022 | 486,481.92 |
| 2008 | 317,520.47 | 2023 | 501,076.38 |
| 2009 | 327,968.83 | 2024 | 516,108.67 |
| 2010 | 338,675.94 | 2025 | 531,591.93 |
| 2011 | 349,720.39 | 2026 | 547,539.69 |
| 2012 | 361,124.97 | 2027 | 563,965.88 |
| 2013 | 372,753.73 | 2028 | 580,884.85 |
| 2014 | 384,033.32 | 2029 | 598,311.40 |
| 2015 | 395,554.32 | 2030 | 616,260.74 |
| 2016 | 407,420.95 | 2031 | 634,748.56 |
| 2017 | 419,643.58 | 2032 | 653,791.02 |
| 2018 | 432,232.88 | 2033 | 673,404.75 |
| 2019 | 445,199.87 | 2034 | 693,606.89 |

As with Actual Real GDP, the Base Case GDP figures in the Global Security are calculated using 1993 as the Year of Base Prices. (<u>Id</u>. § 1(e) at R-5). However, INDEC may in its discretion elect to change the Year of Base Prices, a process that is also known as "rebasing" the GDP calculations. (<u>See</u> MTD at 11). If that occurs, the Base Case GDP figures listed in the Global

8

Security must be adjusted using a fraction "the numerator of
which shall be the Actual Real GDP for such Reference Year
measured in constant prices of the [new] Year of Base Prices,
and the denominator of which shall be the Actual Real GDP for
such Reference Year measured in constant 1993 prices." (Global
Security § 1(e) at R-3) (hereinafter, the "Adjustment
Fraction").[3]

Before a Payment Amount is due, the GDP Growth Subtest
requires comparing Actual Real GDP <u>Growth</u> to Base Case GDP
<u>Growth</u>. <u>See</u> <u>supra</u> at 6.  The Global Security defines "Actual
Real GDP Growth" to mean "for any Reference Year, the percentage
change in Actual Real GDP for such Reference Year, as compared
to Actual Real GDP for the immediately preceding Reference
Year." (Global Security § 1(e) at R-2).  This is simple enough.
However, where INDEC has changed the Year of Base Prices for
calculating Actual Real GDP, the Global Security requires that
the new Year of Base Prices be applied to the Actual Real GDP
for the immediately preceding year.  (<u>Id</u>.).

---

[3] For example, to reconfigure the 2013 Base Case GDP figures to
reflect INDEC's switch to 2004 as the Year of Base Prices, <u>see</u>
<u>infra</u> at 10-11, the equation using the Adjustment Fraction would
look like this:

$$\left(\frac{2013 \text{ Actual Real GDP (2004 Prices)}}{2013 \text{ Actual Real GDP (1993 Prices)}}\right) x \ (2013 \text{ Base Case GDP (1993 Prices)})$$

The Global Security defines "Base Case GDP Growth" to mean "for any Reference Year, the percentage change in Base Case GDP for such Reference Year, as compared to Base Case GDP for the immediately preceding Reference Year." (Id. at R-3). Unlike the definition of Actual Real GDP Growth, the Global Security's definition of Base Case GDP Growth does not provide any specific instructions for adjusting the figure to reflect a change in the Year of Base Prices. Notably, however, the definition of Base Case GDP Growth employs the defined term Base Case GDP, which itself provides for the use of the Adjustment Fraction in the wake of such a change. (Id.).

c. The Complaint

On January 14, 2019, Aurelius filed its complaint, which alleges a solitary claim for breach of contract against the Republic. (See Compl. ¶¶ 40-43). Aurelius alleges that the Republic failed to deliver a payment for Reference Year 2013 even though all conditions for payment were met under the Global Security for that year. (See Id. ¶¶ 1-5). Aurelius has painstakingly detailed every step of the calculations justifying its claim in an exhibit to its complaint, (see Compl. Ex. E), which the Court will review here in broad strokes.

Critically, however, INDEC elected to rebase its GDP in 2014. (See Compl. ¶ 22). The Republic explains that "after an extensive three-year study," INDEC decided to "replace its

10

calculation of real GDP in constant 1993 prices and, effective
[for] 2013, would base it on constant 2004 prices." (MTD at
11). Moreover, after switching the Year of Base Prices from
1993 to 2004, INDEC "discontinued the calculation of the
Republic's real GDP in constant 1993 prices." (Id.). This
meant that the data required for calculating the Base Case GDP
Adjustment Fraction, i.e., the Republic's Actual Real GDP in
constant 1993 prices for the full-year 2013, would no longer be
available. See supra at n. 3.

