UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AURELIUS CAPITAL MASTER, LTD.,

              Plaintiff,

              v.

THE REPUBLIC OF ARGENTINA,

              Defendant.

Case No.:  1:19-CV-0351 (LAP)

The Honorable Loretta A. Preska

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NOVORIVER S.A.,

              Plaintiff,

              v.

ARGENTINE REPUBLIC,

              Defendant.

Case No.:  1:19-CV-09786 (LAP)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ACP MASTER, LTD.,

              Plaintiff,

              v.

THE REPUBLIC OF ARGENTINA,

              Defendant.

Case No.:  1:19-CV-10109 (LAP)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## THE REPUBLIC OF ARGENTINA'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

April 14, 2023

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

683 CAPITAL PARTNERS, LP,

               Plaintiff,

               v.                      Case No.: 1:19-CV-10131 (LAP)

THE REPUBLIC OF ARGENTINA,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

ADONA LLC, EGOZ I LLC, EGOZ II LLC, MASTERGEN, LLC, ERYTHRINA, LLC, AP 2016 1, LLC, AP 2014 3A, LLC, AP 2014 2, LLC, AND WASO HOLDING CORPORATION,

               Plaintiffs,

               v.                      Case No.:  1:19-CV-11338 (LAP)

THE REPUBLIC OF ARGENTINA,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

APE GROUP SPA, ROMANO CONSULTING SPA, ICARO SRL and ELAZAR ROMANO,

               Plaintiffs,

               v.                      Case No.:  1:20-CV-10409 (LAP)

THE REPUBLIC OF ARGENTINA,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

# TABLE OF CONTENTS

*Page*

**PRELIMINARY STATEMENT** ........................................................1

**BACKGROUND** ..........................................................................8

    A.    Plaintiffs .........................................................................8

    B.    Argentina's Default and Restructuring ...............................8

    C.    GDP-Linked Securities ....................................................10

    D.    Communications with Investors About the Design of Argentina's GDP-Linked Securities ................................10

    E.    The Terms of Argentina's GDP-Linked Securities.............................11

    F.    INDEC's Rebasing of Argentina's GDP Under IMF Pressure...........15

    G.    The Ministry of Economy's Application of the Adjustment Provision................................................................17

    H.    The IMF's Scrutiny of INDEC's Rebased GDP Data ........................22

**PROCEDURAL HISTORY** ................................................................23

**ARGUMENT** ...................................................................................24

**I.**    **THE COURT SHOULD GRANT SUMMARY JUDGMENT FOR THE REPUBLIC BECAUSE PLAINTIFFS CANNOT PROVE THRESHOLD ELEMENTS OF THEIR CLAIMS** ................................25

    A.    Plaintiffs Did Not Satisfy the Preconditions for Bringing Suit Set Out in the Global Security and Trust Indenture ...........................25

    B.    Plaintiffs Who Purchased the Securities After the December 2014 No Payment Announcement Cannot Prove That the Claims Were Assigned to Them...........................................26

    C.    WASO Cannot Recover for Purchases Made After the Five-Year Prescription Period ....................................................28

II.   **THERE IS NO TRIABLE ISSUE ON PLAINTIFFS' BREACH OF CONTRACT CLAIM** ............................................................31

    A.   There Is *No* Evidence to Support Plaintiffs' Claim That INDEC's 2014 Rebasing Constituted a Breach of the Implied Covenant of Good Faith and Fair Dealing. ........................................31

    B.   The Ministry of Economy Faithfully Applied the Adjustment Provision in Concluding That No Payment Was Due for 2013. .........37

    C.   In the Alternative, the Republic's Interpretation of the Adjustment Provision Is Correct as a Matter of Law. .........................39

        1.   The Constant Factor Approach Is Consistent with the Context of the Issuance of the GDP-Linked Securities. ...........41

        2.   The Constant Factor Approach Is Consistent with the Text of the Securities, Which Calls for a Single, Fixed Adjustment. ................................................................................43

        3.   Plaintiffs' Interpretation Renders the Adjustment Provision Superfluous and Produces Absurd Results. ..............46

**CONCLUSION** ....................................................................................50

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Advanced Magnetics, Inc.* v. *Bayfront Partners, Inc.*,
106 F.3d 11 (2d Cir. 1997) ...................................................................31

*Ape Group SPA* v. *Republic of Argentina*,
2022 WL 463309 (S.D.N.Y. Feb. 15, 2022) .................................................28, 30

*Atlas Partners, LLC* v. *STMicroelectronics, Int'l N.V.*,
2015 WL 4940126 (S.D.N.Y. Aug. 10, 2015)...................................................49

*Aurelius Capital Master, Ltd.* v. *Republic of Argentina*,
2020 WL 70348 (S.D.N.Y. Jan. 7, 2020) ...................................................*passim*

*Aurelius Capital Master, Ltd.* v. *Republic of Argentina*,
2021 WL 1177465 (S.D.N.Y. Mar. 29, 2021)...............................................*passim*

*Beal Sav. Bank* v. *Sommer*,
8 N.Y.3d 318 (2007) ...........................................................................40

*In re Coudert Bros.*,
487 B.R. 375 (S.D.N.Y. 2013) .................................................................42

*Cruden* v. *Bank of New York*,
957 F.2d 961 (2d Cir. 1992) ...................................................................26

*Diesel Props S.r.l.* v. *Greystone Bus. Credit II LLC*,
631 F.3d 42 (2d Cir. 2011) ....................................................................29

*Dreni* v. *PrinterOn Am. Corp.*,
2021 WL 4066635 (S.D.N.Y. Sept. 3, 2021) ...................................................42

*LaSalle Bank Nat. Ass'n* v. *Nomura Asset Capital Corp.*,
424 F.3d 195 (2d Cir. 2005) ...................................................................48

*Levine* v. *860 West Tower, Inc.*,
1999 WL 185270 (S.D.N.Y. Mar. 31, 1999) (Preska, J.)....................................46

*Matsushita Elec. Indus. Co., Ltd.* v. *Zenith Radio Corp.*,
475 U.S. 574 (1986)...................................................................................25

*Maxim Grp. LLC* v. *Life Partners Holdings, Inc.*,
690 F. Supp. 2d 293 (S.D.N.Y. 2010) (Preska, J.) .............................40

*Phoenix Light SF Ltd.* v. *Deutsche Bank Nat'l Trust Co.*,
585 F. Supp. 3d 540 (S.D.N.Y. 2022) ....................................3, 27, 30

*Pruiss* v. *Bosse*,
912 F. Supp. 104 (S.D.N.Y. 1996) .....................................................31

*Racepoint Partners LLC* v. *JPMorgan Chase Bank*,
2006 WL 3044416 (S.D.N.Y. Oct. 26, 2006).....................................27

*Rogers Revocable Tr.* v. *Bank of Am., N.A.*,
2008 N.Y. Misc. LEXIS 7471 (N.Y. Sup. Ct. Nov. 13, 2008)..........39

*Royal Park Invs. SA/NV* v. *Wells Fargo Bank, N.A.*,
2018 WL 739580 (S.D.N.Y. Jan. 10, 2018) ......................................27

*Salahuddin* v. *Goord*,
467 F.3d 263 (2d Cir. 2006) ..............................................................24

*Sayers* v. *Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*,
7 F.3d 1091 (2d Cir. 1993) ................................................................40

*Security Plans, Inc.* v. *CUNA Mut. Ins. Soc.*,
769 F.3d 807 (2d Cir. 2014) ..............................................................33

*Thompson* v. *Advanced Armament Corp., LLC*,
614 F. App'x 523 (2d Cir. 2015) .......................................................33

*Toledo Fund, LLC* v. *HSBC Bank USA, Nat'l Ass'n*,
2012 WL 2850997 (S.D.N.Y. July 9, 2012).......................................39

*Tractebel Energy Mktg., Inc.* v. *AEP Power Mktg., Inc.*,
487 F.3d 89 (2d Cir. 2007) ................................................................33

*Travellers Int'l, A.G.* v. *Trans World Airlines, Inc.*,
41 F.3d 1570 (2d Cir. 1994) ..............................................................36

*U.S. Bank Nat'l Ass'n* v. *GreenPoint Mortg. Funding, Inc.*,
    45 N.Y.S.3d 11 (App. Div. 1st Dept. 2016) ......................................................30

*USI Ins. Services LLC* v. *Miner*,
    801 F. Supp. 2d 175 (S.D.N.Y. 2011) (Preska, J.) .............................................48

*Utica Mut. Ins. Co.* v. *Clearwater Ins. Co.*,
    906 F.3d 12 (2d Cir. 2018) ...................................................................................46

*Vermont Teddy Bear Co.* v. *538 Madison Realty Co.*,
    1 N.Y.3d 470 (2004) .............................................................................................45

*Wagner* v. *JP Morgan Chase Bank*,
    2011 WL 856262 (S.D.N.Y. Mar. 9, 2011) ..........................................................33

*Waxman* v. *Cliffs Nat. Res. Inc.*,
    222 F. Supp. 3d 281 (S.D.N.Y. 2016) .................................................................26

*Wells Fargo Bank, N.A.* v. *Wrights Mill Holdings, LLC*,
    127 F. Supp. 3d 156 (S.D.N.Y. 2015) .................................................................50

## Other Authorities

Argentine Law No. 17,622 ..........................................................................................34

Fed. R. Civ. P. 15(c) ...................................................................................................31

Fed. R. Civ. P. 56(a) ..................................................................................................25

S.D.N.Y. Local Civil Rule 56.1 ....................................................................................1

## PRELIMINARY STATEMENT[1]

Plaintiffs—hedge funds and other sophisticated investors—strategically acquired the vast majority of their holdings in Argentina's GDP-linked Securities ("Securities") after the Republic announced that no annual payment was due for 2013.  Their bet was that a court would adopt their reading of the Global Security (dubbed the "alternative interpretation" by analysts who followed these Securities) and award them a windfall amounting to hundreds of millions of dollars.