Because INDEC had ceased publishing Actual Real GDP in
constant 1993 prices as of 2014, Aurelius had no way to
calculate the Adjustment Fraction needed to adjust properly Base
Case GDP. Id. Instead, Aurelius opted to use the so-called
EMAE Index--also published by INDEC--as a vehicle for
calculating the Republic's Actual Real GDP in constant 1993
prices. (See Compl. ¶ 25 n.3). The EMAE Index is "an index of
economic activity" which INDEC published for the full year 2013
and calculated using constant 1993 prices. According to
Aurelius, the EMAE Index "exactly tracks and correlates to full-
year Actual Real GDP measured in constant 1993 prices" from 1993
through 2012 and thus is a reliable replacement. (Id.). Based
on this, Aurelius concludes that "[s]ince the full-year 2013
EMAE Index based on constant 1993 prices was 4.914% greater than
2012, then full-year 2013 Actual Real GDP measured in constant

1993 prices is necessarily 4.914% greater than 2012." (Id.).
From there, Aurelius simply multiplied the Republic's full-year
2012 Actual Real GDP in constant 1993 prices--for which full-
year data was available--by 1.04914 to calculate the 2013 Actual
Real GDP in constant 1993 prices (pictured below in Figure 2).

Figure 2: Use of EMAE Index in Aurelius's Calculation of Actual Real GDP

| **EXHIBIT E** | | |
|---|---|---|
| *(For currency values, ARS billions unless otherwise indicated)* | | |
| **Actual Real GDP (constant 1993 prices) for Reference Year 2013** | | |
| 1   EMAE Index (constant 1993 prices) for Reference Year 2012 | | 198.0 |
| 2   EMAE Index (constant 1993 prices) for Reference Year 2013 | | 207.7 |
| 3   Growth Rate of EMAE Index (constant 1993 prices) from 2012 to 2013 | (Row 2 ÷ Row 1 ) - 1 | 4.914% |
| 4   Actual Real GDP (constant 1993 prices) for Reference Year 2012 | | ARS 468.3 |
| 5   Actual Real GDP (constant 1993 prices) for Reference Year 2013 | Row 4 × (Row 3 + 1) | ARS 491.3 |

Armed with its version of the Republic's 2013 Actual Real
GDP in constant 1993 prices, Aurelius calculated the Adjustment
Fraction and thus completed a comparison of Actual Real GDP and
Base Case GDP and of Actual Real GDP Growth and Base Case GDP
Growth.  With respect to the GDP Subtest, Aurelius asserts that
INDEC reported that 2013 Actual Real GDP in constant 2004 prices
was 869.5 billion Argentine Pesos (ARS), which exceeded the
adjusted Base Case GDP for 2013 of ARS 659.7 billion.  (See
Compl. ¶ 33).  As to the GDP Growth Subtest, Aurelius calculated

the Adjustment Fraction for Reference Years 2012 and 2013--
again, relying on the EMAE Index for 2013--to determine Base
Case GDP for those years, concluding that Base Case GDP was ARS
651.5 billion for 2012 and ARS 659.7 billion for 2013.  (See
Compl. ¶¶ 37-38); (see also infra Figure 3).  Thus, Aurelius
determined that Base Case GDP Growth for 2013 was 1.263 percent,
far outstripped by the Actual Real GDP Growth of 2.925 percent.
(See Compl. ¶ 38).

Figure 3: Aurelius's Calculations of Actual Real GDP and Base Case GDP for
Reference Years 2012 and 2013

| Base Case GDP for Reference Years 2012 and 2013, Adjusted for Change in Year of Base Prices | | |
|---|---|---|
| 6   Actual Real GDP (constant 2004 prices) for Reference Year 2012 | | ARS 844.8 |
| 7   Actual Real GDP (constant 1993 prices) for Reference Year 2012 | | ARS 468.3 |
| 8   Adjustment Fraction for Reference Year 2012 | Row 6 ÷ Row 7 | 1.80 |
| 9   Base Case GDP for Reference Year 2012, per Global Security | | ARS 361.1 |
| 10  Base Case GDP for Reference Year 2012, adjusted for change in year of Base Prices | Row 8 × Row 9 | ARS 651.5 |
| 11  Actual Real GDP (constant 2004 prices) for Reference Year 2013 | | ARS 869.5 |
| 12  Actual Real GDP (constant 1993 prices) for Reference Year 2013 | | ARS 491.3 |
| 13  Adjustment Fraction for Reference Year 2013 | Row 11 ÷ Row 12 | 1.77 |
| 14  Base Case GDP for Reference Year 2013, per Global Security | | ARS 372.8 |
| 15  Base Case GDP for Reference Year 2013, adjusted for change in Year of Base Prices | Row 13 × Row 14 | ARS 659.7 |

Finally, Aurelius determined that the Payment Amount for 2013
was well within the Payment Cap, ensuring that the second test's
third condition was satisfied and necessitating payment from the
Republic.