This Court's decision on the Republic's first motion to dismiss rejected the central premise of Plaintiffs' case—that Plaintiffs can prevail using "alternate statistics not contemplated by the Global Security's plain terms," instead of GDP data "published by INDEC," Argentina's national statistics agency, as the Global Security requires.  *Aurelius Capital Master, Ltd.* v. *Republic of Argentina*, 2020 WL 70348, at *7 (S.D.N.Y. Jan. 7, 2020) ("*Aurelius I*").  INDEC never generated the data needed to make the calculation under Plaintiffs' "alternative interpretation" (Actual Real GDP for 2013 in the 1993 "base year")[2] because the data was wildly

---

[1] References to "SOF" are to the Republic's accompanying Rule 56.1 Statement of Facts.  References to "Ex.__" are to the accompanying Declaration of Robert J. Giuffra, Jr.  References to "Opening," "Rebuttal," or "Reply" reports refer to the parties' expert reports, filed as exhibits to the Giuffra Declaration.

[2] GDP can be measured in nominal (current) or real (constant) prices.  GDP in nominal prices is the estimate of final goods and services produced in a country using the contemporaneous prices for those goods and services.  (SOF ¶ 11.)  GDP in real prices involves designating a particular year as the "base year" and using the prices

out of date, and it would have been inconsistent with international standards to do so.  INDEC instead published Actual Real GDP for 2013 in the more recent and accurate base year of 2004, a "rebasing" that the Global Security anticipated.  The Court held that the Republic had no express contractual obligation to keep publishing the outdated 1993 base year on which Plaintiffs' calculations relied and that Plaintiffs' reliance on "alternate, approximated inputs" instead of the "contractually-mandated inputs" was contrary to settled New York law.  *Id.* at *7 & n.7.

In response to *Aurelius I*, Plaintiffs amended their complaints to add another theory that the Court roundly rejected—"that the Republic had the implied obligation under the Global Securities 'to ensure that INDEC published the contractually-mandated input.'"  *Aurelius Capital Master, Ltd.* v. *Republic of Argentina*, 2021 WL 1177465, at *9 (S.D.N.Y. Mar. 29, 2021) ("*Aurelius II*").  The Court held that the terms of the Securities "do not require" this, "and the Court will not impose such an obligation."  *Id.*  Plaintiffs also advanced two new theories that the Court held were sufficiently plausible to survive a motion to dismiss:  that the Republic breached the duty of good faith and fair dealing because INDEC's decision to modernize its data was actually a ploy to "deprive Plaintiffs of payment for the 2013 Reference Year," or, alternatively, that the Republic "fail[ed] to apply" a

---

of goods and services in that year to calculate the value of goods and services in all other years.  (*Id.*)  By keeping prices constant, changes in real GDP capture changes in quantities, rather than prices, of goods and services.  (*Id.*)

contractual "Adjustment Fraction" (also referred to as the "Adjustment Provision") to be used when INDEC changes its base year. *Id.* at *4, *11.

Those theories cannot be squared with the substantial discovery record developed over the last two years, including more than 600,000 pages of documents and testimony from 30 fact witnesses. The undisputed facts show that both of Plaintiffs' new theories are meritless and that summary judgment should be granted for the following reasons:

*1.* ***Plaintiffs have no right to bring these claims.*** Plaintiffs' claims suffer from a number of threshold defects. *First*, no Plaintiff has produced any evidence that they satisfied the five contractual preconditions for bringing suit required by the Trust Indenture and the Global Security, which center on giving notice to the Trustee and providing it with the opportunity to first bring suit on their behalf. *Second*, Plaintiffs in four of the six actions purchased all or some of their Securities *after* the claims had purportedly arisen under those Securities. Under New York law, "[i]t is the Plaintiff's burden to demonstrate their standing to sue for claims related to each [security]." *Phoenix Light SF Ltd.* v. *Deutsche Bank Nat'l Trust Co.*, 585 F. Supp. 3d 540, 565 (S.D.N.Y. 2022). Here, that requires Plaintiffs to document each assignment of their Securities holdings dating back to December 2014, when these claims purportedly arose, and to demonstrate either that (i) the right to bring claims was expressly transferred, or (ii) each transaction was governed by the law of a

jurisdiction where such transfer is automatic.  Plaintiffs have not come forward with this necessary evidence despite the Republic's repeated requests.  *Third*, the Global Security states that "[a]ll claims against the Republic for any amounts due hereunder . . . shall be prescribed unless made within five years from the date on which such payment first became due" (SOF ¶ 222), but one Plaintiff, WASO Holding Corporation ("WASO"), acquired hundreds of millions of dollars in Securities *after* filing suit and did not assert claims on these additional holdings until December 14, 2020, nearly a year after the prescription period expired.  Those claims are untimely.

> **2.     *The Republic acted in good faith at all times in connection with the rebasing.***  After extensive discovery, there is no support for Plaintiffs' conspiracy theory that the Republic "inappropriately us[ed] the rebasing as an excuse to stop publishing Actual Real GDP in 1993 prices" in an "attempt[] to destroy or injure the rights of Plaintiff and other Warrant holders to receive the fruits of the contract." (Aurelius AC ¶ 63.)[3]  To the contrary, the undisputed facts show that (i) there was no political influence over the content or timing of the rebasing; (ii) the rebasing, including discontinuing the publication of the obsolete 1993 base, was performed pursuant to international standards and best practices; and (iii) the timing of the rebasing was driven by sustained pressure from the IMF.

On the last point, the documents turned over by the IMF show that it had

---

[3] "Compl.," "AC," or "SAC" refer to Plaintiffs' operative complaints.

censured the Republic and threatened to cut off its access to IMF funds unless the Republic updated the base year for its GDP data by March 31, 2014.  INDEC worked tirelessly to meet that deadline and published GDP data in the new base year (2004) on March 27, 2014.  INDEC discontinued measuring and publishing real GDP in the old base year (1993) once it rebased to 2004 prices—like every other country in the world has done upon a rebasing, ███████████████████ (SOF ¶ 134.)

3.     *The Republic faithfully applied the Adjustment Provision*.  The record belies Plaintiffs' allegations that the Republic "fail[ed] to apply the Adjustment Fraction to Base Case GDP when calculating Base Case GDP Growth and calculat[ed] the Payment Amount using unadjusted figures instead."  *Aurelius II*, 2021 WL 1177465, at *4.  The Court accepted these allegations as true at the motion to dismiss stage, but they are false.  The truth is that:

- The Ministry of Economy at all times considered that the Adjustment Provision required the application of a single, one-time adjustment fraction to Base Case GDP, which had the effect of updating the Base Case GDP levels but preserving Base Case GDP Growth rates year over year (the "Constant Factor Approach");

- In response to public discussions about an alternative interpretation of the Adjustment Provision that called for an annual calculation of a different adjustment fraction for each Reference Year (the "Variable Factor Approach"), the Ministry of Economy carefully and diligently analyzed this interpretation; and

- The Ministry of Economy concluded—along with the vast majority of market observers—that the Constant Factor Approach was correct because the Variable Factor Approach led to illogical results, including that it entirely negates any impact on payment from changing to a more recent base year and permanently ties payment to an obsolete and outdated measure of GDP, so that payment could be required even in an economic recession.  The Ministry therefore applied the Adjustment Provision using the Constant Factor Approach and determined that with the Base Case GDP Growth trigger for 2013 of 3.22%, no payment was due for 2013 because Argentina's real GDP growth was 2.93%.

4.    *The Ministry of Economy's conclusion was correct.*  All market participants understood at the time the Securities were issued that payments would be made only if the Republic's real GDP was growing at or above 3%, a figure calculated based on the Republic's historic growth trends over the past century.  The text of the Global Security and the record overwhelmingly demonstrate this.  As Plaintiffs concede, only the Republic's interpretation of the Adjustment Provision (the Constant Factor Approach) would preserve the approximately 3% Base Case GDP Growth rate that is the cornerstone of the Securities' design, ensuring that the Republic has an obligation to pay only when its GDP is growing at the agreed rate.  Plaintiffs' Variable Factor Approach, on the other hand, would forever tie payments to an outdated measure of the economy (1993 base year), contrary to the design and economic function of the Securities, not to mention requiring calculation and

publication of outdated GDP data for decades, something no country has ever done. Under Plaintiffs' approach, the Republic could also be obligated to pay even when its economy is collapsing—a result plainly at odds with the purpose of the Securities to condition payment on economic growth.

The English Commercial Court tried similar claims last fall under English law and, last week, handed down a decision adopting Plaintiffs' theory. *Palladian Partners L.P. and ors* v *The Republic of Argentina and anor*, [2023] EWHC 711 (Comm). With all respect, that decision is incorrect. Among other errors, the ruling conflicts with this Court's correct holding that "the Global Securities do not require the Republic to compel INDEC to publish data" and its refusal to judicially "impose such an obligation." *Aurelius II*, 2021 WL 1177465, at *10. The English court held that English law is otherwise: that there *is* an implied publication requirement, and even instructed the Republic to somehow resuscitate the obsolete 1993 base series and continue it through 2034. (Ex. 178 (*Palladian* Judgment) ¶¶ 266–71.) The Republic will appeal this decision, which should be accorded no weight here.

\*      \*      \*

In sum, to the extent that Plaintiffs have even established their right to bring these claims, they have failed to substantiate the theories of liability that the Court approved in *Aurelius I* and *II*. Because there is no genuine dispute of material fact as to the Republic's good faith or its application of the Adjustment Provision, the

Court should grant summary judgment in its favor.

## BACKGROUND

### A.   Plaintiffs

Plaintiffs are hedge funds specializing in distressed debt and other sophisticated investors who assert they are entitled to payment on the Republic's GDP-linked Securities for Reference Year 2013.  Aurelius was the first Plaintiff to file suit in this matter ███████████████████████████.  (SOF ¶ 217.) Aurelius made a name for itself as a long-time "holdout" creditor of the Republic, having declined to participate in the exchange offers where the Securities were issued.  (SOF ¶ 195.)

████████████████████████████████████████
████████████████████████████  (SOF ¶ 216.)  ████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████  (SOF ¶¶ 213–215.)

### B.   Argentina's Default and Restructuring

In December 2001, the Republic announced that it would default on over $80 billion of debt, in what was then the largest sovereign default in history.  (SOF ¶ 5.)  The economic depression that followed paralyzed economic activity, pushed inflation above 40%, and tipped more than half of Argentina's population below the poverty line.  (SOF ¶ 6.)

With a burgeoning debt-to-GDP ratio of more than 130%, the Republic needed to restructure its sovereign debt. (SOF ¶ 7.)  Between 2003 and 2005, the Republic held more than 80 meetings with creditors, as well as meetings with institutional stakeholders such as the IMF, the World Bank, and officials from various countries, to develop its restructuring proposals. (SOF ¶ 26.)  Negotiations with creditors (who were represented by investment banks) centered on the amount of debt that would be sustainable for Argentina going forward.  (SOF ¶¶ 26–27.)