II.   LEGAL STANDARDS

"This is a straightforward contract action," (Opp. at 1),
lurking behind a curtain of complexity.  Under New York law,[4]
"[t]he initial interpretation of a contract is a matter of law
for the court to decide."  Wells Fargo Bank, Nat. Ass'n v.
Davidson Kempner Capital Mgmt. LLC, 32 F. Supp.3d 436, 443
(S.D.N.Y. 2014) (citations omitted).  As such, questions of
contractual interpretation are resolvable at the motion to
dismiss stage.  Medtech, 596 F. Supp.2d at 807.

On a Rule 12(b)(6) motion to dismiss, all factual
allegations in the complaint are accepted as true, and all
inferences are drawn in favor of the pleader.  Mills v. Polar
Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993). To survive a
Rule 12(b)(6) motion to dismiss, the complaint must contain
"sufficient factual matter, accepted as true, to 'state a claim
to relief that is plausible on its face.'"  Ashcroft v. Iqbal,
556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly,

---

[4] The Complaint notes that the Republic "agreed that the
Governing Documents shall be governed by, and construed in
accordance with, the laws of the State of New York without
regard to principles of conflicts of laws."  (Compl. ¶ 13).  The
plain terms of the Global Security state that New York law shall
apply in this action.  (See Global Security § 16). Moreover, "[a
choice of law] analysis is unnecessary because the parties'
briefs assume that New York law controls and such implied
consent . . . is sufficient to establish choice of law."
Benicorp Ins. Co. v. Nat'l Med. Health Card Sys., Inc., 447 F.
Supp.2d 329, 336-37 (S.D.N.Y. 2006) (citations omitted).  Thus,
the Court will apply New York law to this dispute.

550 U.S. 544, 555 (2007)).  A claim is facially plausible when
"the plaintiff pleads factual content that allows the court to
draw the reasonable inference that the defendant is liable for
the misconduct alleged." Id. (quoting Twombly, 550 U.S. at 556).
Put differently, the factual allegations must "possess enough
heft to show that the pleader is entitled to relief." Twombly,
550 U.S. at 557 (internal quotation marks omitted).

In evaluating a motion to dismiss a breach of contract claim
pursuant to Rule 12(b)(6), the Court should "strive to resolve
any contractual ambiguities in [the non-moving party's]
favor."   Gerdau Ameristeel US Inc. v. Ameron Intern. Corp.,
No., 2014 WL 3639176, at *3 (S.D.N.Y. July 22, 2014) (quoting
Int'l Audiotext Network, Inc. v. Am. Tel. and Tel. Co., 62 F.3d
69, 72 (2d Cir.1995)).  This, however, does not require that the
Court take the pleadings' construction of the relevant contract
as gospel.  See Int'l Audiotext Network, 62 F.3d at 72 (The
Court is "not constrained to accept the allegations of the
complaint in respect of the construction of the [a]greement.").
Instead, the Court's primary charge is determining for itself
whether "a contract's language is clear and unambiguous," which
alone allows for the dismissal of a breach of contract claim on
a Rule 12(b)(6) motion.  Oppenheimer & Co., Inc. v. Trans
Energy, Inc.& Co., Inc. v. Trans Energy, Inc., 946 F. Supp.2d
343, 349 (S.D.N.Y. 2013).  See also Georgia-Pacific Consumer

Products, LP v. International Paper Co., 566 F. Supp.2d 246, 250 (S.D.N.Y. 2008) ("If a contract is unambiguous on its face, its proper construction is a question of law."). Conversely, "if a contract is ambiguous as applied to a particular set of facts, a court has insufficient data to dismiss a complaint for failure to state [a] claim." Eternity Global Mater Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 178 (2d Cir. 2004).