A team at the Ministry of Economy led by then-Undersecretary of Economic Programming Sebastián Katz undertook a careful debt sustainability analysis to project the Republic's growth rate "so that the Republic's financial commitments would be manageable" in light of those projections.  (SOF ¶¶ 8-10.)  Based on a historical analysis of the Republic's real economy over the prior century, Katz and his team projected higher economic growth during recovery from the recession, which would taper down to a long-term sustainable growth rate of 3%. (SOF ¶¶ 14–16, 18.)  These forecasts were memorialized in a publicly available November 30, 2004 letter from Katz to then-Secretary of Finance Guillermo Nielsen.  (SOF ¶ 17.)

Certain creditors, however, believed that the Republic's economy would grow at a higher rate.  (SOF ¶¶ 27–28.)  To help bridge the gap with creditors, the Republic introduced the idea of GDP-linked securities.  (SOF ¶ 29.)

### C.     GDP-Linked Securities

GDP-linked securities link a country's payment obligations to its real economic performance.  (SOF ¶¶ 30–31.)  This linkage is desirable because a government's real-world economic output (estimated by its real GDP) is closely related to its tax revenues, and thus its payment capacity.  (SOF ¶¶ 12–13.)  Tying payments to how the real economy performs also ensures that countries will have lower debt service, and thus need less financing, in times of economic hardship.  (SOF ¶¶ 32–34.)  Conversely, this linkage deters overspending when state coffers are flush by increasing debt obligations.  (SOF ¶ 35.)

### D.     Communications with Investors About the Design of Argentina's GDP-Linked Securities

Argentina's projected long-term GDP growth rate of 3%, which had featured prominently in negotiations with creditors, was the key "macroeconomic assumption" behind the restructuring.  (SOF ¶¶ 19–21.)  As the terms of the Securities coalesced, the Republic repeatedly informed investors through press releases, roadshow presentations, and regulatory filings that the growth condition for payments on the Securities was a known percentage tapering off to 3%.  (SOF ¶¶ 21–23.)  For example, in a 2005 roadshow presentation to investors, "Base Case GDP" was not listed in terms of GDP levels, but rather as "AR\$287 mm in 2005 and a growth of approximately 3.6% in 2006, 3.4% in 2007, 3.3% in 2008, 3.3% in 2009, 3.3% in 2010, 3.3% in 2011, 3.3% in 2012, 3.2% in 2013, and 3.0% thereafter."

(SOF ¶ 23.)  The Republic's SEC Form 18-K/A, dated June 10, 2004, also listed the "Payment trigger" for the planned GDP-linked securities as "Actual GDP (expressed in constant pesos) as of the reference date exceeds the base case GDP, and the annual growth rate exceeds 3%."  (SOF ¶ 22.)  ███████████████████████ there is no evidence that any investor believed at the time that Argentina would pay under the GDP-linked securities if its growth rate was under 3%.  (SOF ¶¶ 172–176.)

Market commentary reflected the widespread understanding that payments would be due only if the approximately 3% threshold was met.  (SOF ¶ 63.)  For example, in an April 16, 2004 report, Morgan Stanley independently mirrored Katz's sustainability analysis by conducting a historical evaluation of Argentina's economy, finding that the mean growth rate from 1900 to 2003 was just above 3%.  (SOF ¶ 24.)  The report then valued the Securities under the assumption that the payment threshold would be between 3% and 4% for the life of the Securities.  (*Id.*)

E.   **The Terms of Argentina's GDP-Linked Securities**

In June 2005, and again in April 2010, the Republic launched voluntary debt exchanges, during which various debt instruments, including the Securities, were issued pursuant to a Trust Indenture dated June 2, 2005 (as amended in April 2010, the "Indenture").  "The 2005 Global Security and 2010 Global Security contain the same material terms."  *Aurelius II*, 2021 WL 1177465, at *2.  As relevant here, each year on November 1 (the "Calculation Date"), the Ministry of Economy calculates

whether a payment is due under the Securities for the previous year (or "Reference Year"), and the amount of any payment, based on data specified in the Global Security. (SOF ¶¶ 65–67.) Payment is only required when three conditions are satisfied, only two of which are relevant here. *See Aurelius I*, 2020 WL 70348, at *3.

***The Level Condition.*** The Republic's Actual Real GDP for the Reference Year must exceed a level for that year set forth in the Securities and referred to as "Base Case GDP" (the "Level Condition"). (Ex. 37 (Global Security) at R-2–R-3.)

"Importantly, the Global Security only allows Actual Real GDP figures that are calculated and published by [INDEC] to be used in the relevant calculations." *Aurelius I*, 2020 WL 70348, at *3; *see* Ex. 37 (Global Security) at R-2. Like many other countries, Argentina calculates real GDP using a base year. One inevitable consequence of this approach is that the actual economy evolves away from the one represented by the base year, introducing distortions between measurements of a country's real GDP and its actual, real-world economic output—distortions that become worse with time. (SOF ¶¶ 75–79, 81.)[4] For this reason, the Securities contemplate that the relevant base year will change over the Securities' 30-year life.

---

[4] Two key sources of distortion are changes in the prices and quality or type of goods. For example, if the price of a good increases due to changes in supply and demand, that change would not be captured by prices from the old base year. Additionally, when the quality of goods increases dramatically after the base year—for example, computers and related products between 1993 and 2004—there may be no appropriate pricing for those goods in the old year of base prices. (SOF ¶¶ 75–79.)

(SOF ¶ 80.)  Otherwise, payment would not be linked to economic output, frustrating the Securities' purpose of reflecting the Republic's ability to pay.  (SOF ¶¶ 12–13, 32–35, 37.)

When the Securities were drafted, INDEC calculated Actual Real GDP using 1993 as the year of base prices.  (SOF ¶ 49.)  Accordingly, the definition of "Year of Base Prices" in the Securities states that "if the calendar year employed by INDEC for purposes of determining Actual Real GDP shall at any time be a calendar year other than the year 1993, then the Year of Base Prices shall mean such other calendar year."  (Ex. 37 (Global Security) at R-5.)

The Adjustment Provision sets out instructions for adjusting the Base Case GDP figures "if the Year of Base Prices employed by INDEC for determining Actual Real GDP shall at any time be a calendar year other than the year 1993."  (*Id.* at R-3.)  When a rebasing occurs, "the Base Case GDP figures listed in the Global Security must be adjusted using the Adjustment Fraction, 'the numerator of which shall be the Actual Real GDP for such Reference Year measured in constant prices of the [new] Year of Base Prices, and the denominator of which shall be the Actual Real GDP for such Reference Year measured in constant 1993 prices.'"  *Aurelius II*, 2021 WL 1177465, at *2 (quoting Ex. 37 (Global Security) at R-3).

**The Performance Condition.**  Actual Real GDP Growth for the Reference Year must exceed Base Case GDP Growth (the "Performance Condition").  Base

Case GDP Growth is "for any Reference Year, the percentage change in Base Case GDP for such Reference Year, as compared to Base Case GDP for the immediately preceding Reference Year."  (Ex. 37 (Global Security) at R-3.)  The Base Case GDP Growth percentages begin at 4.26% in 2005, decrease to 3.22% in 2013, and remain at 3% starting in 2015 through the expiration of the Securities in 2035.  (SOF ¶ 59, 61.)[5]

The witnesses involved in designing the Securities uniformly testified that these growth rates were intended to mirror the Republic's publicly available sustainability analysis, and that the Base Case GDP figures were just a function of these growth rates.  (SOF ¶ 60.)  The witnesses also confirmed that Base Case GDP levels were provided in 1993 prices simply because that was the operative base year at issuance, but that the projected growth rates were not linked to any particular base year.  (SOF ¶¶ 60, 62.)  In other words, they envisioned that the agreed Base Case GDP Growth percentages would be unaffected by a change in base year.

***Payment Amount.***  When the payment conditions are met for a Reference Year, payment is calculated by multiplying Available Excess GDP by the outstanding notional amount of the Securities (the "Payment Amount").  (Ex. 37

---

[5] Base Case GDP Growth figures are not expressly listed in the Global Security, although they are listed in the 2010 Prospectus. (SOF ¶ 61.)  Regardless, it is evident using a calculator that the Base Case GDP levels set out in the Securities are a function of a pre-defined growth rate—not the other way around.  That is why every Base Case GDP level from 2015 on is exactly 3% higher than in the previous year.

(Global Security) at R-4.)  Excess GDP is the difference between Actual Nominal GDP and Nominal Base Case GDP.  (*Id.* at R-3.)  Excess GDP reflects the Republic's real economic performance above a base case, translated into current prices by a GDP deflator.  (SOF ¶ 66.)

The Securities contain additional terms relevant to this dispute.  They include:

- "All calculations made by the Ministry of Economy hereunder shall be binding on . . . all Holders of this Security, absent bad faith, willful misconduct or manifest error on the part of the Ministry of Economy" (the "Binding Effect Clause").  (Ex. 37 (Global Security) at R-4.)

- Any claims against the Republic for amounts due under the Securities are "prescribed unless made within five years from the date on which such payment first became due, or a shorter period if provided by law" (the "Prescription Clause").  (*Id.* at R-14.)

- Holders are only entitled to payment based on the above criteria, and "are not entitled to receive principal in the amount of, or interest based on [the] notional amount [of the Security]."  (*Id.* at 1.)

The Republic has paid approximately $10 billion to holders of GDP-linked securities since they were first issued.  (SOF ¶ 71.)

### F.    INDEC's Rebasing of Argentina's GDP Under IMF Pressure

The undisputed facts have put the lie to Plaintiffs' allegation that the Republic "caused and/or permitted INDEC to withhold [GDP] data in order to try to obscure the fact that a payment was due."  (Aurelius AC ¶¶ 13, 72.)  In fact, the rebasing was

nearly a decade in the making, and the eventual timing of the publication of the new base year on March 27, 2014, was driven by pressure from the IMF.