"Ambiguity in a contract exists where the provisions in controversy are reasonably susceptible to different interpretations or may have two or more different meanings." Gao v. JPMorgan Chase & Co., No. 14 Civ. 4281(PAC), 2015 WL 3606308, at *3 (S.D.N.Y. June 9, 2015) (citations and internal quotations omitted). However, "the mere fact that the [p]arties disagree on the proper interpretation of the contract does not render the contractual language ambiguous." Serdarevic v. Centex Homes, LLC, 760 F. Supp.2d 322, 329 (S.D.N.Y. 2010). The Court must evaluate the contract according to the plain meaning of its terms and should not read ambiguity into the contract where it would "strain[] the contract language beyond its reasonable and ordinary meaning." Metropolitan Life Ins. Co. v. RJR Nabisco, Inc., 906 F.2d 884, 889 (2d Cir. 1990) (quoting Bethlehem Steel Co. v. Turner Construction Co., 141 N.E.2d 590, 593 (N.Y. 1957)).

DISCUSSION

In its motion to dismiss, the Republic argues that the Court should dismiss Aurelius's breach of contract action for two distinct reasons.  First, the Republic states that Aurelius has failed to allege facts that would implicate an exception to the Global Security's binding effect clause.  That provision purportedly renders the Republic's determination that Base Case GDP growth exceeded Actual Real GDP growth in 2013--which, if true, would absolve the Republic of its payment obligation for that year--"binding" on Aurelius absent "bad faith, willful misconduct or manifest error."  (MTD at 13-14).  Second, the Republic avers that Aurelius's use of the EMAE Index to replace Actual Real GDP in constant 1993 prices for purposes of determining the Adjustment Fraction runs afoul of the Global Security's plain terms because it is "not [a] GDP figure[], but . . . an index."  (MTD at 19).

Aurelius's reliance on the EMAE Index requires dismissal of this case.[5]  Here, Aurelius's entitlement to a remedy for breach of contract necessarily hinges on whether a Payment Amount is

---

[5] Consequently, the Court does not reach the issue of whether the Republic's "calculations" are binding under the Global Security as the Republic contends.  The Court notes only that Aurelius's complaint makes no assertion that the Republic made those calculations in bad faith, an explicit contractual exception to the purportedly binding nature of the Republic's calculations. (Global Security § 1(e) at R-4).

due under the terms of the Global Security which itself hinges on whether Base Case GDP and Base Case GDP Growth exceed (or do not exceed) the Republic's Actual Real GDP and Actual Real GDP Growth.  (See Compl. ¶¶ 32-34).  That much is undisputed. Aurelius contends that, because calculating Base Case GDP Growth for purposes of activating the payment trigger requires using Base Case GDP, because calculating Base Case GDP requires the use of an Adjustment Fraction that relies on Actual Real GDP in 1993 prices as an input,[6] and because the Republic stopped publishing Actual Real GDP in 1993 prices in the spring of 2014, it may rely on an alternate and comparable metric--one also published by INDEC--to evaluate whether the Republic's payment obligations are triggered.  The Republic counters that the Global Security does not contemplate the use of such substitute statistics.

---

[6] The Court rejects the Republic's atextual argument that the Global Security's definition of "Base Case GDP Growth" does not encompass the Adjustment Fraction mandated by the Security's definition of Base Case GDP. (See Reply at 7). The definition of Base Case GDP Growth expressly employs the defined term Base Case GDP, which in turn requires the use of the Adjustment Fraction where a change of the Year of Base Prices occurs.  The Republic has provided no basis for the Court to find that the parties "did not intend to incorporate [the Adjustment Fraction] proviso" in the definition of Base Case GDP Growth.  (See Reply at 7).  The Republic cannot pick and choose which parts of the definition of Base Case GDP are incorporated into the definition of Base Case GDP Growth.

Unfortunately for Aurelius, there is no theory of "second best" when it comes to express contractual terms. Here, the Global Security unequivocally states that the defined term Actual Real GDP refers to a version of the Republic's gross domestic product that is published by INDEC. (See Global Security §1(e) at R-2). It is unquestionably that figure that must be employed in calculating the Adjustment Fraction. See supra at 9 n. 3. As noted above, Aurelius could have bargained for language that provided flexibility where INDEC fails to publish Actual Real GDP data. See supra at 2. It did not do so.