International standards prescribe that countries rebase their GDP statistics every five to ten years to mitigate the distortions resulting from changes in the structure of the economy.  (SOF ¶ 81; *see supra* n.4.)  Before 2014, the last rebasing in Argentina had been in 1999, when GDP was rebased to the 1993 base.  (SOF ¶ 84.)  In 2004, INDEC began taking a National Economic Census, which marked the beginning of its work to rebase GDP to 2004.  (SOF ¶¶ 85–87.)  The rebasing process was delayed by a number of technical issues, including the need to manually collect and then digitize census data.  (SOF ¶ 88.)  By the time it was complete in 2008, new international GDP guidelines resulted in further delay.  (SOF ¶ 89.)

In 2009, the IMF began to express its doubts as to the accuracy of Argentina's outdated 1993 base.  (SOF ¶¶ 93, 95–97.)  By 2011, the IMF came "to the conclusion that GDP data produced by INDEC h[ad] been inaccurately reported" and needed to be updated to a 2004 base year.  (SOF ¶¶ 95–98.)  From 2011 to the end of 2012, the IMF set repeated deadlines for the Republic to rebase to 2004 prices, which INDEC was unable to meet.  (SOF ¶¶ 98–104.)  After being formally censured in February 2013 by the IMF, which set a new time limit of September 2013, the Republic missed that deadline as well.  (SOF ¶¶ 105–109.)  The IMF staff initially set a revised deadline of September 30, 2014, but influential directors (including from the United

States) demanded that the timeline be accelerated to March 31, 2014.  (SOF ¶¶ 111–113.)  The IMF Executive Board agreed and warned Argentina that failure to meet this date would lead to "immediate consideration of a Declaration of Ineligibility to use Fund resources."  (SOF ¶¶ 113–119.)

INDEC devoted all available resources to meet the March 31, 2014 rebasing deadline.  (*See* SOF ¶ 120.)  On March 27, 2014, INDEC published preliminary real GDP for 2012 and 2013 in the 2004 base series.  (SOF ¶ 121.)  In keeping with universal international practice, INDEC stopped calculating real GDP in the 1993 base once it rebased to the 2004 base.  (SOF ¶¶ 132–134.)  INDEC never measured or published real GDP for 2013 in the old 1993 series.  (SOF ¶¶ 132–133.)

### G.     The Ministry of Economy's Application of the Adjustment Provision

As explained above, the Securities specify that the Payment Amount, if any, "shall be determined by the Ministry of Economy."  (Ex. 37 (Global Security) at R-4.)  Within the Ministry, the National Office of Public Credit ("ONCP") was tasked with making the necessary calculations.  (SOF ¶¶ 138–140.)  The earliest consideration of the effect of the Adjustment Provision is a January 17, 2012 memorandum written by Santiago Wright, then-Head of the ONCP's Financial Information Unit, which sought "to identify the effect of a change of base year in the calculation of real GDP on the amount to be paid."  (SOF ¶¶ 140, 143.)  Wright applied a constant adjustment factor (expressed as "Y/X" to represent the adjustment

factor) to each Base Case GDP figure in the Securities to adjust them to a hypothetical new base year.  (SOF ¶¶ 144–148.)

As shown in tables at the end of his memorandum, Wright's assumption was that the Adjustment Provision entails a single adjustment fraction to Base Case GDP for each year (*i.e.*, the Constant Factor Approach).  This approach rescales the entire Base Case GDP table by the same factor, leaving the rate of growth from one year of Base Case GDP to the next—*i.e.* Base Case GDP Growth—unchanged.  (*Id.*)

Following INDEC's publication of the 2004 base series in March 2014, the consensus view of market observers was that the Adjustment Provision required the Constant Factor Approach (consistent with Wright's analysis from January 2012).  (SOF ¶¶ 167–170.)   In late March 2014, however, former Secretary of Finance Guillermo Nielsen publicized a conflicting view that the Adjustment Provision required a different adjustment fraction for each year (*i.e.*, the Variable Factor Approach).  (SOF ¶ 154.)  A Variable Factor cannot actually be calculated for 2013 (or any later year) because INDEC stopped generating real GDP in the 1993 base.  Nielsen thus used substitute statistics to calculate a variable factor for 2013 and arrived at a revised 1.38% Base Case GDP Growth rate for 2013 (far lower than the 3.22% in the Securities).  (SOF ¶¶ 155–156.)[6]

---

[6] In a sworn statement, Nielsen explained that his statements in March 2014 did not reflect his understanding of how the Securities worked when he was Secretary of

Nielsen's commentary caused Wright and other ONCP personnel to conduct a detailed analysis of the Variable Factor Approach.   In an April 4, 2014 memorandum, Wright identified two fundamental problems with that approach. (SOF ¶¶ 157–160.)   *First*, that "[i]t requires maintaining the calculation of GDP at 1993 prices and at 2004 prices at least until the [securities'] payment is exhausted or until 2034," which "is not a common practice of Statistics Offices around the world." (SOF ¶ 159.)   *Second*, that "[t]he growth condition becomes independent of the GDP calculation with the new base, and depends exclusively on the growth of the economy calculated with the 1993 base."   (SOF ¶ 160)   In other words, the Variable Factor Approach cancels out the Adjustment Provision and renders it mathematically irrelevant, as if it were not applied at all.   (SOF ¶¶ 161–163.)   Wright noted that this would go "against the basic principle of making payments when the Republic's payment capacity improves, resulting from a higher GDP growth."   (SOF ¶ 164.)[7]

Like the ONCP, market analysts evaluated the Constant Factor Approach and Variable Factor Approach—and independently reached the same conclusions.   (*See*

Finance in 2005.  Rather, he understood at the time of issuance that "the design of the GDP indexed bonds was not to make a payment if the economy was growing at a low level such as 1.38 percent per year" and payments under the Securities "were only supposed to be made if the economy was growing at or above 3 percent (depending on the year)."  (Ex. 2 (Nielsen Statement) ¶ 36.)

[7] Similar conclusions by Wright and others were memorialized in numerous additional memoranda, presentations, and communications in the months following the rebasing.  (*See* SOF ¶¶ 157–160, 165–166, 181–182.)

SOF ¶¶ 167–170.)  As reflected in an April 8, 2014 Bank of America Merrill Lynch report, the consensus view was that "a rescaling of the base case GDP by a constant factor . . . is consistent with the indentures and the prospectuses and makes complete economic sense [and] is entirely consistent with the original spirit of the indenture, as the path of real GDP growth was set in accordance with a debt sustainability analysis and a reasonable estimate of the economy's long-run growth."  (SOF ¶¶ 169–170.)  The Variable Factor Approach was an "alternative interpretation" that "makes less economic sense" because it "requires the government to continue to report GDP under the old National Accounts methodology until 2034" and would "change the nature and original spirit of the security, as the new base case GDP path needed to determine payments would not be known in advance anymore."  (*Id.*)  The report also identified and mathematically proved the same redundancy in the Variable Factor Approach recognized internally by the ONCP:  that approach "effectively reverts back to the original trigger criteria using [the 1993 base year]" meaning that "the GDP with the new methodology is irrelevant in determining when a payment is triggered."  (*Id.*; *see also* SOF ¶¶ 160, 163,167–168 (cataloguing the views of Bank of America Merrill Lynch, HSBC, and other private analysts).)[8]

---

[8] According to Plaintiffs' own emails (produced only after the Court granted the Republic's motion to compel), ████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

On September 24, 2014, INDEC announced slightly updated figures for 2013 GDP in 2004 prices, reporting a growth rate of 2.93%. (SOF ¶¶ 178–179.) Following this publication, the Ministry of Economy finalized a December 11, 2014 memorandum signed by members of the ONCP team, the Secretary of Finance, and the Minister of the Economy. (*See* SOF ¶ 181.) The memorandum concluded that "[t]he economic and financial logic of the instrument (as well as its spirit) indicates that the [Adjustment Provision's] Y/X fraction should be calculated for a particular year and applied . . . creating a single new Base Case at 2004 prices" (*i.e.*, the Constant Factor Approach). (SOF ¶ 182.) Applying the Constant Factor Approach, "the new Base Case GDP maintains the growth rates of the Base Case" set forth in the Securities, so Base Case GDP Growth for Reference Year 2013 is 3.22%. (*Id.*) Therefore, because the Republic's Actual Real GDP Growth rate for 2013 of 2.93% was below the Base Case GDP Growth rate, the Ministry of Economy concluded that no payment was due. (SOF ¶¶ 179–183.)

On December 15, 2014, the Republic announced that no payment was due for Reference Year 2013 because the Performance Condition was not met (the "No Payment Announcement"). (SOF ¶ 183.) Notwithstanding Plaintiffs' speculation

---

( ██████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████ (SOF ¶ 171).

that the Ministry of Economy was influenced by "political and economic pressure not to make payment on the GDP Warrants" (Adona SAC ¶ 111), all of the witnesses involved in this determination attest that they were not under any pressure to reach a particular conclusion in their analysis.  (SOF ¶ 135–137.)

## H.  The IMF's Scrutiny of INDEC's Rebased GDP Data

The IMF carefully scrutinized the Republic's rebased GDP and on April 16, 2015, concluded that the revised GDP data was of "better quality than previous estimates."  (SOF ¶¶ 184–190.)[9]  The IMF also observed that the size of the financial services sector was still slightly overstated and that, if this were corrected, the estimate of annual GDP growth for 2013 would decrease by at least 0.3% (to 2.6%). (SOF ¶ 190.)  On June 29, 2016, INDEC further revised its GDP estimates in 2004 prices for 2013, resulting in a figure of 2.3% annual GDP growth.  (SOF ¶ 191.)  In July 2016 the IMF concluded that the Republic's GDP was in line with international standards and in November 2016 lifted the Declaration of Censure against the

---

[9] Private economists ████████, who had long considered that Argentina's GDP was overstated in the 1993 base year, also recognized the accuracy of the new GDP data.  (*See* SOF ¶¶ 97, 123–126.)  ████████████████████████
████████████████████████████████████████████████
██████████ (SOF ¶ 126.) ████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████ (SOF ¶ 125.)

Republic.  (SOF ¶¶ 192–194.)