Aurelius contends that the EMAE Index is close enough. (See Opp. at 20 ("[T]he EMAE Index is reliable because updates and revisions to the EMAE Index since the issuance of the [GDP-Linked Securities] have usually been relatively small, and mostly upward.")). But the Global Security neither enumerates nor implies exceptions as to the statistics to be employed in calculating the Adjustment Fraction, meaning Aurelius's claim can only pass muster where the contractually-mandated inputs are used. Where--as here--the Global Security's payment triggers are assessed against benchmarks that are tabulated using alternate, approximated inputs, it is as if an entirely separate set of benchmarks is being evaluated. In other words, the "Base Case GDP" and "Base Case GDP Growth" that Aurelius has

calculated via its version of the Adjustment Fraction are inherently different from the versions of those statistics that are required under the contract.  While Aurelius's calculations may well be superficially similar to the calculations specified in the Global Security, its doppelgänger versions of Base Case GDP and Base Case Growth have different component parts and thus cannot stand in the place of the real thing under the plain terms of the contract.

Even if the Court sympathizes with Aurelius's practical plight, i.e., that the Republic's decision to rebase its GDP eliminated necessary data, without more,[7] it cannot ignore the

_____

[7]Aurelius was forced to rely on an extra-contractual calculation method because of the Republic's own actions, i.e., its decision to shift from constant 1993 prices to constant 2004 prices and its discontinuance of publishing the relevant metrics in terms of 1993 prices.  Of course, the Republic was under no explicit contractual obligation to continue to calculate Actual Real GDP using constant 1993 prices and thus maintained significant discretion under the terms of the Global Security to rebase its GDP.  (See Reply at 9).  That discretion, however, is not absolute.  Under New York law, "[w]here [a] contract contemplates the exercise of discretion, the covenant of good faith and fair dealing 'includes a promise not to act arbitrarily or irrationally in exercising that discretion,'" Dalton v. Educational Testing Serv., 663 N.E.2d 289, 291 (N.Y. 1995).  As then-Judge Scalia put it, discretion does not equate to "for any reason whatsoever, no matter how arbitrary or unreasonable."  Tymshare, Inc. v. Covell, 727 F.2d 1145, 1154 (D.C. Cir.1984).  Indeed, it is hornbook law that the Republic may not "frustrate the contracts into which [it has] entered."  Grad v. Roberts, 198 N.E.2d 26, 28 (N.Y. 1964).
     Accordingly, while it may be true that "countries should periodically 'rebase' their GDP," (MTD at 11), here it could be argued that the Republic could not do so in a way that "destroy[ed] or injur[ed] the right of [Aurelius] to receive the

plain language of the Global Security.   The Court will not buck
the bedrock rule that it "may neither rewrite, under the guise
of interpretation, a term of the contract when the term is clear
and unambiguous, nor redraft a contract to accord with [its]
instinct for dispensation of equity upon the facts of a given
case."  Montefiore Med. Center v. Local 272 Welfare Fund, 712 F.
App'x 104, 106 (2d Cir. 2018).  Accordingly, because Aurelius
has constructed its claim using alternate statistics not
contemplated by the Global Security's plain terms, the
Republic's motion to dismiss Aurelius's complaint for failure to
state a claim is granted.  However, because the Court does not
believe that amendment would be futile, see supra n. 7, the
motion will be granted without prejudice, and Aurelius is
granted leave to amend its complaint.

---

fruits of the contract," Dalton, 663 N.E.2d at 296 (citations
omitted), that is, by discontinuing the publication of Actual
Real GDP using constant 1993 prices.  Notably, other litigants
have alleged--and the Court makes no comment on the plausibility
of those allegations--that the Republic breached the covenant of
good faith and fair dealing by rebasing its GDP in a manner
deliberately designed to avoid making payment under the Global
Security.  See, e.g., Compl. ¶¶ 118-122, 683 Cap. Partners, LP
v. The Republic of Arg., No. 19 Civ. 10131(LAP) (S.D.N.Y. Oct.
31, 2019).  By contrast, Aurelius has not even asserted that the
Republic rebased its GDP in a manner intentioned to avoid
triggering its payment obligations, let alone done so plausibly.

III. CONCLUSION

For the reasons specified above, the Republic of Argentina's motion to dismiss Aurelius Capital Master, Ltd.'s complaint [dkt. no. 17] is GRANTED without prejudice.  Aurelius may file an amended complaint by no later than February 8, 2020.

**SO ORDERED.**

Dated:      New York, New York
            January 7, 2020

*Loretta A. Preska*
LORETTA A. PRESKA
Senior United States District Judge

22