## PROCEDURAL HISTORY

More than four years after the No Payment Announcement, Aurelius filed suit in January 2019, claiming that the Republic breached the terms of the Global Security by failing to make a payment for Reference Year 2013.  Plaintiffs ACP Master, 683 Capital, Novoriver, and the Adona Plaintiffs followed with copycat complaints in the fall of 2019.  To argue that the payment conditions were met— specifically, that real GDP Growth exceeded the threshold set out in the Securities— Plaintiffs pointed to the "EMAE Index" as an alleged substitute for Actual Real GDP in 1993 prices as published by INDEC.  The Court dismissed the complaint, holding that the Global Security does not provide for the use of "substitute statistics," such as EMAE, and "the Republic was under no explicit contractual obligation to continue to calculate Actual Real GDP using constant 1993 prices." *Aurelius I*, 2020 WL 70348, at *6–8.  The Court left open a path for Aurelius to plead in an amended complaint that "the Republic breached the covenant of good faith and fair dealing by rebasing its GDP in a manner deliberately designed to avoid making payment under the Global Security." *Id.* at *7 n.7.

In response to *Aurelius I*, Plaintiffs alleged that the Republic: (i) breached an implicit provision of the Global Security, or in the alternative, violated its duty of good faith and fair dealing, by not "publish[ing] 2013 Actual Real GDP in 1993

prices . . . for the Reference Year 2013," supposedly to avoid payment that would otherwise be due (*e.g.*, Aurelius AC ¶¶ 67, 71), and (ii) breached the Global Security because it "did not apply the adjustment fraction" and in doing so "attempted to unilaterally change the terms of the contract without complying with the 'Modifications' provision in the Global Security" (*e.g.*, *id.* ¶¶ 67–68).

On March 29, 2021, the Court held that the Global Security contained no obligation—*express or implied*—for the Republic to "compel INDEC to publish data," including actual real GDP in the 1993 base year. *Aurelius II*, 2021 WL 1177465, at *9-10 (emphasis added). But the Court held that Plaintiffs' "allegations [were] sufficient to state a claim that the Republic sought to deprive Plaintiffs of payment for the 2013 Reference Year by causing INDEC not to publish the data necessary to make such a calculation." *Id.* at *11. The Court also held that it was plausible that the Republic "modified" the Securities when calculating payment for 2013 by "eschewing the Adjustment Fraction calculation." *Id.* at *9.

## ARGUMENT

"Where, as here, the nonmovant bears the burden of proof at trial, the movant may show prima facie entitlement to summary judgment" by "point[ing] to evidence that negates its opponent's claims" or "identify[ing] those portions of its opponent's evidence that demonstrate the absence of a genuine issue of material fact." *Salahuddin* v. *Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). The motion should be

granted unless the non-moving party comes forward with admissible evidence demonstrating the existence of a *genuine* issue of material fact that precludes judgment. *Matsushita Elec. Indus. Co., Ltd.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); Fed. R. Civ. P. 56(a).

## I.   THE COURT SHOULD GRANT SUMMARY JUDGMENT FOR THE REPUBLIC BECAUSE PLAINTIFFS CANNOT PROVE THRESHOLD ELEMENTS OF THEIR CLAIMS.

Discovery has demonstrated that Plaintiffs did not follow the threshold requirements for bringing suit, which is fatal to their claims as a matter of law.

### A.   Plaintiffs Did Not Satisfy the Preconditions for Bringing Suit Set Out in the Global Security and Trust Indenture.

Section 4.8 of the Indenture and Section 11 of the Global Security, which are substantively identical, contain five conditions that must be satisfied before any holder may bring suit under the Securities (the "No-Action Clause"). (SOF ¶¶ 205–206.)[10] These conditions operate as a "no-action clause," and such "clauses are

---

[10] Holders must:  (a) "give[] to the Trustee" (the Bank of New York Mellon) "written notice of default and of the continuance thereof with respect to the . . . Securities"; (b) obtain the cooperation of "the Holders of not less than 25% in aggregate . . . amount of the Outstanding . . . Securities" to make a "written request to the Trustee to institute such action, suit or proceeding in its own name as Trustee under this Indenture"; (c) "provide[] to the Trustee such reasonable indemnity and/or security as it may require" to bring such action; and (d) give the Trustee "60 days after its receipt of such notice . . . to institute any such action."  In addition, it must be the case that (e) "no direction inconsistent with such written request [by at least 25% of the holders] shall have been given to the Trustee" by a majority of the holders. (Ex. 35 (2005 Indenture) § 4.8; *see also* Ex. 37 (Global Security) § 11, at R-13.)

strictly construed."  *Cruden* v. *Bank of New York*, 957 F.2d 961, 968 (2d Cir. 1992).

All Plaintiffs except one claim to rely on the No-Action Clause as the basis for bringing suit, and the remaining Plaintiff gives no basis for bringing suit.[11]  None of the Plaintiffs has identified any evidence that they complied with these preconditions, warranting summary judgment against them.  *See Waxman* v. *Cliffs Nat. Res. Inc.*, 222 F. Supp. 3d 281, 292 (S.D.N.Y. 2016) (dismissing claims where "Plaintiffs have not complied with the Indentures' no-action clause").[12]

### B. Plaintiffs Who Purchased the Securities After the December 2014 No Payment Announcement Cannot Prove That the Claims Were Assigned to Them.

In the *Aurelius*, *ACP Master*, *Adona*, and *683 Capital* actions, Plaintiffs

---

[11] *See* Aurelius AC ¶ 17; ACP Master AC ¶ 17; Novoriver AC ¶ 18; Adona SAC ¶ 29; 683 Capital AC ¶ 20.  The Ape Group Plaintiffs do not allege any basis for their lawsuit under the terms of the Securities.

[12] The Adona Plaintiffs additionally purport to bring suit under Section 4.9 of the Indenture (Adona SAC ¶ 29), which the *Palladian* court found could be relied on by the claimants in that case.  (Ex. 178 (*Palladian* Judgment) ¶¶ 277–305.)  The *Palladian* ruling was decided under English law and is subject to appeal for legal error.  Section 4.9 only applies to a right to receive "payment of the ***principal of and interest on*** its Debt Security on the stated maturity date" and to "institute suit for the enforcement of any such payment."  (Ex. 35 (2005 Indenture) § 4.9 (emphasis added).)  Section 4.9 does not apply here because the Global Security expressly provides that "[h]olders of this Security are not entitled to receive principal in the amount of, or interest based on [the] notional amount [of the Security]" (SOF ¶ 210), a fact that is reiterated in the Republic's 2005 and 2010 Prospectuses (SOF ¶ 211).  In short, the ability to sue for "principal and interest" does not apply to the Securities (since payments under the Securities are neither principal nor interest), but instead to other bonds governed by the Trust Indenture.  (SOF ¶¶ 209–211.)

purchased some or all of their Securities after the No Payment Announcement. Under New York law, "[i]t is the Plaintiff's burden to demonstrate their standing to sue for claims related to each [security]." *Phoenix Light*, 585 F. Supp. 3d at 565. Plaintiffs must therefore prove that the right to sue transferred from each previous holder of the Securities on which they now purport to sue, dating back to the December 2014 No Payment Announcement, when the claims arose. *See Racepoint Partners LLC* v. *JPMorgan Chase Bank*, 2006 WL 3044416, at *5 (S.D.N.Y. Oct. 26, 2006) (dismissing case where plaintiffs failed to "allege facts to show that New York law governed every prior transfer of the notes at issue . . . such that their transferrers [sic] would have automatically acquired the claims of all the previous noteholders"). Such proof could be either (i) express assignments of the right to sue, or (ii) evidence that a transaction occurred under the law of a jurisdiction where such transfer would be automatic. *See Royal Park Invs. SA/NV* v. *Wells Fargo Bank, N.A.*, 2018 WL 739580, at *14 (S.D.N.Y. Jan. 10, 2018). Plaintiffs, however, have produced no such evidence, despite the Republic's requests. (SOF ¶ 221.) [13] Because these Plaintiffs chose to withhold all information about the "contracts" by which they purchased the Securities after the No Payment Announcement, there is no evidence that they own the claims on which they purport to sue.

---

[13] ███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████

C.     **WASO Cannot Recover for Purchases Made After the Five-Year Prescription Period.**

In *Ape Group SPA* v. *Republic of Argentina*, this Court recognized that the Prescription Clause "prescribes the Republic's obligation to pay where the security holder fails to assert a right to payment within the five-year period."  2022 WL 463309, at *3 (S.D.N.Y. Feb. 15, 2022).   Therefore, all claims for payment in connection with the December 15, 2014 No Payment Announcement are time barred unless the holder asserted a right to payment under the Securities at issue by December 15, 2019.  Plaintiff WASO first filed suit on December 11, 2019, based on holdings of a notional amount of $152,975,000 of the Securities (SOF ¶ 224), and filed an Amended Complaint on March 23, 2020.  (*Adona*, ECF No. 8.)

In September and October of 2020, more than six months after filing its Amended Complaint, WASO bought additional $557,750,000 of the Securities, increasing its total notional holdings to $710,725,000.  (SOF ¶ 225.)  WASO did not assert a right to payment on these later-acquired Securities until December 14, 2020—nearly a year to the day *after* the prescription period had expired—when it filed a letter seeking leave to supplement its Amended Complaint.  (*Adona*, ECF No. 23.)[14]  The claims based on these additional Securities were already time-barred

---

[14] The parties later filed a stipulation, which the Court so-ordered on July 19, 2021, granting the Adona Plaintiffs (of which WASO is one) leave to file the Supplemental Amended Complaint but without "waiver of any of the parties' rights or defenses

under the Prescription Clause when WASO acquired them, and time-barred claims do not transfer with the sale of a security. *Diesel Props S.r.l.* v. *Greystone Bus. Credit II LLC*, 631 F.3d 42, 55 (2d Cir. 2011) ("[A]n assignee stands in the shoes of its assignor and takes subject to those liabilities of its assignor that were in existence prior to the assignment.").

WASO has argued that these claims were not untimely because its late purchases of Securities did "not raise any new 'claims.'" (*Adona*, ECF No. 27 at 2.) This is wrong for several reasons. *First*, the claims relating to the additional Securities were time-barred at the time of purchase—meaning that WASO's earlier assertion of a right to payment over different Securities does not retroactively "un-prescribe" the claims on these later-acquired Securities. *Second*, WASO's unsupported contention ignores that it asserts a claim for payment based on its ownership of *each underlying Security. See Adona*, ECF No. 40-1 ¶ 29 ("Plaintiffs . . . bring this action on their own behalf in order to pursue the remedies available to a holder of the GDP Warrants *with respect to their beneficial holdings*.") (emphasis added); *see also Phoenix Light*, 585 F. Supp. 3d at 565 (requiring plaintiffs to "demonstrate their standing to sue for claims related to each [underlying security]"). In any event, the Prescription Clause mandates that a potential plaintiff assert a right

---

. . . including the right to challenge and/or object to the new allegations of the Supplemental Amended Complaint, including on timeliness, contractual prescription, . . . " or other grounds. (*Adona*, ECF No. 41 at 2.)

to payment "for *any amounts* due" within the prescription period.  (Ex. 37 (Global Security) at R-14 (emphasis added).)  WASO did not assert a right to payment for "amounts due" under the additional Securities within the prescription period.[15]

WASO also has contended that the relation back doctrine can save its untimely new claims.  (*Adona*, ECF No. 27 at 2 (citing Fed. R. Civ. P. 15(c).)  But relation back is forbidden where, as here, "a contractual condition precedent to asserting a claim"—*i.e.*, the satisfaction of the Prescription Clause—"is satisfied only after that claim has been asserted."  *Phoenix Light*, 585 F. Supp. 3d at 568; *see U.S. Bank Nat'l Ass'n* v. *GreenPoint Mortg. Funding, Inc.*, 45 N.Y.S.3d 11, 17 (App. Div. 1st Dept. 2016) (permitting relation back in such circumstances would "simply eviscerate the condition precedent").  Here, the condition precedent (the Prescription Clause) could never have been satisfied because any claims under the additional Securities were time-barred before WASO bought them.

WASO's post-filing purchases also cannot meet Rule 15(c)'s relation back requirements because that doctrine only allows for the correction of "inconsequential

---

[15] In *Ape Group*, this Court found that the Ape Group Plaintiffs satisfied the Prescription Clause by emailing the Republic's counsel and identifying the type and precise amount of their Securities' holdings and proposing a tolling agreement—thereby alerting the Republic to the specific amount of their asserted "right to payment" within the prescription period.  2022 WL 463309, at *3.  In contrast, WASO did not notify the Republic of the existence of or its intent to sue on the "amounts due" in connection with the additional $557,750,000 of Securities until nearly a year after the prescription period had run.

pleading error[s]," *Advanced Magnetics, Inc.* v. *Bayfront Partners, Inc.*, 106 F.3d 11, 19 (2d Cir. 1997), which is why the supplemented facts must arise out of the same "transaction" as set out in the original complaint.  But here, WASO attempts to use the doctrine not to correct its past pleadings, but to add new claims based on new transactions.  *Pruiss* v. *Bosse*, 912 F. Supp. 104, 106 (S.D.N.Y. 1996) ("An amendment will not relate back if it sets forth a new set of operational facts; it can only make more specific what has already been alleged.").  If WASO were right that relation back applies, a plaintiff who acquired a single dollar's worth of Securities to timely sue could then later acquire and recover for *all* of the remaining outstanding Securities.  This would gut the Prescription Clause and deprive the Republic of the finality and repose to which it is contractually entitled.

## II.   THERE IS NO TRIABLE ISSUE ON PLAINTIFFS' BREACH OF CONTRACT CLAIM.

In addition to Plaintiffs' failure to overcome the threshold bars to their claims, there is no triable issue of fact under either of the theories the Court allowed to proceed to discovery.  In any event, the Ministry of Economy's conclusion that no payment was due for 2013 was not only reasonable but entirely correct when the contractual language is considered as a whole and in context.

### A.   There Is *No* Evidence to Support Plaintiffs' Claim That INDEC's 2014 Rebasing Constituted a Breach of the Implied Covenant of Good Faith and Fair Dealing.

In *Aurelius I*, the Court dismissed the complaint because Aurelius'

calculations rested on assuming a figure—Actual Real GDP for 2013 in 1993 base as published by INDEC—that does not exist.  2020 WL 70348, at *6–7.  Plaintiffs cannot plug in "substitute statistics" such as the EMAE Index that were "inherently different from the versions of those statistics that are required under the contract." *Id.* at *7.  But the Court left open the possibility that Aurelius could plead that "the Republic breached the covenant of good faith and fair dealing by rebasing its GDP in a manner *deliberately designed* to avoid making payment under the Global Security."  *Id.* at *7 n.7 (emphasis added).  Plaintiffs promptly amended their complaints to posit this theory.[16]

In denying the Republic's motion to dismiss the amended complaints, the Court held that because "Plaintiffs allege[d] that the Republic caused INDEC to stop publishing data to obscure the fact that a payment was due," they had "alleged sufficient facts which, taken as true, plausibly state a claim for breach of the implied covenant of good faith and fair dealing."  *Aurelius II*, 2021 WL 1177465, at *11–12. The Court left open the question of "[w]hether discovery will bear out Plaintiffs' contentions."  *Id.* at *12.  More than two years of extensive discovery has provided an answer: their allegations are false.

"Under New York law, a defendant violates the implied covenant when it

---

[16] *See* Aurelius AC ¶¶ 5, 13, 63; ACP Master AC ¶¶ 5, 13, 63; Novoriver AC ¶¶ 10, 41, 63, 76; Adona SAC ¶¶ 13, 18, 86; 683 Capital AC ¶ 118.

purposefully sabotages a plaintiff's ability to benefit under the contract." *Thompson* v. *Advanced Armament Corp., LLC*, 614 F. App'x 523, 525 (2d Cir. 2015).  The implied covenant "will be breached only in a narrow range of cases," *Security Plans, Inc.* v. *CUNA Mut. Ins. Soc.*, 769 F.3d 807, 817 (2d Cir. 2014), and "there is a presumption that all parties act in good faith," *Tractebel Energy Mktg., Inc.* v. *AEP Power Mktg., Inc.*, 487 F.3d 89, 98 (2d Cir. 2007).  To overcome this presumption, "[a] plaintiff must show substantially more than evidence that the defendant's actions were negligent or inept." *Security Plans*, 769 F.3d at 817; *see Thompson*, 614 F. App'x at 525 ("intentional acts done without the purpose of cheating the plaintiff" are insufficient); *Wagner* v. *JP Morgan Chase Bank*, 2011 WL 856262, at *4 (S.D.N.Y. Mar. 9, 2011) ("[A] defendant violates the covenant of good faith and fair dealing only when he acts with some improper motive.").

**INDEC's Independent Decision to Rebase.**  Plaintiffs allege that the Republic "caused and/or permitted INDEC to withhold [GDP] data in order to try to obscure the fact that a payment was due, and to attempt to stymie Warrant holders' ability to assert their rights to payment."  (Aurelius AC ¶ 13.)  But there is no evidence of any influence by the Republic on the timing or methodology of the 2014 rebasing—let alone to avoid payment under the Securities.  INDEC's National Director of National Accounts, Gustavo Rodríguez, who oversaw the rebasing, recounts in his sworn declaration that "[the Ministry of Economy] did not provide

any direction as to the rebasing process, the data that was required to complete the rebasing . . . or the timeframe within which [INDEC was] aiming to complete it." (SOF ¶ 136.)  Indeed, relevant individuals at the Ministry of Economy, including the Secretary of Finance, were not even aware of many specifics of the rebasing, including that the 1993 base year was being discontinued, until after INDEC's publication of the 2004 base series on March 27, 2014.  (SOF ¶ 137.)

Plaintiffs argue that "[t]he Republic has the power to compel INDEC to publish Actual Real GDP in 1993 prices" (Aurelius AC ¶ 36), but this is a red herring in light of the Court's holding that the Securities "do not require the Republic to compel INDEC to publish data."  *Aurelius II*, 2021 WL 1177465, at *9.  Further, the Court made clear that the critical question is not whether the Republic had the power to influence INDEC, but whether "the Republic <u>in fact</u> caused INDEC to refrain from publishing data in this instance."  *Id.* at *12 n.14.[17]  There is no such evidence.

***Adherence to International Standards.***  There is no support for Plaintiffs' allegation that the Republic "inappropriately us[ed] the rebasing as an excuse to stop publishing Actual Real GDP in 1993 prices."  (Aurelius AC ¶ 63.)  INDEC's

---

[17] Moreover, as explained by the eminent Professor Julio Pablo Comadira, Argentine Law No. 17,622 created INDEC as a "deconcentrated body" and gave it certain exclusive technical competences.  (Ex. 179 (Comadira Rebuttal) ¶¶ 15–17.) INDEC's technical competences include determining the methodology to carry out official statistical activities.  (*Id.* ¶ 25.)  Where a body has a technical competence, that competence cannot be exercised or directed by any other body.  (*Id.* ¶¶ 32–33.)

discontinuance of real GDP in the 1993 base after it issued the new 2004 series adhered to standard practice.  (SOF ¶¶ 81, 132, 134, 159.)  Plaintiffs' allegation that this practice "differed from other countries" (Adona SAC ¶ 49) is false.  ███████

████████████████████████████████████████████████████████████

████████████████████████████████████████  (SOF ¶ 134.)[18]

*IMF Pressure to Rebase.*  Plaintiffs' allegation that Argentina timed its rebasing to occur "as it was becoming apparent that Argentina would owe a payment under the GDP Warrants with respect to Reference Year 2013" has also fallen flat. (Aurelius AC ¶ 37.)  The undisputed facts show that INDEC began the process of updating the year of base prices used to calculate its real GDP in 2004, when it began conducting a National Economic Census.  (SOF ¶¶ 86–88.)  This was consistent with international standards that call for a rebasing to take place every 5 to 10 years.  (SOF ¶ 81.)  Despite starting the process in 2004, INDEC's rebasing was not completed until 2014.  As the record shows, this delay was due in large part to the difficulty INDEC experienced in processing the census data, which took until the end of 2008, and other complexities attendant with updating national accounts in the wake of massive structural changes that took place between 1993 to 2004.  (*See* SOF ¶¶ 88–

---

[18] *See* Ex. 57 (Reinsdorf Dep. Tr.) at 276:12–19 ██████████████████████
████████████████ Ex. 13 (Ostry Dep. Tr.) 62:17–21 ██████████████████
████████████████████████████████████████████████████████████
█████████████████████████████████████████████

89, 109.)

There is also no dispute that, as the rebasing wore on, the IMF placed immense and increasing pressure on the Republic to complete the rebasing—culminating in the issuance of an unprecedented Declaration of Censure in 2013 after the Republic had missed deadlines set by the IMF.  (SOF ¶¶ 90–107.)  After the Censure, extensive and well-documented discussions took place within the IMF and between the IMF and the Republic to determine the fastest possible timetable to complete the rebasing.  (SOF ¶¶ 108–109, 111.)  Eventually, at the insistence of influential Executive Directors, the IMF set a deadline of March 31, 2014 for the Republic to publish real GDP in the new 2004 base year, with the threat of ruinous consequences if the Republic failed to comply, including a Declaration of Ineligibility to use IMF resources.  (SOF ¶¶ 112–113.)

*　　*　　*

The record amply demonstrates that the Republic's and INDEC's decisions were "guided by valid, good faith business judgments," and not any "improper motive."  *Travellers Int'l, A.G.* v. *Trans World Airlines, Inc.*, 41 F.3d 1570, 1577 (2d Cir. 1994).  There is simply no evidence to support Plaintiffs' central theory: that the Republic "caus[ed] INDEC not to publish the data necessary to make such a calculation."  *Aurelius II*, 2021 WL 1177465, at *11.

**B.    The Ministry of Economy Faithfully Applied the Adjustment Provision in Concluding That No Payment Was Due for 2013.**

Plaintiffs also allege that the Republic "did not apply the adjustment fraction to Base Case GDP, and did not use adjusted Base Case GDP to calculate Base Case GDP Growth."—*i.e.*, failed to apply the Adjustment Provision.   (Aurelius AC ¶ 68.)[19]   In *Aurelius II*, the Court denied the Republic's motion to dismiss the amended complaints based on Plaintiffs' allegation (which it was required to accept as true) that the Republic breached the Securities' modifications provision by "*failing to apply* the Adjustment Fraction to Base Case GDP when calculating Base Case GDP Growth and calculating the Payment Amount using *unadjusted* figures instead."  2021 WL 1177465, at *4 (emphasis added).

The undisputed facts show that the Republic *did apply* the Adjustment Provision.[20]   Indeed, the record is replete with evidence of the Ministry of Economy's thoughtful, good faith analysis of how to apply the Adjustment Provision, including grappling with the issue in detailed internal memoranda and

---

[19] *See also* ACP Master AC ¶ 68; Adona SAC ¶ 66; Novoriver AC ¶ 79; Ape Group Compl. ¶ 32; 683 Capital AC ¶ 123.

[20] Ironically, as explained in the Section II.C *infra*, it is Plaintiffs—not the Republic—who use "unadjusted figures" for Base Case GDP in their calculations, as their expert conceded in his expert report and at his deposition.  *See* Ex. 32 (Ostry Rebuttal) ¶ 15 ("the net effect of Plaintiffs' interpretation is that the Level and Growth Conditions will remain a function of real GDP in constant 1993 prices after a rebasing"); *see also* Ex. 13 (Ostry Dep. Tr.) at 40:18–41:9, 90:3–91:22.

presentations.   (SOF ¶¶ 143–166.)   For instance, as discussed in Background section G *supra*, the Ministry of Economy's official memorandum regarding the determination that no payment was due for 2013 walks through the Ministry's careful application of the Adjustment Provision.  (SOF ¶¶ 181–182; *see also* pp. 19–21 *supra*.)   The memorandum explains that the Ministry determined that the Adjustment Provision required the Constant Factor Approach and then applied the Constant Factor.   Based on this calculation, the Ministry concluded that the Performance Condition was not met because "the annual growth of the Actual Real GDP for 2013," which was 2.93%, "did not exceed the growth rate of the Base Case at 2004 prices, corresponding to 2013."  (SOF ¶ 182.)

This documentary record is corroborated by the testimony of Pablo López (then-Secretary of Finance) and Santiago Wright (then-Head of the Financial Risks Analysis Unit of the ONCP)—the two individuals most involved in the determination that no payment was due for Reference Year 2013—who both affirmed that the Republic applied the Adjustment Provision.  (SOF ¶ 180.)

Plaintiffs' allegations that the Republic "fail[ed] to apply the Adjustment Fraction" or "us[ed] unadjusted figures" are demonstrably wrong, and accordingly, there is no triable issue of fact on the issue of whether the Republic "eschew[ed] the Adjustment Fraction."  *Aurelius II*, 2021 WL 1177465, at *4, *9.   The Court therefore should grant summary judgment in favor of the Republic on Plaintiffs'

claim for breach of the modifications provision.  At a minimum, the Republic's determination that a Constant Factor should be applied to rescale Base Case GDP was reasonable and entitled to deference under the Binding Effect Clause, which provides that "[a]ll calculations made by the Ministry of Economy hereunder shall be binding on . . . all Holders of this Security, absent bad faith, willful misconduct or manifest error."  (Ex. 37 (Global Security) at R-4.)[21]

### C.    In the Alternative, the Republic's Interpretation of the Adjustment Provision Is Correct as a Matter of Law.

The Court need not address the question of whether the Republic's interpretation of the Adjustment Provision is *correct* to resolve this motion.  As discussed above, given the Court's rulings in *Aurelius I* and *II*, the two theories of breach that remain in the case turn on the Republic's alleged bad faith and failure to apply the Adjustment Provision at all.  Nevertheless, the Global Security considered

---

[21] In *Aurelius II*, this Court held that the Binding Effect Clause did not apply based on the allegation that the Republic "modified the method of calculation of the Payment Amount" by "eschewing the Adjustment Fraction calculation."  2021 WL 1177465, at *9.  Plaintiffs' allegation has been proven incorrect: the Ministry of Economy applied the Adjustment Provision in concluding that no payment was due.  This conclusion stands under the Binding Effect Clause absent evidence of "bad faith, willful misconduct or manifest error," none of which are present here.  *See Toledo Fund, LLC* v. *HSBC Bank USA, Nat'l Ass'n*, 2012 WL 2850997, at *7 (S.D.N.Y. July 9, 2012) (defendant with "sole discretion" of "critical determinations" under a contract did not breach its contractual obligations where defendant "did not act arbitrarily or irrationally in exercising that discretion and control"); *Rogers Revocable Tr.* v. *Bank of Am., N.A.*, 2008 N.Y. Misc. LEXIS 7471, at *12 (N.Y. Sup. Ct. Nov. 13, 2008) (dismissing breach of contract claim due to contractual provision that gave defendant "sole discretion" to make adjustment).

as a whole, and in the context of the circumstances surrounding the issuance of the Securities, makes clear that the Republic's interpretation of the Adjustment Provision—the Constant Factor Approach—is correct as a matter of law.

"The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent." *Maxim Grp. LLC* v. *Life Partners Holdings, Inc.*, 690 F. Supp. 2d 293, 303 (S.D.N.Y. 2010) (Preska, J.). Courts should "construe the agreements so as to give full meaning and effect to the material provisions" and "not render any portion meaningless." *Beal Sav. Bank* v. *Sommer*, 8 N.Y.3d 318, 324 (2007); *see also Sayers* v. *Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993) ("By examining the entire contract, we safeguard against adopting an interpretation that would render any individual provision superfluous."). The Republic's interpretation of the Adjustment Provision (i) is the only interpretation consistent with the circumstances under which the Securities were issued; (ii) is correct under the plain language of the Securities; and (iii) gives meaning to the Adjustment Provision, which is rendered superfluous under Plaintiffs' Variable Factor Approach.

The Republic recognizes that in *Palladian*, an English court applying English law adopted the Variable Factor Approach. That decision is subject to appeal on the basis that it is flawed in fundamental respects, including for reasons similar to those set forth in this section. In any event, the *Palladian* decision is irreconcilable with

two of this Court's key holdings: that Plaintiffs cannot prevail using "alternate statistics not contemplated by the Global Security's plain terms," instead of GDP data "published by INDEC," *Aurelius I*, 2020 WL 70348, at *7, and that "the Global Securities do not require the Republic to compel INDEC to publish data, and the Court will not impose such an obligation," *Aurelius II*, 2021 WL 1177465, at *10. Two central premises of the English court's decision were that substitute statistics *could* be used for 2013, and that there *was* an implied obligation to publish GDP in a particular base year—indeed the court ordered the Republic to publish real GDP in the 1993 base through 2034.  (Ex. 178 (*Palladian* Judgment) ¶¶ 266–71.)  The Republic intends to appeal the *Palladian* decision, and for that reason and because it was reached on different grounds under a different system of law, this Court should not rely on it in considering this motion.  Instead, to the extent it reaches questions of construction, it should do so afresh in light of the evidence and New York law arguments set forth below.

### 1.    The Constant Factor Approach Is Consistent with the Context of the Issuance of the GDP-Linked Securities.

The Court may consider evidence going to the circumstances surrounding the execution of a contract, even in the absence of ambiguity, because "the court's primary purpose in interpreting the agreement is to determine the parties' intentions, and interpreting the contract's terms in a factual vacuum would undermine that goal."  *In re Coudert Bros*., 487 B.R. 375, 393 (S.D.N.Y. 2013); *see also Dreni* v.

*PrinterOn Am. Corp.*, 2021 WL 4066635, at *3 (S.D.N.Y. Sept. 3, 2021) ("The Court's consideration of the context and circumstances surrounding the execution of the [contract] is consistent with well-established precedent.").  When the Securities are considered in the relevant context, it is clear that the Constant Factor Approach is the only reading consistent with the parties' expectations at the time of issuance.

As discussed in Background section B *supra*, the GDP-linked Securities were issued in the wake of Argentina's economic crisis and default.  (*See supra* pp. 8–9.) To avoid future defaults, it was critical that Argentina's restructured debt burden be sustainable. (SOF ¶¶ 10, 60.)  Ultimately, the team at the Ministry of Economy conducting the debt sustainability analysis, led by Sebastián Katz, determined that Argentina's long-term potential GDP—independent of any particular year of base prices—was 3%. (*See supra* p. 9; SOF ¶¶ 14–15, 62.) This long-term 3% growth rate consequently became the central assumption behind the GDP-linked Securities and the Base Case GDP levels were derived from this assumption.  (*See* SOF ¶¶ 19–20.)

Further, the record shows that all parties understood at the time of the Securities' issuance that the Securities were designed around this 3% long-term GDP growth rate:  the Republic repeatedly described the Securities to investors as paying out when real GDP Growth exceeded 3% Base Case GDP Growth (*see supra* pp. 10–11; SOF ¶¶ 21, 51), and numerous analyst reports published at issuance highlighted the 3% growth assumption (*see supra* at 11; SOF ¶¶ 63, 123, 168–170).

Indeed, even *Plaintiffs* understood that the Securities would pay only if the Republic's economic growth was at or above 3%.  (SOF ¶¶ 162, 171–176.)[22] Tellingly, Plaintiffs have not identified a single investor in the Securities who, at the time of the Securities' issuance, understood the Adjustment Provision to mean what they now claim.  (*See, e.g.*, SOF ¶ 176.)

### 2. The Constant Factor Approach Is Consistent with the Text of the Securities, Which Calls for a Single, Fixed Adjustment.

The text of the Adjustment Provision supports the one-time adjustment required by the Constant Factor Approach.  The Adjustment Provision applies "if the Year of Base Prices employed by INDEC for determining Actual Real GDP shall at any time be a calendar year other than the year 1993."  (Ex. 37 (Global Security) at R-3.)  Similarly, the definition of "Year of Base Prices" provides that if INDEC employs a base year other than 1993, "then the Year of Base Prices shall mean such other calendar year."  (*Id.* at R-5.)  The clear import of this language is that there can only be *one* Year of Base Prices at any time.  Thus, a change in Year of Base Prices necessarily requires retiring the old Year of Base Prices and adopting a new Year of

---

22 

Base Prices.  This is consistent with the Constant Factor Approach, which unlike the Variable Factor Approach, does not require continued use of the old Year of Base Prices throughout the life of the Securities.

In the event of a change in the Year of Base Prices, the Adjustment Provision provides that "the Base Case GDP for each Reference Year *shall be adjusted* to reflect any *such change* in the Year of Base Prices." (*Id.* at R-3 (emphasis added).) The natural reading of this language is that the necessary adjustment is to be made just once, when the rebasing has occurred, consistent with the Constant Factor Approach.  The Securities further provide that this adjustment should be performed "by multiplying the Base Case GDP for such Reference Year . . . by *a fraction*." (*Id.* (emphasis added).)  These words are consistent with the use of a single adjustment fraction (*i.e.*, the Constant Factor Approach) and contrary to the annual calculation of a new adjustment fraction, as required under the Variable Factor Approach.  (*See* SOF ¶¶ 144–153, 155–166.)

Moreover, the Adjustment Provision describes the fraction: "the numerator of which shall be the Actual Real GDP for *such Reference Year* measured in constant prices of the Year of Base Prices, and the denominator of which shall be the Actual Real GDP *for such Reference Year* measured in constant 1993 prices." (Ex. 37 (Global Security) at R-3 (emphasis added).)  This language also suggests that: (i) there is a one-time adjustment; (ii) the adjustment fraction is derived from inputs

that are available at the time the adjustment is to be made; and (iii) the words "such Reference Year" refer to the year from which the adjustment fraction's inputs are taken, which must be a year in which the GDP data necessary to calculate the fraction is available. Under the Constant Factor Approach, the single adjustment fraction can be calculated from inputs available at the time of the rebasing, and such inputs can be taken from a single Reference Year. Under Plaintiffs' Variable Factor Approach, the entire Base Case GDP table cannot be adjusted at the time of the rebasing because (i) Actual Real GDP for future reference years cannot be known in advance in either the Year of Base Prices or 1993 prices, and (ii) Actual Real GDP in 1993 base prices is no longer published at all. (*See* SOF ¶¶ 159–166.)

Additionally, the fact that the Securities do not require the Republic to publish Actual Real GDP in 1993 base (or any other outdated base year) is itself compelling evidence that the parties did not adopt the Variable Factor Approach when the Securities were issued. *Vermont Teddy Bear Co.* v. *538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004) ("[C]ourts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include."). As this Court has already recognized, real GDP in the old base year is essential for Plaintiffs' calculations to work. *Aurelius I*, 2020 WL 70348, at *7. If the parties had intended the Republic to publish an outdated base year for the life of the Securities until 2035, they would have said so, but "[b]y their

terms, the Global Securities do not require the Republic to compel INDEC to publish data, and the Court will not impose such an obligation." *Aurelius II*, 2021 WL 1177465, at \*10.  The absence of any such covenant is especially telling given that no country has ever published real GDP in the old base year after re-basing.  (SOF ¶ 134.)  Had the parties expected the Republic to take this unprecedented step, they would have "bargained for a provision requiring INDEC to calculate and publish that data in all circumstances." *Aurelius II*, 2021 WL 1177465, at \*9; *see Utica Mut. Ins. Co.* v. *Clearwater Ins. Co*., 906 F.3d 12, 24–25 (2d Cir. 2018) (refusing to "imply so significant a term into a contract negotiated between sophisticated parties"); *Levine* v. *860 West Tower, Inc.*, 1999 WL 185270, at \*4 (S.D.N.Y. Mar. 31, 1999) (Preska, J.) ("declin[ing] to insert" contractual language "when the parties themselves have decided not to include it").

### 3.   Plaintiffs' Interpretation Renders the Adjustment Provision Superfluous and Produces Absurd Results.

Expert discovery has proven what Bank of America Merrill Lynch already identified in April 2014 as "one of the most enigmatic consequences of [the Variable Factor Approach]":  it does not use adjusted Base Case GDP figures at all, only the original, *unadjusted* Base Case GDP figures in the Global Security.  (SOF ¶ 170.)  In other words, it writes the entire 115-word Adjustment Provision, along with other key terms, out of the Global Security altogether.  This is highly ironic given that Plaintiffs survived the Republic's motion to dismiss the amended complaints by

claiming that the Republic breached the modifications provision by "calculating the Payment Amount using unadjusted figures." *Aurelius II*, 2021 WL 1177465, at *4, *11.  The Republic's expert, Dr. Eduardo Borensztein, showed in his opening report that Plaintiffs' interpretation was mathematically equivalent to simply using the 1993 base year for the life of the Securities to assess whether payment is required. That is, under Plaintiffs' Variable Factor Approach, all Payment Conditions are "exclusively based on the Republic's real GDP in 1993 base prices, even after the Republic rebased its real GDP."  (Ex. 14 (Borensztein Report) ¶ 50 & App'x C; *see* Ex. 33 (Borensztein Reply) ¶¶ 15–31.)  This is contrary to the basic function of GDP-linked securities, which seek to link payment obligations to the current economy—not to an obsolete picture of the economy.  (*See* pp. 9–10 *supra*.) ███████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████ (Ex. 32 (Ostry Rebuttal) ¶ 15; Ex. 13 (Ostry Dep. Tr.) at 40:18–41:9.)

███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████ (Ex. 32 (Ostry Rebuttal) ¶ 15 n.8 (emphasis added).)) ██████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

(Ex. 33 (Borensztein Reply) ¶¶ 24–36.) ███████████████████████████

███████████████████████ (Ex. 13 (Ostry Dep. Tr. 90:3–91:22; SOF ¶¶ 161–163.)

Under Plaintiffs' interpretation, therefore, adjusted Base Case GDP and the

Adjustment Provision "play no role in the calculation of the Payment Amount" or

any other aspect of the Securities other than as a pointless series of calculations

producing the same result as comparing Base Case GDP in 1993 prices with real

GDP in 1993 prices for a given year.  (SOF ¶¶ 161–163.)  Plaintiffs' interpretation

is the same as deleting the Adjustment Provision from the Securities entirely.

In sum, if applied as Plaintiffs propose, the Adjustment Provision has no effect

on whether holders are paid, how much they are paid, or indeed anything else under

the Securities.[23]  This reading is contrary to settled New York law.  *LaSalle Bank*

*Nat. Ass'n* v. *Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) ("[A]n

interpretation of a contract that has the effect of rendering at least one clause

superfluous or meaningless . . . is not preferred and will be avoided if possible.");

*USI Ins. Services LLC* v. *Miner*, 801 F. Supp. 2d 175, 184 (S.D.N.Y. 2011) (Preska,

J.) ("[T]he Court must give effect to all of the provisions of a contract, and an

---

[23] The term "Year of Base Prices" is also rendered superfluous because Plaintiffs' interpretation permanently ties the Payment Conditions to real GDP in 1993 base, meaning that any subsequent Year of Base Prices has no purpose.

interpretation that renders a term superfluous or meaningless is avoided if possible.").[24]

Plaintiffs' interpretation has other fatal flaws as well, including that it "produce[s] a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties." *Atlas Partners, LLC* v. *STMicroelectronics, Int'l N.V.*, 2015 WL 4940126, at *5 (S.D.N.Y. Aug. 10, 2015). In particular, by making payment solely a function of real GDP in 1993 base, Plaintiffs' interpretation would mandate payments and increase debt service even when Actual Real GDP Growth in the 2004 base series—the best measure of the actual economy—is *negative*. (SOF ¶ 166.) ███████████████████████████████
████████████████████████████████. (SOF ¶¶ 171–176.)

Plaintiffs' flawed interpretation also relies on the completely counterintuitive assumption (without any evidence) that a rational investor in 2005 or 2010 wanted to be tied to the increasingly obsolete and distorted 1993 base year for the lifespan of the Securities (*i.e.*, through 2035). That is, under the Variable Factor Approach,

---

[24] In *Palladian*, the court concluded (applying English law) that because the "Adjustment Provision does do something," it cannot be considered superfluous under the Variable Factor Approach. (Ex. 178 (*Palladian* Judgment) ¶ 178.) This misses the point. It is irrelevant whether or not the Adjustment Provision does **something** under Plaintiffs' interpretation if that something is a circular math exercise. The critical point for contractual interpretation is that, under the Variable Factor Approach, the Adjustment Provision could just as soon be deleted from the Global Security, and the Securities would operate in the same way.

rather than analyzing the Payment Conditions against the anticipated performance of the Republic's economy, investors would be guessing at the performance of an obsolete measure of the Republic's economy (real GDP in 1993 prices) that would have no purpose other than to determine payment under the Securities—and thus no analysis or oversight from economists and other experts.  (SOF ¶¶ 159–166.)  Courts will not adopt an interpretation that is "commercially unreasonable or illogical." *Wells Fargo Bank, N.A.* v. *Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 173 (S.D.N.Y. 2015).

## CONCLUSION

For the foregoing reasons, the Court should grant the Republic's motion for summary judgment.

Respectfully,

*/s/ Robert J. Giuffra, Jr.*
Robert J. Giuffra, Jr.
Sergio J. Galvis
Amanda F. Davidoff
Thomas C. White

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
Telephone:  (212) 558-4000
Facsimile:   (212) 558-3588

*Counsel for the Argentine Republic*

April 14, 2023