UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AURELIUS CAPITAL MASTER, LTD., :

        Plaintiff, :

        v. :    Case No.:  1:19-CV-0351

                        (LAP)

THE REPUBLIC OF ARGENTINA, :

        Defendant. :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

*[CAPTION CONTINUED ON FOLLOWING PAGES]*

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE
REPUBLIC'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT
OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**

**FRIEDMAN KAPLAN SEILER
  ADELMAN & ROBBINS LLP**
Edward A. Friedman
Daniel B. Rapport
Michael S. Palmieri
7 Times Square
New York, NY  10036-6516
(212) 833-1100

*Counsel for Plaintiffs
Aurelius Capital Master, Ltd. and
ACP Master, Ltd.*

**LATHAM & WATKINS LLP**
Matthew S. Salerno
1271 Avenue of the Americas
New York, NY  10020
(212) 906-1200

*Counsel for Plaintiffs Adona LLC,
Egoz I LLC, Egoz II LLC,
Mastergen, LLC, Erythrina, LLC,
AP 2016 1, LLC, AP 2014 3A, LLC,
AP 2014 2, LLC, and
WASO Holding Corporation*

*[COUNSEL CONT'D ON NEXT PAGE]*

June 13, 2023

**PERKINS COIE LLP**
Matthew M. Riccardi
H. Rowan Gaither IV
Jacob Taber
1155 Avenue of the Americas, 22nd Floor
New York, New York 10036-2711
Telephone:   (212) 262-6900
Facsimile:   (212) 977-1649

*Counsel for Plaintiff*
*683 Capital Partners, LP*

**BLEICHMAR FONTI & AULD LLP**
Javier Bleichmar
Evan A. Kubota
7 Times Square, 27th Floor
New York, NY  10036
(212) 789-1341

*Counsel for Plaintiff Novoriver S.A.*

**LAW OFFICES OF ERIC J. GRANNIS**
Eric J. Grannis
11 Broadway, Suite 615
New York, New York  10004
Telephone:  (212) 903-1025

*Counsel for Plaintiffs Ape Group SpA,*
*Romano Consulting SpA, Icaro SRL and*
*Elazar Romano*

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - x
NOVORIVER S.A.,                                       :
                                                      :
                 Plaintiff,                           :
                                                      :
                 v.                                   :    Case No.:  1:19-CV-09786
                                                      :    (LAP)
ARGENTINE REPUBLIC,                                   :
                                                      :
                 Defendant.                           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x
ACP MASTER, LTD.,                                     :
                                                      :
                 Plaintiff,                           :
                                                      :
                 v.                                   :    Case No.:  1:19-CV-10109
                                                      :    (LAP)
THE REPUBLIC OF ARGENTINA,                            :
                                                      :
                 Defendant.                           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x
683 CAPITAL PARTNERS, LP,                             :
                                                      :
                 Plaintiff,                           :
                                                      :
                 v.                                   :    Case No.:  1:19-CV-10131
                                                      :    (LAP)
THE REPUBLIC OF ARGENTINA,                            :
                                                      :
                 Defendant.                           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
ADONA LLC, EGOZ I LLC, EGOZ II          :
LLC, MASTERGEN, LLC, ERYTHRINA,         :
LLC, AP 2016 1, LLC, AP 2014 3A, LLC,   :
AP 2014 2, LLC, AND WASO HOLDING        :
CORPORATION,                            :    Case No.:  1:19-CV-11338
                                        :    (LAP)
              Plaintiff,                :
                                        :
          v.                            :
                                        :
THE REPUBLIC OF ARGENTINA,              :
                                        :
              Defendant.                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
APE GROUP SPA, ROMANO                   :
CONSULTING SPA, ICARO SRL and           :
ELAZAR ROMANO,                          :
                                        :    Case No.:  1:20-CV-10409
              Plaintiffs,               :    (LAP)
                                        :
          v.                            :
                                        :
THE REPUBLIC OF ARGENTINA,              :
                                        :
              Defendant.                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ..................................................................iv

GLOSSARY OF NAMES ....................................................................ix

PRELIMINARY STATEMENT ..............................................................1

FACTS ................................................................................................5

    1.    GLOBAL SECURITY TERMS RELATING TO PAYMENTS..........5

    2.    ██████████████████████████████████████████
        ██████████████████████████████████████████ 10

    3.    INDEC'S PUBLICATION OF ACTUAL REAL GDP AND
        THE EMAE INDEX ...............................................................12

    4.    ██████████████████████████████████████████
        ██████████████████████████████████████████ 14

    5.    ██████████████████████████████████████████
        ██████████████████████████████████████████ 16

    6.    ██████████████████████████████████████████
        ██████████████████████████████████████████ 17

    7.    ██████████████████████████████████████████
        ██████████████████████████████████████████
        ██████████████████████████████████████████ ...19

    8.    ██████████████████████████████████████████
        ██████████████████████████████████████████ 20

**Page**

9. ██████████████████████████████.24

10. THE REPUBLIC'S SHIFTING POSITION AS TO THE
ADJUSTMENT PROVISION ..............................................26

11. THE ENGLISH JUDGMENT, APRIL 5, 2023 ...................................27

ARGUMENT ...................................................................................................33

I. THE ADJUSTMENT PROVISION REQUIRES A SEPARATE
ADJUSTMENT FRACTION FOR EACH REFERENCE YEAR ...............33

   A. The Words of the Adjustment Provision Are Clear and
Unambiguous...................................................................................33

   B. The Plain Language Does Not Produce Absurd Results.....................37

II. INDEC IS PART OF, AND CONTROLLED BY, THE REPUBLIC..........41

III. THE REPUBLIC BREACHED THE MODIFICATIONS
PROVISION ...................................................................................44

IV. THE REPUBLIC BREACHED THE IMPLIED COVENANT OF
GOOD FAITH AND FAIR DEALING ................................................45

   A. The Republic's Conduct Is a Classic Violation of the Covenant........46

   B. The Undisputed Facts Prove All the Allegations the Court
Identified as Sufficient to State a Claim for Breach of the
Covenant.........................................................................................50

      1. ████████████████████████...51

      2. ████████████████████████████52

3732035.1

**Page**

3.     ███████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████.53

V.    UNDER THE PREVENTION DOCTRINE, THE REPUBLIC CANNOT AVOID ITS PAYMENT OBLIGATION .....................................58

VI.    THE REMEDY FOR THE REPUBLIC'S BREACH SHOULD BE AN AWARD OF AMOUNTS DUE FOR 2013 IN PROPORTION TO EACH PLAINTIFF'S BENEFICIAL INTEREST IN THE GLOBAL SECURITY .....................................................................61

VII.    PLAINTIFFS HAVE THE RIGHT TO PURSUE THE CLAIMS THEY HAVE ASSERTED ...............................................................63

     A.     The Governing Documents Grant Plaintiffs the Same Right as the "Holder" to Bring Suit for Payments Due.....................63

     B.     Plaintiffs Do Not Need Assignments from Former Beneficial Owners..........................................................................................67

VIII.   THE REPUBLIC'S AFFIRMATIVE DEFENSES SHOULD ALL BE DISMISSED ......................................................................................72

IX.    THE ENTIRETY OF WASO'S CLAIM IS TIMELY AND PROPER........75

     A.     WASO's Notice of Claim Satisfies the Prescription Clause ..............75

     B.     WASO's Claim Arising from the Republic's Systemic Breaches is Not Covered Under the Prescription Clause ...................78

     C.     The Prescription Clause is Ambiguous ...............................................79

     D.     The Prescription Clause is Unenforceable ..........................................81

     E.     WASO's Updated Beneficial Holdings Relate Back to its Timely Notice of Claim Under the Prescription Clause ...................82

CONCLUSION ...................................................................................................85

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aetna Cas. & Sur. Co. v. Aniero Concrete Co.,*
    404 F.3d 566 (2d Cir. 2005) .................................................................75

*Aktiebolag v. Andrx Pharm., Inc.,*
    695 F. Supp. 2d 21 (S.D.N.Y. 2010) ....................................................83

*Ape Grp. SPA v. Republic of Argentina,*
    2022 WL 463309 (S.D.N.Y. Feb. 15, 2022) ........................................75, 78, 79

*Atif v. Ctr. of World Car Serv. Corp.,*
    58 Misc. 3d 156 (A), 95 N.Y.S.3d 124 (N.Y. App. Term. 2018) .....................80

*Aurelius Cap. Master, Ltd. v. Republic of Argentina,*
    2020 WL 70348 (S.D.N.Y. Jan. 7, 2020) ....................................................*passim*

*Aurelius Cap. Master, Ltd. v. Republic of Argentina,*
    2021 WL 1177465 (S.D.N.Y. Mar. 29, 2021)............................................*passim*

*Bluebird Partners, L.P. v. First Fid. Bank, N.A.,*
    94 N.Y.2d 726 (2000) ..................................................................38, 73

*CCM Rochester, Inc. v. Federated Invs., Inc.,*
    2014 WL 6674480 (S.D.N.Y. Nov. 25, 2014)....................................................78

*Cognetta v. Valencia Devs., Inc.,*
    8 A.D.3d 318 (2d Dep't 2004)...........................................................75

*Commerzbank AG v. U.S. Bank Nat'l Ass'n,*
    457 F. Supp. 3d 233 (S.D.N.Y. 2020) .......................................................71, 77

*Consol. Edison Inc. v. Ne. Utils.,*
    318 F. Supp. 2d 181 (S.D.N.Y. 2004) ...........................................................71

*Diesel Props S.r.l. v. Greystone Bus. Credit II LLC,*
    631 F.3d 42 (2d Cir. 2011) ..............................................................77

**Page(s)**

*Elliott Associates, L.P. v. Banco de la Nacion*,
  194 F.3d 363 (2d Cir. 1999) ...................................................19, 51, 73

*Espadarte Partners, LLC v. Riverside Gulf Coast Banking Co.*,
  2020 WL 1955672 (N.Y. Sup. Ct. Apr. 23, 2020) .............................74

*Etienne v. Wal-Mart Stores, Inc.*,
  197 F.R.D. 217 (D. Conn. 2000) ........................................................74

*Fiore v. Fiore*,
  46 N.Y.2d 971 (1979) .........................................................................36

*H/R Stone, Inc. v. Phoenix Bus. Sys., Inc.*,
  660 F. Supp. 351 (S.D.N.Y. 1987) .....................................................49

*Hexagon Sec. LLC v. Leawood Bancshares, Inc.*,
  2014 WL 1303516 (S.D.N.Y. Mar. 14, 2014)....................................48

*Iroquois Master Fund, Ltd. v. Quantum Fuel Sys. Techs. Worldwide,
  Inc.*,
  2013 WL 4931649 (S.D.N.Y. Sept. 12, 2013) ...................................35

*Ixe Banco, S.A. v. MBNA Am. Bank*,
  2008 WL 650403 (S.D.N.Y. Mar. 7, 2008)........................................59

*Ixe Banco, S.A. v. MBNA Am. Bank, N.A.*,
  2009 WL 3124219 (S.D.N.Y. Sept. 29, 2009) ...................................59

*Justinian Cap. SPC v. WestLB AG*,
  43 Misc. 3d 598 (N.Y. Sup. 2014), *aff'd*, 128 A.D.3d 553 (1st
  Dep't 2015) ........................................................................................72

*Kemper Ins. Co. v. United States*,
  2004 WL 1811390 (W.D.N.Y. Aug. 13, 2004)..................................84

*Kirke La Shelle Co. v. Armstrong Co.*,
  263 N.Y. 79 (1933) ............................................................................46

*Lightwater Corp. v. Republic of Argentina*,
  2003 WL 1878420 (S.D.N.Y. Apr. 14, 2003) ...................................74

*In re Livent, Inc. Noteholders Sec. Litig.*,
  355 F. Supp. 2d 722 (S.D.N.Y. 2005) ...............................................74

v

**Page(s)**

*Mazzini v. Republic of Argentina*,
2005 WL 743090 (S.D.N.Y. Mar. 31, 2005), *aff'd*, 282 F. App'x
907 (2d Cir. 2008) ............................................................................74

*Melling v. Hamilton Point Investments, LLC*,
2019 WL 235641 (E.D.N.Y Jan. 16, 2019) ......................................48

*Merican Curtis, Inc. v. Meg-Na Transp.*, Inc.,
1986 WL 10291 (S.D.N.Y. Sept. 10, 1986) ...............................83, 84

*Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*,
500 F.3d 171 (2d Cir. 2007) .............................................................81

*Mineroff v. Lonergan*,
152 A.D.3d 506, 58 N.Y.S.3d 136 (2017) ........................................78

*Oscar Gruss & Son, Inc. v. Hollander*,
337 F.3d 186 (2d Cir. 2003) .............................................................61

*Perez v. MVNBC Corp*,
2016 WL 6996179 (S.D.N.Y. Nov. 29, 2016) ..................................84

*Petersen Energia Inversora, S.A.U. v. Argentine Republic*,
2023 WL 2746022 (S.D.N.Y. Mar. 31, 2023) .............................42, 71

*Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co.*,
585 F. Supp. 3d 540 (S.D.N.Y 2022) ..........................................71, 77

*Powermat Techs., Ltd. v. Belkin Int'l Inc.*,
2020 WL 2892385 (S.D.N.Y. Apr. 2, 2020) .....................................76

*PPS, Inc. v. Jewelry Sales Representatives, Inc.*,
392 F. Supp. 375 (S.D.N.Y. 1975) ...................................................42

*R.A. Mackie & Co. v. Petrocorp Inc.*,
329 F. Supp. 2d 477 (S.D.N.Y. 2004) ..............................................71

*Racepoint Partners, LLC v. JPMorgan Chase Bank*,
2006 WL 3044416 (S.D.N.Y. Oct. 26, 2006) ...................................71

*Rosen v. Sapir*,
2021 WL 4523713 (S.D.N.Y. Sept. 30, 2021) ..................................48

**Page(s)**

*Royal Park Investments SA/NV v. Wells Fargo Bank, N.A.*,
 2018 WL 739580 (S.D.N.Y. Jan. 10, 2018) ......................................................72

*Schwimmer v. Allstate Ins. Co.*,
 176 F.3d 648 (2d Cir. 1999) ................................................................................70

*SCR Joint Venture L.P. v. Warshawsky*,
 559 F.3d 133 (2d Cir. 2009) ................................................................................73

*Stern v. Gepo Realty Corp.*,
 289 N.Y. 274 (1942) ............................................................................................60

*Tr. For the Certificate Holders of Merrill Lynch Mortg. Invs., Inc. v.
 Love Funding Corp.*,
 13 N.Y.3d 190 (2009) ..........................................................................................73

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*,
 487 F.3d 89 (2d Cir. 2007) ...........................................................................61, 62

*Two Farms, Inc. v. Greenwich Ins. Co.*,
 993 F.Supp.2d 353 (S.D.N.Y. 2014) ..................................................................35

*U.S. Bank Nat'l Ass'n v. GreenPoint Mortg. Funding, Inc.*,
 147 A.D.3d 79 (1st Dep't 2016) .........................................................................77

*Van de Walle v. Van de Walle*,
 68 Misc. 3d 1224(A), (N.Y. Sup. Ct. 2020) ......................................................75

*W.W.W. Assocs., Inc. v. Giancontieri*,
 77 N.Y.2d 157 (1990) ..........................................................................................29

*WG Sec. Prod., Inc. v. Tyco Int'l Ltd.*,
 2006 WL 5671239 (C.D. Cal. Mar. 6, 2006)......................................................42

*Zakrzewski v. Luxoft USA, Inc.*,
 151 A.D.3d 573 (1st Dep't 2017) .......................................................................49

*Zaremba v. Interface Flooring Sys., Inc.*,
 195 A.D.2d 471 (2d Dep't. 1993)........................................................................80

3732035.1

**Page(s)**

**Statutes**

N.Y. GEN. OBLIG. LAW § 13-107(1) .........................................................71

N.Y. JUD. LAW § 489(1).........................................................................73

RESTATEMENT (THIRD) OF TORTS: PHYS. & EMOT. HARM (Am. Law
    Inst. 2010) ch. 1 §1 ........................................................................54

**Other Authorities**

FED. R. CIV. P. 44.1 ...............................................................................42

## Glossary of Names

The below chart sets forth the names of Argentine Government officials referred to herein, with their positions and dates:*

| Name | Positions and Dates |
|------|---------------------|
| **Capitanich, Jorge** | The Republic's Chief of Cabinet of Ministers, (November 2013–February 2015) |
| **Eggers, Francisco** | MECON,** Director of the National Office of Public Credit (August 2010–December 2013) |
| **Kicillof, Axel** | MECON, Secretary of Economic Policy (December 2011–November 2013) MECON, Minister (November 2013–December 2015) |
| **Nielsen, Guillermo** | MECON, Secretary of Finance (May 2003–November 2005) |
| **Rodriguez, Gustavo** | INDEC, National Director of National Accounts (June 2012–January 2016) |
| **Wright, Santiago** | MECON, Head of Financial Information Unit, National Office of Public Credit (June 2007-October 2014) MECON, Head of Financial Risk Analysis Unit, National Office of Public Credit (October 2014-October 2018) |

---

* The information in this Glossary is from documents published by the Republic. *See* Plaintiffs' Statement of Material Facts in Support of their Cross-Motion for Summary Judgment at iv n.2.

** MECON is the Republic's Ministry of Economy.

Plaintiffs respectfully submit this Memorandum of Law in opposition to the Republic's Motion for Summary Judgment and in support of Plaintiffs' Cross-Motion for Summary Judgment.

## PRELIMINARY STATEMENT

The primary issue in this litigation is how to interpret the Adjustment Provision in the Global Security for the GDP Warrants—whether it provides for a variable adjustment fraction separately calculated for each year per the plain words of the provision (as Plaintiffs contend), or whether it provides for a single constant fraction applied to all years in accord with the supposed "spirit" of the contract (as the Republic contends). And in a year when payment was due (in this case, 2013), what should be the consequences of (i) the Republic's disregard of the unambiguous words of the Adjustment Provision, (ii) its failure to publish a GDP figure required by that provision and necessary to determine the payment conditions and payment amount, and (iii) its non-payment of the amount due?

In the view of the Republic, there are no consequences. The Republic thinks it is permitted to nullify its obligations under the GDP Warrants simply by disregarding the plain words of the contract and stopping publication of necessary GDP figures. A good deal for the Republic, but not what the contract permits absent compliance with the Modifications Provision, which never happened. And not what the implied covenant of good faith and fair dealing, or the prevention

doctrine, allows, because it would destroy the benefit of the contract for holders of the GDP Warrants.

Contrary to the Republic's contentions, the Adjustment Provision means what it says—a separate variable adjustment fraction must be applied to Base Case GDP for each year after a rebasing—and the Republic is liable for the 2013 Payment Amount.  That was the ruling of the High Court of Justice in London on April 5, 2023, after an 11-day trial.  The result should be the same here. The English law Warrants and the New York law Warrants contain identical terms, and the same conduct by the Republic was at issue in the two cases.  The detailed, lengthy, and carefully reasoned decision of the English court speaks for itself.

The controlling contract language and the undisputed facts in the record here prove all of Plaintiffs' claims:

(i)     The Adjustment Provision is clear and unambiguous, and requires that, after a rebasing, Base Case GDP must be adjusted by a fraction that is separately determined for each year in order to determine adjusted Base Case GDP Growth for the year in question.

(ii)    Because the Modifications Provision in the Global Security prohibits changes in contractual terms absent super-majority approval by holders, the Republic had no right to disregard the terms of the Adjustment Provision and substitute a constant adjustment fraction based on its own, self-interested view of the contract's "spirit."

(iii)   INDEC's failure to publish 2013 Actual Real GDP measured in constant 1993 prices—a contractually necessary input for the 2013 adjustment fraction—does not provide a basis for the Republic to avoid its payment obligation for 2013.

2

(iv)    The Republic's Prospectus in 2005 for the issuance of the GDP
        Warrants told investors that INDEC "is controlled by the Argentine
        government."

(v)



(ix)    The supposed "standard practice" of other countries that rebase, but
        who are not party to contracts requiring old series GDP data for
        calculations, provides no defense for Argentina.

(x)



---

[1] The Republic's contention about its supposed good faith in deciding to rebase is
beside the point.  Plaintiffs are not challenging the Republic's right to rebase.
Rather, Plaintiffs rely on the Court's ruling that "the Republic may not frustrate the
contracts into which it has entered," and "while it may be true that countries should
periodically rebase their GDP, here it could be argued that the Republic could not
do so in a way that destroyed or injured the right of Plaintiffs to receive the fruits
of the contract, that is, by discontinuing the publication of Actual Real GDP using
constant 1993 prices." *Aurelius Cap. Master, Ltd. v. Republic of Argentina*, 2020

3

Apart from the merits, the Republic also, four years into this litigation, now challenges Plaintiffs' right to bring these claims.  It argues that Plaintiffs as beneficial owners of GDP Warrants—unlike beneficial owners of all other Debt Securities issued under the Indenture—cannot individually sue for payments due. The Republic is wrong because the Indenture and the Global Security expressly grant beneficial owners the right to sue for their proportionate share of any Payment Amount due.  Nor do Plaintiffs need, as the Republic contends, an assignment from prior beneficial owners.

For all of these reasons, the Court should deny the Republic's motion, grant Plaintiffs' cross-motion, and enter judgment for Plaintiffs in the amount of their proportionate part of the Payment Amount due for 2013, plus pre-judgment interest.

---

WL 70348, at *7 n.7 (S.D.N.Y. Jan. 7, 2020) ("*Aurelius I*").  In other words, the rebasing may have been fine, but non-publication and non-payment were not.

4

# FACTS

As more fully set forth in Plaintiffs' Statement of Material Facts in Support of their Cross-Motion for Summary Judgment (cited as "PSoF ¶__"), the relevant facts are summarized below.[2]

## 1.   Global Security Terms Relating to Payments

A payment is due on the GDP Warrants if certain conditions are met. For any Reference Year, Actual Real GDP must exceed Base Case GDP (the "Level Condition") and Actual Real GDP Growth must exceed Base Case GDP Growth (the "Growth Condition").  Declaration of Edward A. Friedman, June 13, 2023 ("Friedman Decl.") Exs. 60 & 61 § 2(b).

Actual Real GDP is defined to mean: "for any Reference Year, the gross domestic product of Argentina for such Reference Year measured in constant prices of the Year of Base Prices, as published by INDEC." *Id*. at R-2.[3]  The



[2] ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[3] When GDP is "measured in constant prices of the Year of Base Prices," that means a fixed base methodology is being used.  The experts agree that, with a fixed base methodology, sectors of the economy are separately estimated, and the overall level of GDP is a weighted average of the results for each sector.  The prices of a given "base year" determine the weights, and the weights are specific to that base year.  PSoF ¶ 21.  If a country using the fixed base method publishes

definition of Base Case GDP includes a figure for each Reference Year through 2034.  *Id.* at R-2-3.

At the time the Warrants were issued, the Republic was using 1993 as the Year of Base Prices, and reporting Actual Real GDP measured in constant 1993 prices.  Likewise, the Base Case GDP figures in the Global Security are set forth "in millions of constant 1993 pesos."  *Id.* at R-2-3.

Actual Real GDP Growth is the percentage change in Actual Real GDP for the current year compared to the prior year.  *Id.* at R-2.  Base Case GDP Growth is the percentage change in Base Case GDP for the current year compared to the prior year.  *Id.* at R-3.

At the time the Warrants were issued, the Republic was using 1993 as the Year of Base Prices, and reporting Actual Real GDP measured in constant 1993 prices.  Likewise, the Base Case GDP figures in the Global Security are set forth "in millions of constant 1993 pesos."  *Id.* at R-2-3.

Argentina episodically changes the Year of Base Prices, or "rebases," with no pattern as to how many years there are between rebasings.  When a rebasing occurs, the measurement of Actual Real GDP and the calculation of Actual Real GDP Growth changes.  PSoF ¶¶ 33-34.[4]  This is evident because, with each rebasing, the Republic publishes Actual Real GDP in the new year of base prices going back to that new base year.  So, for example, after the 2014 rebasing,

---

GDP measured "in constant Year X prices," (or "in constant Year X pesos," in the case of Argentina), national accounts statisticians understand that to mean the GDP estimate has been prepared using the prices and weights from Year X.  *Id.* ¶ 22.

[4] The change is due, in substantial part, to the fact that new prices and weights are applied with a new base year.  *See*, *supra* note 3.

6

the Republic published Actual Real GDP measured in constant 2004 prices for the

years 2004 to 2012—years for which the Republic had previously published Actual

Real GDP measured in constant 1993 prices.  *Id.* ¶ 142, 237.  The █████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████  *Id.* ¶¶ 34-35.  For example, 2008 Actual Real GDP Growth measured

in constant 1993 prices was 6.76%, but 3.10% when measured in constant 2004

prices.  *Id.* ¶ 35.

To address rebasing, the Adjustment Provision (that is part of the

definition of Base Case GDP) provides that when the Year of Base Prices is other

than 1993, the Base Case GDP figures in the Global Security are adjusted by a

fraction that must be separately determined for "each Reference Year":

> *provided* that, if the Year of Base Prices employed by
> INDEC for determining Actual Real GDP shall at any
> time be a calendar year other than the year 1993, then the
> Base Case GDP for ***each Reference Year*** shall be
> adjusted to reflect any such change in the Year of Base
> Prices by multiplying the Base Case GDP for ***such***
> ***Reference Year*** (as set forth in chart above) by a fraction,
> the numerator of which shall be the Actual Real GDP for
> ***such Reference Year*** measured in constant prices of the
> Year of Base Prices, and the denominator of which shall
> be the Actual Real GDP for ***such Reference Year***
> measured in constant 1993 prices.

Friedman Decl. Ex. 60 at R-3; *id.* Ex. 61 at R-2 (emphasis added).  By its terms, the Adjustment Provision specifies a variable adjustment fraction which is different for "each Reference Year" based upon GDP data for "such Reference Year."  The fraction for each year is comprised of a numerator—"Actual Real GDP for such Reference Year measured in constant prices of the Year of Base Prices" [i.e., the new Year of Base Prices after rebasing]—and a denominator— "Actual Real GDP for such Reference Year measured in constant 1993 prices."

After a rebasing, when Base Case GDP figures are adjusted, the Base Case GDP Growth figures (i.e., the threshold for the Growth Condition) for each year also change.  *See Aurelius I*, 2020 WL 70348, at *6 n.6.  So, for example, 2013 Base Case GDP Growth without any adjustment was 3.22%.  Friedman Decl. Ex. 60 at R-3; *id.* Ex. 61 at R-2.  As discussed below, that figure after a rebasing was 1.26%.  *See infra*, at 15.

The change in Base Case GDP Growth after a rebasing is to be expected because Base Case GDP for each year is being adjusted by a different fraction.  If Base Case GDP Growth did not change after a rebasing, then the Growth Condition would be comparing whether Actual Real GDP Growth measured in constant prices of the new Year of Base Prices exceeds Base Case GDP Growth measured in constant 1993 prices.  This is not at all what the Global Security contemplates.

Such an apples-to-oranges comparison is what results from the application of the Republic's constant fraction alternative to the plain language of the Adjustment Provision.  Under that alternative, Base Case GDP for each year after a rebasing is adjusted by a single constant fraction, not a variable fraction determined each year as specified in the Adjustment Provision.  *See* Arg. Br. at 43-46.[5]  The Republic's constant fraction approach allows it to choose (in its sole discretion) one of the "overlap" years (for which the Republic published Actual Real GDP measured in constant 1993 prices and constant prices of the new Year of Base Prices) to determine the numerator and denominator for a single adjustment fraction that is applied to all years.  *See* PSoF ¶ 160.  The effect of the Republic's approach is that Base Case GDP Growth for each year after a rebasing remains the same as if it were determined on the basis of unadjusted Base Case GDP.  Thus, with a constant adjustment fraction, Actual Real GDP Growth for each year measured in constant prices of the new Year of Base Prices is compared to Base Case GDP Growth measured in constant 1993 prices.

The Adjustment Provision as written avoids this mismatch.  In addition, the Adjustment Provision as written provides important protection for holders of GDP Warrants.  If the Level Condition and Growth Condition would

---

[5] "Arg. Br." refers to the Republic's Memorandum of Law in Support of Its Motion for Summary Judgment (19-cv-351 Dkt. No. 136).

3732035.1

have been satisfied using 1993 series data before a rebasing, the conditions would still be satisfied after a rebasing.  *Id*. ¶ 37.  At the time the Warrants were issued in 2005, investors had more than five years of experience with the 1993 series; by the 2010 issuance, more than ten years.  *Id*. ¶ 31.  Investors could not know when the Republic would rebase, what changes in methodology the Republic would initiate, and how those changes would affect Actual Real GDP and Actual Real GDP Growth.  *Id*. ¶ 39.  By virtue of the Adjustment Provision, the Republic cannot use a rebasing to avoid a payment that would otherwise be due—for example, by rebasing at a time when it saw a payment would be due based on statistics in 1993 prices, but not in the new Year of Base Prices.  *Id*. ¶ 40.

**2.**   ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████



is not surprising that Nielsen

, since the Republic's Prospectus for the offering specifically
represented that INDEC was controlled by the government of Argentina. *Id*. ¶ 55.

██████████████████████████████████████████████

███████████████████████████████████████

3.    __INDEC's Publication of Actual Real GDP and the EMAE Index__

        INDEC publishes quarterly Actual Real GDP figures approximately 11 to 12 weeks after the end of the quarter.  Each quarterly figure is annualized, meaning it represents what GDP would be for the year if the economic performance for the other three quarters were the same as the quarter being reported.  When the fourth quarter is published, typically in March of the following year, INDEC publishes full-year Actual Real GDP for the year ended, by averaging the four quarterly Actual Real GDP figures.  *Id.* ¶ 72.

        INDEC also publishes monthly the *Estimador Mensual de Actividad Económica*, or EMAE Index, an annualized indicator of economic activity, approximately 45 days after the end of each month.  When publishing the EMAE Index, INDEC "tr[ies] to replicate, to the extent possible, the use of the sources of information and the calculation methods of the quarterly and/or annual GDP."  *Id.* ¶ 73.  When the December EMAE figure is published, INDEC publishes a full-year EMAE Index by averaging the 12 monthly figures.  *Id.* ¶ 74.

        Like Actual Real GDP, the EMAE Index is measured in constant prices of a particular Year of Base Prices.  From 2005 (when the Warrants were issued) until the rebasing in March 2014, INDEC published both Actual Real GDP

12

and the EMAE Index measured in constant 1993 prices.  *Id*. ¶ 75.  The EMAE

Index that was published each month during this period was based on an initial

index value of 100 for 1993; each subsequently published monthly or annual

EMAE Index figure reflects growth in economic activity relative to 1993.  *Id*. ¶ 76.

The Republic has asserted that the EMAE index "has tracked

published GDP figures only because INDEC retroactively adjusted the index to do

so."  Friedman Decl. Ex. 67 (Republic April 18, 2019 Memorandum) at 13.  The

facts are otherwise.  The evidence shows that the provisional EMAE figures,

before adjustment to correspond to published GDP figures, have historically

provided a precise proxy for Actual Real GDP and Actual Real GDP Growth.

PSoF ¶ 78.

Plaintiffs' expert has explained how remarkably accurate INDEC's

provisional EMAE figures are in predicting Actual Real GDP as later published by

INDEC.  In particular, he showed that using the provisional EMAE figures for the

three months of the last quarter of any year, and the Actual Real GDP figures for

the first three quarters of that year (the data published for 2013), predicts with

pinpoint accuracy the full year Actual Real GDP for any given year (*id.* ¶ 80):

| Year | Predicted Actual Real GDP (*billions of 1993 pesos*) | Published Actual Real GDP (*billions of 1993 pesos*) | Prediction Error (%) |
|------|------|------|------|
| **2009** | 386.7 | 386.7 | 0.0 |
| **2010** | 421.7 | 422.1 | -0.1 |
| **2011** | 459.3 | 459.6 | -0.1 |
| **2012** | 468.2 | 468.3 | 0.0 |

Indeed, INDEC's National Director of National Accounts admitted that EMAE figures are the best proxy for Actual Real GDP before the GDP figures are published.  *Id*. ¶ 79.

**4.    Before the Rebasing, the Republic Was Aware that Payment**

██████████████████████████████

         ████████████████████████████

██████████████████████████████████

████████████████████████████████████

███████████████████████████████

         ████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

██████████████████

14



3732035.1



16



17



**7.**



3732035.1

███████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████

███████████████████████████████

On April 3, 2014, the President's Chief of Cabinet, Jorge Capitanich, told the Argentine Congress that Nielsen was wrong, though he did not explain why, and that a payment on the Warrants would not be made for 2013.  *Id.* ¶ 141.

**8.**    ████████████████████████████

████████████████████████████████

██████████████████████████████████

████████████████████████████████

██████████████████████████████

███████████████████████████████

████████████

---

███████████████████████████████████



¶¶ 152, 154.

10

3732035.1



22



23

**9.**





For example, the Bank of England advised that "[r]ebasing and method of calculation changes can be dealt with by requiring governments or outside agencies to keep separate GDP series based on the old method." *Id.* ¶ 51.

Experts in the field also explain that continuing to publish a parallel GDP series using an old base year can address investor concerns about rebasing risks.  For example, the U.S. Council of Economic Advisors noted that "investors may worry that the revisions or any methodological changes in compiling the statistics could complicate payments on growth-indexed debt" and suggested that "[c]hanges to statistical methodologies could be handled by requiring governments to keep separate GDP series calculated with the old methodology, even after

25

adopting a new technique for other purposes, until the outstanding contracts reach

maturity." *Id*. ¶ 49.



**10.     The Republic's Shifting Position as to the Adjustment Provision**

In moving to dismiss the Aurelius Capital Master original complaint,

the Republic said nothing about the constant fraction alternative.  Instead, it argued

that after a rebasing, Base Case GDP Growth should be determined solely on the

basis of unadjusted Base Case GDP figures.  The Republic argued that the

Adjustment Provision should not be applied at all when calculating Base Case

GDP Growth because it supposedly was not part of Base Case GDP as that term is

used in the definition of Base Case GDP Growth.  *Id*. ¶¶ 183-84.  The Court

rejected that argument as "atextual" and noted that the Republic "cannot pick and

choose which parts of the definition of Base Case GDP are incorporated into the definition of Base Case GDP Growth." *See Aurelius I*, 2020 WL 70348, at *6 n.6.

In moving to dismiss Plaintiffs' Amended Complaints, the Republic again said nothing about its constant fraction alternative. This time, the Republic argued that the "binding effect" clause empowered MECON to resolve how to make calculations where an input required by the Adjustment Provision was missing. PSoF ¶¶ 185-86. In rejecting that argument, the Court ruled that the "Global Securities do not otherwise confer upon the Republic the power to substitute other INDEC-published GDP figures where INDEC does not publish the data that the Global Securities call for." *Aurelius Cap. Master, Ltd. v. Republic of Argentina* ("*Aurelius II*"), 2021 WL 1177465, at *9 (S.D.N.Y. Mar. 29, 2021). In other words, when determining whether the Growth Condition was satisfied, the Republic does not have the right to substitute data that is different from the inputs specified in the Adjustment Provision.

## 11.   **The English Judgment, April 5, 2023**

At the same time the Republic issued the New York law GDP Warrants that are the subject of these cases, the Republic also issued English law GDP Warrants with identical substantive terms. Friedman Decl. Ex. 107 ¶¶ 24-26, 102-115. Shortly after litigation commenced in this Court, holders of English law Warrants commenced litigation in the High Court of Justice in London, claiming,

27

*inter alia*, the Republic owed Warrant Holders a payment for Reference Year

2013.  *Id*. Ex. 217.  In the English case, as here, the central issue has been the

proper interpretation of the Adjustment Provision.  *Id*. Ex. 107 ¶ 1.

On April 5, 2023, after an 11-day trial, the English court issued its

judgment, ruling that the proper interpretation of the Adjustment Provision is

exactly as Plaintiffs here have argued and requires payment for 2013.  *Id*.  As

detailed below, the English court ruled that the words of the Adjustment Provision

are clear and specifically rejected the Republic's constant fraction alternative.  *Id*.

¶¶ 1-2, 171-232.

After finding the Republic had breached its contractual obligations,

the English court determined the payment amount due to Warrant holders by

estimating 2013 Actual Real GDP measured in constant 1993 prices, exactly as

Plaintiffs' expert proposes here.  That is, the English court looked at INDEC's

publication of Actual Real GDP for the first three quarters of 2013 and the EMAE

figures for the three months of the last quarter, all measured in constant 1993

prices, to come up with a figure of 491 billion pesos.  On that basis, the English

court ordered the Republic to pay the Payment Amount due for Reference Year

2013 under the English law Warrants, i.e., € 1.330 billion.  The English court also

ordered the Republic (i.e., INDEC) to publish the 1993 series starting with 2014,

which the Republic's counsel had represented at trial it was "ready, willing and able" to do if ordered by the court.  *Id*. ¶¶ 247-256, 266-271, 306.

Plaintiffs respectfully submit that the English judgment is correct, and the Court should reach the same conclusion here.  Indeed, with respect to the issue of contract interpretation, both New York and English law look to the words of the contract, the only difference being that, under English law, the Republic was allowed more latitude to introduce parol evidence than would be permissible under New York law.[12]  The principal rulings of the English court include the following:

(i)      The English court explained that the Republic's interpretation of the Adjustment Provision would require adding words (underscored in the English Judgment and below) that are not there:

> The Republic, in short, takes the position that the Adjustment Provision should be regarded as though it stated as follows:
>
> '... *provided that, if the Year of Base Prices employed by INDEC for determining Actual Real GDP shall at any time be a calendar year other than the year 1993, then*
>
> *the Base Case GDP for each Reference Year shall be adjusted to reflect any such change in the Year of Base Prices by multiplying the Base Case GDP for such*

---

[12] *Compare id*. ¶¶ 128-31, 153-54, *with W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990) ("[W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms.  Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing.").

> *Reference Year (as set forth in chart above, <u>or as</u>*
> *<u>previously adjusted</u>) by a fraction, <u>calculated for the last</u>*
> *<u>Reference Year for which official INDEC data is</u>*
> *<u>available,</u> the numerator of which shall be the Actual*
> *Real GDP for such Reference Year measured in constant*
> *prices of the Year of Base Prices, and the denominator of*
> *which shall be the Actual Real GDP for such Reference*
> *Year measured in constant 1993 prices <u>(or, if INDEC has</u>*
> *<u>effected more than one change, the previous Year of Base</u>*
> *<u>Prices)</u>.*'

*Id*. ¶ 124 (emphasis in original).  This additional language would be necessary if

the Court were to accept the Republic's proposed constant fraction alternative to

the Adjustment Provision.  *See* Arg. Br. at 43-46.

(ii)   The English court rejected the Republic's contention that the

threshold for the Growth Condition was intended to always be a fixed percentage

of at least 3%, explaining its reasoning in detail:

> There are a number of reasons why I am unpersuaded by
> Mr. Valentin [*counsel for the Republic*] KC's submission
> that there was an assumption that there would be long-
> term 3% growth which was common to both the Republic
> and investors.
>
> First, there is nothing in the Securities or in the 2005
> Prospectus which refers to a fixed percentage, still less
> anything with growth rates in something other than 1993
> YOBP [*year of base prices*]. . . .  It would be surprising,
> given this, if the Republic were right that the Adjustment
> Provision is to be understood as requiring the application
> of a fixed percentage . . . .

Friedman Decl. Ex. 107 ¶¶ 164-65.

(iii)   The English court explained in detail its conclusion that the

words of the Adjustment Provision mean what they say.

> Turning, therefore, to the Adjustment Provision, I have
> reached the clear conclusion that the Claimants are right
> and that the Republic is wrong: in other words, that the
> Annual Adjustment Construction, rather than the One-
> Off Overlap Construction[13] (or, for that matter as I shall
> come on to explain, the Hubbard Deflator Construction),
> is the appropriate construction.
>
> I say this for what, ultimately, is a very simple reason.
> This is that, as Ms. Prevezer KC [*counsel for the
> Claimants*] submitted and as demonstrated by the fact
> that it requires the Adjustment Provision to be read as
> though it contained additional wording which it does not
> have, the One-Off Overlap Construction just does not
> reflect the wording used in the Adjustment Provision. In
> contrast, the Annual Adjustment Construction is faithful
> to the wording used.
>
> Specifically, and with apologies for setting out the
> wording again, albeit with emphasis which to date has
> been absent, it is the use of the words "*each*" and "*such*"
> in the Adjustment Provision which should be noted, as
> follows:
>
> '. . . if the Year of Base Prices employed by INDEC for
> determining Actual Real GDP shall at any time be a
> calendar year other than the year 1993, then the Base
> Case GDP for <u>each</u> Reference Year shall be adjusted to
> reflect any <u>such</u> change in the Year of Base prices by
> multiplying the Base Case GDP for such Reference Year
> (as set forth in the chart above) by a fraction, the
> numerator of which shall be the Actual Real GDP for

---

[13] The "One-Off Overlap Construction" is Argentina's constant fraction alternative; the "Annual Adjustment Construction" is the variable fraction set forth in the plain words of the Adjustment Provision.

> such Reference Year measured in constant prices of the
> Year of Base Prices, and the denominator of which shall
> be the Actual Real GDP for such Reference Year
> measured in constant 1993 prices.'
>
> I agree with Ms. Prevezer KC when she submitted that
> the words "each" and "such" make it clear that the
> envisaged adjustment is made for each Reference Year
> and, furthermore, that the numerator and denominator in
> the adjustment fraction are based on the Actual Real
> GDP for that ("such") Reference Year in the new YOBP,
> [*year of base prices*] and such Reference Year in constant
> 1993 prices.
>
> That is what the words say in terms: that there is an
> adjustment for "each" Reference Year and that the
> adjustment for any given Reference Year (hence the
> reference to "such Reference Year") is performed by a
> fraction using Real GDP for that particular Reference
> Year in each of the new YOBP and 1993 prices.

*Id*. ¶¶ 181-85 (emphasis in original).

(iv)    After agreeing with the Claimants as to the proper interpretation

of the Adjustment Provision, the English Court determined the payment due for

2013 based on an estimate of 2013 Actual Real GDP measured in constant 1993

prices using figures published by INDEC for Actual Real GDP for the first three

quarters of 2013 and the EMAE Index for the last three months of 2013:

> The question, then, is whether Mr Davies [*Claimants'*
> *expert*] was right to use a GDP + EMAE approach. The
> answer, in my view, is obvious: clearly, it made sense for
> Mr Davies to use the GDP data which INDEC published
> for 2013 Q1 to Q3 and, then, also to use the EMAE data
> published by INDEC itself about 50 days after the end of
> the month and designed to give an advance indication of
> where official GDP will turn out to be for Q4 . . . .

*Id*. ¶ 253.  The English court explained that the historical evidence showed almost

no difference between Actual Real GDP and EMAE data:

> That the EMAE is reliable is, furthermore, borne out by
> an analysis which Mr Davies carried out by reference to
> historical years for which data is available. That analysis
> showed almost no difference between the GDP and
> EMAE data, confirming the reliability of Mr Davies'
> approach.

*Id*. ¶¶ 254.  The historical analysis and data concerning the EMAE referred to by

the English court is the same analysis and data Plaintiffs are presenting here.

## ARGUMENT

## I.

## THE ADJUSTMENT PROVISION REQUIRES A SEPARATE ADJUSTMENT FRACTION FOR EACH REFERENCE YEAR

### A.    The Words of the Adjustment Provision Are Clear and Unambiguous

The definition of Base Case GDP first sets forth a chart specifying the

initial Base Case GDP values for each year measured in constant 1993 prices.

Then, in the event of a rebasing, the definition sets forth the fraction to be used for

each year to adjust Base Case GDP for such year:

> *provided* that, if the Year of Base Prices employed by
> INDEC for determining Actual Real GDP shall at any
> time be a calendar year other than the year 1993, then the
> Base Case GDP for **each Reference Year** shall be
> adjusted to reflect any such change in the Year of Base
> Prices by multiplying the Base Case GDP for **such
> Reference Year** (as set forth in chart above) by a
> fraction, the numerator of which shall be the Actual Real
> GDP for **such Reference Year** measured in constant

33

> prices of the Year of Base Prices, and the denominator of
> which shall be the Actual Real GDP for **such Reference
> Year** measured in constant 1993 prices.

Friedman Decl. Ex. 60 at R-3; Friedman Decl. Ex. 61 at R-2; PSoF ¶ 36 (emphases

added).  By using the words "each" and "such" as it does, the Adjustment

Provision prescribes a separate adjustment fraction for each year.

This Court has previously had occasion to consider what the

adjustment fraction should be for 2013:

> For example, to reconfigure the 2013 **Base Case GDP**
> figures to reflect INDEC's switch to 2004 as the Year
> of Base Prices,…the equation using the Adjustment
> Fraction would look like this:

$$\frac{2013\ Actual\ Real\ GDP\ (2004\ Prices)}{2013\ Actual\ Real\ GDP\ (1993\ Prices)} \times (2013\ Base\ Case\ GDP\ (1993\ Prices))$$

*Aurelius I*, 2020 WL 70348, at *3 n. 3.  The Republic now contends the Court

should jettison its prior reading of the plain words of the Global Security in favor

of the Republic's "constant" fraction alternative.  Arg. Br. at 39-50.  Like the

various contractual interpretations offered by the Republic and rejected by the

Court so far in this litigation, the "constant" fraction is at odds with the actual

words of the Global Security.

The Republic's interpretation fails to consider the words "*each

Reference Year*" and "*such Reference Year*" in context and give them coherent and

consistent meaning.  The same language—"such Reference Year"—is used three

times within the same sentence, and New York law presumes it should be given the

34

same meaning each time.[14]  The first time the term "such Reference Year" is used it undisputedly refers back to "each Reference Year."  Likewise, the second and third uses of the term "such Reference Year" in the numerator and denominator of the adjustment fraction refer back to "each Reference Year."  Friedman Decl. Ex. 60 at R-3; Friedman Decl. Ex. 61 at R-2; PSoF ¶ 36.  This means, as the English court accepted, there is an adjustment for "each Reference Year" and the adjustment for any "such Reference Year" is based on a fraction using real GDP data for that "such Reference Year" measured in constant prices of the new Year of Base Prices and constant 1993 prices.  Friedman Decl. Ex. 107 ¶¶ 181-86.

Under the Republic's interpretation, the second and third time the term "such Reference Year" appears, it would have a different meaning from the first time.  According to the Republic, the second and third time, the term "such Reference Year" no longer refers back to "each Reference Year" as it did the first time, but rather means "the year from which the adjustment fraction inputs are taken."  Arg. Br. 45.  This is another atextual reading unsupported by the words of the contract.  Nothing in the Adjustment Provision suggests that "such Reference Year" refers to "the year from which the adjustment fraction input are taken,"

---

[14] *See Iroquois Master Fund, Ltd. v. Quantum Fuel Sys. Techs. Worldwide, Inc.*, 2013 WL 4931649, at *2 (S.D.N.Y. Sept. 12, 2013); *Two Farms, Inc. v. Greenwich Ins. Co.*, 993 F.Supp.2d 353, 362 (S.D.N.Y. 2014).

rather than the "each Reference Year" explicitly mentioned in the provision. *See* Black's Law Dictionary ("such" means "the same as what has been mentioned"). Not only does the Republic's proposed interpretation give inconsistent meaning to the term "such Reference Year" contrary to New York canons of construction, but it is a bald faced attempt to re-write clear and unambiguous terms of the contract. *Fiore v. Fiore*, 46 N.Y.2d 971, 971 (1979).

In the English proceedings, the Republic conceded that "the words create a difficulty" for its constant fraction alternative, and admitted in pleadings submitted to the English court that its alternative implied the addition of 32 new words to the Adjustment Provision, underlined below:

> *provided* that, if the Year of Base Prices employed by INDEC for determining Actual Real GDP shall at any time be a calendar year other than the year 1993, then the Base Case GDP for each Reference Year shall be adjusted to reflect any such change in the Year of Base Prices by multiplying the Base Case GDP for such Reference Year (as set forth in chart above, <u>or as previously adjusted</u>) by a fraction, <u>calculated for the last Reference Year for which official INDEC data is available,</u> the numerator of which shall be the Actual Real GDP for such Reference Year measured in constant prices of the Year of Base Prices, and the denominator of which shall be the Actual Real GDP for such Reference Year measured in constant 1993 prices <u>(or, if INDEC has effected more than one change, the previous Year of Base Prices)</u>.

Friedman Decl. Ex. 107 (U.K. Judgment) ¶¶ 187-88; Ex. 234 (Arg. Pleading) ¶ 35A.8.

36

**B.**     **The Plain Language Does Not Produce Absurd Results**

The Republic argues that interpreting the words as written produces "absurd results."  Arg. Br. at 46.  Not true.  The words help ensure for holders that a rebasing will not affect their right to payment.  If they would have been entitled to payment before the rebasing, that will not change.  PSoF ¶¶ 35, 37, 39-40.

Under the Republic's alternative, the right to receive payment could be adversely affected by a change in the Year of Base Prices.  Reference Year 2013 is a prime example.  By using a different Year of Base Prices (2004 instead of 1993), the Republic reduced Actual Real GDP Growth from 4.91% to 2.93%.  *Id.* ¶¶ 84, 94, 113.  In the Republic's view, Actual Real GDP Growth measured in constant 2004 prices—2.93%—should be compared to unadjusted Base Case GDP Growth measured in constant 1993 prices—3.22%—and thus, no payment would be due for 2013.

The English court rejected the Republic's arguments that the plain language was "commercially nonsensical and economically absurd:"

> First and perhaps most fundamentally, the effect of the Annual Adjustment Construction is that rebasing does not make a difference to whether or not the Performance Condition and the Level Condition are satisfied since the Annual Adjustment Construction ties the Payment Conditions to 1993 YOBP [year of base prices].  In that sense, whatever the bargain was (and, in particular, however good or bad it may have been), the Annual Adjustment Construction preserves that bargain as regards the Payment Conditions.  <u>As a result, a creditor</u>

<u>or investor who makes the decision at any point to accept
or purchase the Securities, based on the known position
in terms of base case in 1993 YOBP and published
Actual Real GDP in 1993 YOBP, knows that a rebasing
will not affect their assessment of whether payments are
likely in the future.</u>

Friedman Decl. Ex. 107 ¶¶ 203-204 (emphasis added).

There are a host of other reasons why the plain language is not unreasonable or absurd, many of which were recognized by the English court:

- *First*, contrary to the Republic's assertion that what matters is the "real world economy" (and the supposed need to jettison the 1993 series figure), Arg. Br. at 12, the Adjustment Provision by its own terms addresses the method of measurement, not economic performance in the abstract, recognizing that there can be different measurements of the same economic activity.  Friedman Decl. Ex. 107 ¶¶ 209-10.

- *Second*, an adjustment fraction that changes with each Reference Year ensures the effect of a rebasing on both sides of the propositions (i.e., Actual Real GDP to Base Case GDP, and Actual Real GDP Growth to Base Case GDP Growth) is properly reflected on both sides.  Otherwise, the rebasing would be reflected on the Actual Real GDP side, but not properly on the Base Case GDP side because the adjustment would not reflect the actual effect on Base Case GDP for any year other than the single overlap year used to determine the constant fraction.  *Id*. ¶¶ 211-15.

- *Third*, it does not make sense to treat the overlap year—the year chosen by the Republic for the constant adjustment fraction—differently than other years (and no words in the contract suggest a special treatment or designation for an overlap year). *Id*. ¶¶ 216.

- *Fourth*, a constant fraction approach makes the choice of which overlap year to use for determining the constant fraction highly significant, because the numerical value of the fraction affects the thresholds for the Level Condition for every year.  But the contract does not mention the concept of a constant fraction or provide any criteria for determining what year should be used. The Republic's view is that after the 2014 rebasing it had unlimited discretion to choose for the constant fraction any year in which it chose to publish figures in both the old and new series, i.e., the Republic could choose any year from 2005-2012, or, if the Republic did not like the numbers from those years, the Republic could choose to publish 1993 and 2004 series data for, say 2013, 2014, 2015 etc. and choose any one of those years. *Id*. ¶ 217.[15]

_____

[15] ████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

- *Fifth*, there is a moral hazard that the Republic will make choices—the overlap year, timing of rebasing, methodological choices as part of the rebasing—most favorable to it, and there is no reason investors would have wanted to give the Republic such discretion.  Friedman Decl. Ex. ¶¶ 218-23; *see also supra*, at 9-10 (citing PSoF ¶¶ 39-40, 160).

- *Sixth*, a variable adjustment fraction maintains the relationship between Actual Nominal GDP and the Payment Amount.  Friedman Decl. Ex. 107 ¶ 224.

- *Seventh*, leading experts in the field of GDP-linked securities have specifically recommended publication of parallel series and using that series for calculations as a way of dealing with the uncertainties of a rebasing.  *See supra*, at 26 (citing PSoF ¶¶ 49-53).

- *Eighth*, publication of 2013 Actual Real GDP measured in constant 1993 prices prior to the calculation date would not have been impossible or unduly burdensome.  Indeed, the English court has ordered the Republic to continue publication of the 1993 series for the life of the securities beginning with 2014.  Friedman Decl. Ex. 107 ¶¶ 266-71.

## II.

## <u>INDEC IS PART OF, AND CONTROLLED BY, THE REPUBLIC</u>

The Republic had argued in its motion to dismiss the Amended

Complaints that INDEC—the Republic's own statistical agency—somehow was

not under the control of the Republic, and that the Republic does not have the

power to compel INDEC to publish Actual Real GDP data.  *See* Friedman Decl.

Ex. 178 at 17.  In fact, the Republic does control INDEC.  The Republic itself

stated in the 2005 Prospectus for the issuance of the GDP Warrants that INDEC "is

controlled by the Argentine government."  PSoF ¶ 55.  ███████████████

████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████

In its motion for summary judgment, the Republic now argues that

whether it has the power to compel INDEC to publish Actual Real GDP in 1993

prices "is a red herring" because MECON purportedly did not influence the

rebasing.  Arg. Br. at 33-34.  But that contention is the red herring.  The question is

whether the Republic is responsible for the non-publication of the contractually

required input (2013 Actual Real GDP measured in constant 1993 prices) that

destroyed Plaintiffs' right to payment.  The answer is yes.  INDEC's non-

publication is the Republic's non-publication because (as discussed here) INDEC is part of the Republic and controlled by the Republic, and ( ███████████

███████████████████████████████████████

Because INDEC is a part of the Republic with no separate juridical existence, PSoF ¶ 54, INDEC's acts and omissions—including its failure to publish 2013 Actual Real GDP measured in constant 1993 prices—are the Republic's acts and omissions.  Just as a corporation could not disclaim responsibility for the conduct of a division, the Republic cannot insulate itself from the conduct of INDEC.  *See, e.g.*, *WG Sec. Prod., Inc. v. Tyco Int'l Ltd.*, 2006 WL 5671239, at *4 (C.D. Cal. Mar. 6, 2006); *PPS, Inc. v. Jewelry Sales Representatives, Inc.*, 392 F. Supp. 375, 378 n.3 (S.D.N.Y. 1975).  How the Republic chooses to allocate responsibilities to INDEC, which the Republic can change as it sees fit, does not diminish the Republic's legal obligations to holders of the GDP Warrants.

For the avoidance of doubt, set forth below is a summary of the expert reports and testimony confirming that, under existing Argentine law, the Republic controls INDEC and could have compelled it to publish 2013 Actual Real GDP measured in constant 1993 prices.[16]

---

[16] "The interpretation and application of foreign law is a legal question appropriate for resolution by the Court on summary judgment." *Petersen Energia Inversora, S.A.U. v. Argentine Republic*, 2023 WL 2746022, at *4 (S.D.N.Y. Mar. 31, 2023) (collecting cases).  *See also* FED. R. CIV. P. 44.1.



For example, Article 99(17) of the Argentine Constitution provides that the President "may request whatever information he may consider proper" from "all branches and departments of the Administration," and "[t]hey are compelled to supply such information."  Friedman Decl. Ex. 213.  Plaintiffs' expert (Alberto Bianchi) opined that, under Article 99(17), if the President asked INDEC to publish 2013 Actual Real GDP measured in constant 1993 prices, "INDEC would have been required to do so."  *Id*. Ex. 88 ¶¶ 8, 116. ▮

▮

---

[17] The issue is not, as the Republic contends, whether the Republic could have influenced the methodology for carrying out official statistical activities.  Arg. Br. at 34 n.17.  Rather, the question is whether, with INDEC having decided to rebase, the Republic could have directed INDEC to publish an additional or parallel statistic necessary for calculations under the Global Security.

3732035.1



## III.

## <u>THE REPUBLIC BREACHED THE MODIFICATIONS PROVISION</u>

Under the terms of the Global Security, the adjustment fraction to be applied to 2013 Base Case GDP required as a denominator 2013 Actual Real GDP measured in constant 1993 prices. *Aurelius I*, 2020 WL 70348, at *3 n. 3. There is no dispute that INDEC did not publish that contractually necessary input, *id*. at *6-7, *see also* PSoF ¶ 82, and no dispute that the Republic did not apply the adjustment fraction required by the contract. PSoF ¶¶ 161-62.

The Court rejected the Republic's argument that in the absence of the necessary input, it could substitute something else to determine payment conditions and payment amount for 2013. The Court stated:

3732035.1

> [T]he Global Securities do not . . . confer upon the
> Republic the power to substitute other INDEC-published
> GDP figures where INDEC does not publish the data that
> the Global Securities call for. Just as "[Plaintiffs] could
> have bargained for language that provided flexibility
> where INDEC fails to publish Actual Real GDP data," . .
> . the Republic could have done the same.

*Aurelius II*, 2021 WL 1177465 at *9 (internal citation omitted).

The Court further ruled that under these circumstances, the Global

Security "explicitly required the Republic to comply with the Modifications

Provision," which requires super-majority consent of the holders for modifications

of contractual terms.  *Id.*  The Republic did not seek or obtain such consent.  PSoF

¶ 169.  Thus, the undisputed facts establish that the Republic breached the

Modifications Provision by applying its own version of the adjustment fraction

rather than complying with the contractual terms.

**IV.**

**THE REPUBLIC BREACHED THE IMPLIED**
**<u>COVENANT OF GOOD FAITH AND FAIR DEALING</u>**

In ruling that Plaintiffs' Amended Complaints are "clearly sufficient"

to state a claim for breach of the implied covenant of good faith and fair dealing,

this Court explained the well-established principles applicable here:

> Under New York law, a covenant of good [faith] and fair
> dealing is implied in all contracts. The implied covenant
> embraces a pledge that neither party shall do anything
> which will have the effect of destroying or injuring the
> right of the other party to receive the fruits of the

45

> contract. The duties of good faith and fair dealing do not
> imply obligations inconsistent with other terms of the
> contractual relationship . . . [but] do encompass any
> promises which a reasonable person in the position of the
> promisee would be justified in understanding were
> included.

*Aurelius II*, 2021 WL 1177465, at *11 (citations and internal quotations omitted).

These principles have been repeatedly stated, in these same words, by the New

York Court of Appeals in an unbroken line of authority going back almost a

century.  *See Kirke La Shelle Co. v. Armstrong Co.,* 263 N.Y. 79 (1933).

### A.     The Republic's Conduct Is a Classic Violation of the Covenant

Here, the undisputed facts establish all the elements of the breach of

the implied covenant—(1) the Republic's conduct had "the effect of destroying or

injuring the right of [holders] to receive the fruits of the contract"; (2) a reasonable

person in the position of holders would be justified in understanding the Republic

impliedly promised to publish 2013 Actual Real GDP measured in constant 1993

prices where doing so was necessary to avoid depriving holders of a payment that

was due; and (3) such implied promise is not inconsistent with other terms of the

contract.

As to the first element—did the Republic's conduct have the effect of

destroying the rights of holders to payment for 2013—the answer is, of course it

did.  MECON jettisoned the plain terms of the Adjustment Provision in favor of an

alternative based on its view of the contract's supposed "spirit."  Doing so meant

that (i) the Republic would apply a constant adjustment fraction to every year after the rebasing; (ii) the Base Case GDP Growth threshold each year after rebasing would be the same as unadjusted Base Case GDP Growth before the rebasing; (iii) no payment would be made for 2013 because Actual Real GDP Growth for 2013 measured in constant 2004 prices (2.93%) was less than unadjusted Base Case GDP Growth (3.22%); and (iv) there was no need to publish 2013 Actual Real GDP measured in constant 1993 prices because that figure is unnecessary under the constant fraction alternative. █████████████████████

████████████████████████████████████

██████████████████████████████████

████████████████

        Against the background of all of the foregoing, the Republic contends Plaintiffs cannot show entitlement to payment for 2013 because a necessary data point for calculations was not published by the Republic.  Such contention just confirms that the Republic's conduct destroyed Plaintiffs' right to the fruits of the contract, and deprived Plaintiffs of the payment they were entitled to.

        As to the second element—what would a reasonable person have been justified in understanding the Republic impliedly promised—again, the answer is clear.  A reasonable person would have understood there to be an implied promise that the Republic would not destroy holders' rights to payment by failing to publish

47

a data point necessary under the contract and within the sole power of the Republic to publish—especially under the circumstances of 2013, where such data point would have confirmed holders' right to payment.  And, a reasonable person also would have understood there to be a further implied promise that in the event the Republic failed to publish a contractually necessary input, the Republic would not assert that the absence of such input means holders lose their right to payment.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████

Where, as here, one party to a contract has information that the other party needs in order to receive what it is entitled to under the contract—and there is no express contractual obligation to provide the information—courts have not hesitated to rule that the failure to provide the information is a breach of the implied covenant of good faith and fair dealing.  *Melling v. Hamilton Point Investments*, *LLC*, 2019 WL 235641, at *6 (E.D.N.Y Jan. 16, 2019) (defendant withholds information necessary to determine amounts due to plaintiff); *Hexagon Sec. LLC v. Leawood Bancshares, Inc*., 2014 WL 1303516, at *5 (S.D.N.Y. Mar. 14, 2014) (defendant refuses to provide information that would have confirmed plaintiff's entitlement to a success fee); *see also Rosen v. Sapir*, 2021 WL 4523713, at *7 (S.D.N.Y. Sept. 30, 2021) (defendant withholds information

48

necessary to determine whether plaintiff had the right to exercise contractual default remedies); *Zakrzewski v. Luxoft USA, Inc*., 151 A.D.3d 573, 574 (1st Dep't 2017) (defendant's refusal to provide performance goals frustrates plaintiff's right to earn contractual payments); *H/R Stone, Inc. v. Phoenix Bus. Sys., Inc*., 660 F. Supp. 351, 359 (S.D.N.Y. 1987) (defendant refuses to provide information necessary for plaintiff's performance).  And these cases do not present the egregious additional circumstances present here, such as the Republic's disregard of the plain terms of the contract, and its announcements, immediately after the rebasing, that 2013 Actual Real GDP measured in constant 1993 prices would not be published and no payment would be made for 2013.  PSoF ¶¶ 134, 141, 161-162.

As to the third element—whether such implied promise is inconsistent with other terms of the contract—it clearly is not.  There is no contractual provision authorizing the Republic to cease publication of data necessary for operation of the contract.  The Republic repeatedly argues that this Court ruled that the Global Security does not require the Republic to compel INDEC to publish data.  Arg. Br. at 7, 24, 34.  But just because "the contract does not impose a categorical duty" to publish necessary data "in all circumstances," *Aurelius II*, 2021 WL 1177465, at *10, does not mean the Republic has a license, when a

49

payment would be due, to destroy Plaintiffs' right to payment by failing to publish

a data point necessary for calculations.[18]

**B.      The Undisputed Facts Prove All the Allegations the Court**
**        Identified as Sufficient to State a Claim for Breach of the Covenant**

In sustaining Plaintiffs' claim for breach of the implied covenant of

good faith and fair dealing, the Court described certain allegations as sufficient to

state a claim:

> Plaintiffs have alleged that the Republic was aware that it
> would owe a payment to Warrant holders if Base Case
> GDP Growth was calculated based on adjusted Base
> Case GDP.
>
> Although Plaintiffs do not contend that the EMAE index
> should be adopted as the contractual input here (as
> Aurelius did in its first complaint), Plaintiffs point to data
> published by INDEC—including the EMAE Index for
> 2013, and Actual Real GDP in 1993 prices for the first
> three quarters of 2013—to allege that the Republic was
> aware that Actual Real GDP Growth for 2013 would
> have substantially exceeded Base Case GDP Growth for
> that year if INDEC had published 2013 Actual Real GDP
> in 1993 prices.
>
> Plaintiffs allege that the Republic caused INDEC to stop
> publishing data to obscure the fact that a payment was

_____

[18] Plaintiffs respectfully submit the Republic does have an obligation to publish at
all times in all circumstances, but that is not an issue the Court needs to reach to
grant summary judgment to Plaintiffs for the 2013 payment due.  It is also
noteworthy that the Republic's counsel in the English proceedings conceded that if
Plaintiffs' interpretation of the Adjustment Provision is correct, the Republic does
have an implied duty to publish.  Friedman Decl. Ex. 107 ¶ 229; *id*. Ex. 214 at
19:1-21:4.

due so as to prevent having to make payment to
bondholders.

*Aurelius II*, 2021 WL 1177465, at \*11 (internal citations omitted).  The undisputed

facts establish all these allegations.[19]



---

[19] For the avoidance of doubt, Plaintiffs submit that it is not necessary for them to
prove each of these specific allegations.  The legal authorities cited above in sub-
section A establish that the facts described therein are sufficient to warrant
summary judgment in Plaintiffs' favor.



3732035.1



53

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████████

████████████████████████████████

█████████████████████████████████

██████████

It should be noted that proving purpose or intent does not require showing that there was a meeting in a smoke-filled room where the participants agreed on a scheme to avoid payment and obscure holders' rights.  Rather, as explained in the RESTATEMENT (THIRD) OF TORTS: PHYS. & EMOT. HARM (Am. Law Inst. 2010) ch. 1 §1, "A person acts with the intent to produce a consequence if . . . the person acts knowing that the consequence is substantially certain to result."  Here, the undisputed facts more than prove that the Republic knew that the "substantially certain" consequences of its atextual alternative to the Adjustment Provision and its failure to publish contractually necessary data would be:  (i) non-payment for 2013, and (ii) the inability on the part of holders to show their entitlement to payment.

████████████████████████████████████

████████████████████████████████████





56



57

███████████████████████████████████████████

███████████████████████████████████████████

As this Court previously ruled, while recognizing the Republic's discretion to rebase, such discretion cannot be exercised in a way that is arbitrary, irrational or unreasonable.  *Aurelius I*, 2020 WL 70348, at *7 n.7.  The Court explained, "the Republic may not frustrate the contracts into which [it has] entered."  *Id.* (internal citations and quotations omitted).  In fact, the Republic did just that when proceeded down its atextual path and withheld publication of 2013 Actual Real GDP measured in constant 1993 prices.  In the view of the Republic, it can never be faulted for failing to publish data, even if the non-publication destroys Plaintiffs' right to payment.  That is not the law.

## V.

### UNDER THE PREVENTION DOCTRINE, THE REPUBLIC CANNOT AVOID ITS PAYMENT OBLIGATION

The Court previously declined to decide whether the prevention doctrine applies here, explaining that it was unnecessary to do so, because Plaintiffs' allegations are "clearly sufficient" to state a claim under the doctrine of good faith and fair dealing.  *Aurelius II*, 2021 WL 1177465, at *11.  The Court also explained that the cases cited by Plaintiffs that "have applied the prevention doctrine … appear to address slightly different factual scenarios"—prevention by one party of a condition precedent to the other party's performance or prevention

58

of a condition precedent to the formation of a contract.  *Id.*  As shown below, this case in substance is not different from cases with "slightly different factual scenarios" where courts have applied the prevention doctrine.  Also, courts have in fact found the prevention doctrine applicable when, like the Republic here, one party prevents the occurrence of a condition precedent to its own payment obligation.

Under the prevention doctrine, a party may not "(1) do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract or (2) act in such a way as to frustrate or prevent the occurrence of a condition precedent."  *Id*. at *10 (quoting *Ixe Banco, S.A. v. MBNA Am. Bank*, 2008 WL 650403, at *10 (S.D.N.Y. Mar. 7, 2008)).  If a party acts deliberately or arbitrarily, that is sufficient; "professed good intentions do not prevent a finding of prevention or hindrance."  *Ixe Banco, S.A. v. MBNA Am. Bank, N.A.*, 2009 WL 3124219, at *4 n.8 (S.D.N.Y. Sept. 29, 2009).

Here, the Republic's refusal to apply the Adjustment Provision as written, and its failure to publish 2013 Actual Real GDP measured in constant 1993 prices, had the effect of destroying Plaintiffs' right to receive payment for 2013.

In addition, publication of 2013 Actual Real GDP measured in constant 1993 prices was, according to the Republic, a condition precedent to the

Republic's payment obligations.  The Republic has argued that because of the missing input, Plaintiffs cannot show the Growth Condition was met. Alternatively, satisfaction of the Growth Condition is a condition precedent to payment, and the Republic prevented satisfaction of that condition by non-publication of an input necessary to calculate whether the Growth Condition was satisfied.  In either case, the Republic's conduct prevented the satisfaction of a condition to payment.  Rewarding the party that prevented the performance of the condition and destroyed Plaintiffs' rights to receive the fruits of the contract is what the prevention doctrine proscribes.

Thus, this case is like *Stern v. Gepo Realty Corp.*, 289 N.Y. 274, 277 (1942), a decision at the foundation of the prevention doctrine.  In *Stern*, the defendant, a seller of a property, prevented the closing of title on the property by not clearing liens. Closing of title was a condition precedent to the seller's obligation to pay a commission to the plaintiff, the seller's broker.  The Court of Appeals sustained plaintiff's claim to hold seller liable to pay the plaintiff's commission because the seller, having itself prevented the occurrence of the condition, could not avoid its payment obligation based on the non-occurrence of the condition.

The fundamental principle underlying the prevention doctrine is equally applicable in the present case.  A defendant, acting deliberately or

60

arbitrarily, cannot reap the benefits of a contract while depriving plaintiff of the fruits.  Thus, where as here, the Republic prevented occurrence of a condition precedent to payment and/or prevented Plaintiffs' ability to come forward with specified data, the Republic cannot avoid its liability for the 2013 payment due.

## VI.

### THE REMEDY FOR THE REPUBLIC'S BREACH SHOULD BE AN AWARD OF AMOUNTS DUE FOR 2013 IN PROPORTION TO EACH PLAINTIFF'S BENEFICIAL INTEREST IN THE GLOBAL SECURITY

If the Court agrees with Plaintiffs that the words of the contract mean what they say, then the Republic owes Warrant holders a payment for Reference Year 2013.  The Republic as breaching party has no basis to argue there should be no payment, whether because the missing input precludes precise calculation or for any other reason.  Whether liability is premised on breach of the Modifications Provision, the implied covenant of good faith and fair dealing, the prevention doctrine, or simply breach of contract, the Court should award a remedy that puts Plaintiffs in "the same economic position [they] would have occupied had the breaching party performed the contract."  *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 196 (2d Cir. 2003).  Plaintiffs "need only show a stable foundation for a reasonable estimate" supporting the remedy.  *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110 (2d Cir. 2007) (internal quotations omitted).  The Court has "significant flexibility" in crafting the remedy, and "[t]o

61

the extent certain variables must be assumed in order to arrive at a reasonable estimate, the district court may do so," absent evidence to the contrary.  *Id.* at 112.

Here, in placing Plaintiffs in "the same economic position [they] would have occupied had the breaching party performed the contract," the Court can award them the amount the Court determines is the payment they would have received if 2013 Actual Real GDP measured in constant 1993 prices had been published.  The undisputed facts provide the Court with a compelling basis to determine what that figure would have been, and from that it is easy to calculate what the payment would have been for 2013.  PSoF ¶¶ 84-103.

The analysis by Plaintiffs' expert demonstrates that 2013 Actual Real GDP measured in constant 1993 prices would have been 491.4 billion pesos, exactly coinciding with the MECON/INDEC figures being used at the time of the rebasing to estimate the Republic's liability for 2013 on the GDP Warrants, and the same figure used by the English court.  *Id.* ¶¶ 84-86, 123, 125-32, 159; Friedman Decl. Ex. 107 ¶¶ 251-56.  With that figure, the payment conditions would have been met and a payment would have been due for 2013, PSoF ¶¶ 84-103, just as the English court found payment to be due under the English law GDP Warrants for 2013, Friedman Decl. Ex. 107 ¶¶ 251-56.  The amount of the payment due here would have been $0.07680 per notional dollar, and each Plaintiff is therefore

entitled to payment at that rate based upon its respective proportional beneficial ownership of the Global Security, plus applicable interest.  *See* PSoF ¶¶ 1-14.

## VII.

### PLAINTIFFS HAVE THE RIGHT TO PURSUE THE CLAIMS THEY HAVE ASSERTED

The Republic argues in its Motion for Summary Judgment for the first time in these proceedings that Plaintiffs' claims should be dismissed because Plaintiffs did not comply with the threshold requirements for bringing suit, namely according to the Republic, satisfying the pre-requisites of the No-Action Clause and obtaining an assignment of claims from prior beneficial owners of the GDP Warrants.  Arg. Br. at 25-27.  These arguments fail because Plaintiffs have, under the express terms of the Indenture and Global Security, the right to sue for payments due (i) separate and apart from the No-Action Clause, and (ii) without assignments from former beneficial owners.

A.     **The Governing Documents Grant Plaintiffs the Same Right as the "Holder" to Bring Suit for Payments Due**

Like most publicly-traded debt securities, the GDP Warrants provide multiple avenues for beneficial owners such as Plaintiffs to pursue claims against the Republic as issuer.  On the "No-Action" path, beneficial owners of interests aggregating above a threshold (here, 25% of the aggregate notional amount) may pursue claims after the Trustee declines their request to pursue those claims.  The

Republic contends incorrectly that Plaintiffs "claim to rely on the No-Action clause as the basis for bringing suit." *Id*. at 26 (citing, for example, Aurelius Capital Master and ACP Master Amended Complaints ¶ 17).

In fact, paragraph 17 of the Aurelius pleadings quotes the last sentence of Section 11 of the 2005 Global Security and Section 9 of the 2010 Global Security, which acknowledge the remedial rights of beneficial owners, whether or not claims are pursued under the No-Action clause:

> The Republic expressly acknowledges, with respect to the right of any Holder to pursue a remedy under the Indenture, the GDP-Linked Securities Authorization or the Securities, the right of any beneficial owner of Securities to pursue such remedy with respect to the portion of this Global Security that represents such beneficial owner's interest in this Security as if Certificated Securities had been issued to such beneficial owner.

Friedman Decl. Ex. 60 § 11; *id*. Ex. 61 § 9; PSoF ¶ 209. That is, beneficial owners have the same remedial rights as the Holder. The Holder is the entity in whose name the Global Security is registered on behalf of the clearing system through which the GDP Warrants are held. Here, the Holder has been at all times Cede & Co. and The Bank of New York Depositary (Nominees) Limited for the 2005 and 2010 Global Securities, respectively. PSoF ¶ 218.

Each Holder has, pursuant to Section 4.9 of the Indenture, the "right, which is absolute and unconditional, to receive payment of the principal and

3732035.1

interest on its Debt Security on the stated maturity date for such payment expressed in such Debt Security." Under Section 4.9, the Holder also has the right "to institute suit for the enforcement of any such payment." Friedman Decl. Ex. 184 §4.9; PSoF ¶ 210. Thus, Plaintiffs have the right to bring their claims because Section 4.9 authorizes the Holder to pursue claims for payment (without complying with the No-Action Clause), and the last sentence of Sections 11 and 9 of the Global Securities (in the block quote above) expressly authorizes any beneficial owner to pursue any remedy that any Holder could pursue, with respect to such beneficial owner's proportionate interest in the Global Security.[20]

The Republic contends, however, that the GDP Warrant Holders (and therefore Plaintiffs) do not have the right to bring suit for a missed payment because such payments are not principal or interest. Arg. Br. at 26 n.12. That argument defies the language of the Global Security and common sense.

Sections 11 and 9 of the 2005 and 2010 Global Securities, respectively, both confirm the Section 4.9 rights of Holders (and beneficial owners) to sue for payment. Those sections say that Holders do not need to comply with the No-Action Clause when bringing claims "as provided in Section 4.9 of the Indenture with respect to the right of any Holder of a Security to enforce

---

[20] All rights under the Indenture and Global Security are cumulative and non-exclusive, and Plaintiffs may elect to follow any path allowed to them. *Id.* ¶ 211.

the payment of any amounts due hereunder on any Payment Date. . . ."  Friedman

Decl. Ex. 60 § 11; *id*. Ex. 61 § 9; PSoF ¶ 212.  The sole and obvious purpose of

this provision is to confirm that the Section 4.9 right to sue for principal and

interest on stated maturity dates applies to GDP Warrant Holders with respect to

their rights to sue for "amounts due hereunder on any Payment Date."[21]  Moreover,

the Republic's position would treat Holders of the GDP Warrants differently from

Holders of all other Debt Securities by stripping away the right to sue for missed

payments.  There is no indication that such disparate treatment was intended, i.e.,

that as to the Warrants only, there be no right to sue for missed payments under

Section 4.9.

      The only basis for the Republic's argument that the Payment Amount

is not principal or interest is a legend on the front of the Global Security that says:

> THE ONLY AMOUNTS PAYABLE IN RESPECT OF
> THIS SECURITY ARE THE PAYMENTS
> CONTINGENT UPON AND DETERMINED ON THE
> BASIS OF THE PERFORMANCE OF THE GROSS
> DOMESTIC PRODUCT OF THE REPUBLIC OF
> ARGENTINA (THE "REPUBLIC") REFERRED TO
> HEREIN.  THE NOTIONAL AMOUNT OF THIS
> SECURITY SET FORTH BELOW WILL BE USED
> SOLELY TO ALLOCATE THESE PAYMENTS
> AMONG HOLDERS OF THIS SECURITY.  HOLDERS
> OF THIS SECURITY ARE NOT ENTITLED TO

---

[21] As the English court recognized, "It is obvious, in the circumstances, that section 4.9 ought to be regarded as referring to a claim for the Payment Amount." Friedman Decl. Ex. 107 ¶ 300.

> RECEIVE PRINCIPAL IN THE AMOUNT OF, OR
> INTEREST BASED ON, SUCH NOTIONAL
> AMOUNT.

Arg. Br. at 26 n. 12 (citing Arg. SOF 210); *see also* Friedman Decl. Exs. 60 & 61 at 1; § 9; PSoF ¶ 215.  This legend does not say payments on the Warrants are not principal or interest.  Rather, it alerts Holders of limits on the amounts that can be recovered under the terms of the Global Security.  Specifically, they "are not entitled to receive principal in the amount of, or interest based on, such notional amount."  That legend is consistent with the Payment Cap found in the Global Security, which caps the total payment potentially due under the Warrants at an amount less than the notional amount.  Friedman Decl. Exs. 60 & 61 at R-4; PSoF ¶ 95.  All the legend does is confirm that payments to Warrant holders are those provided under the Global Security's terms; the legend does not characterize such payments as something other than principal or interest.

**B.**     **Plaintiffs Do Not Need Assignments from Former Beneficial Owners**

The Republic also contends that certain Plaintiffs must "prove that the right to sue transferred from each previous holder of the Securities on which they now purport to sue, dating back to the December 2014 No Payment Announcement."  Arg. Br. at 27.  This argument defies the language of the contract, common sense, all market practice, and New York law.

3732035.1

As noted above, Sections 11 and 9 of the 2005 and 2010 Global
Securities, respectively, delegate to "any beneficial owner" the right to bring suit to
collect its share of the payments due under the Global Securities.  Friedman Decl.
Ex. 60 § 11; *id*. Ex. 61 § 9; PSoF ¶ 213.  Sections 11 and 9 do not delegate the
right to bring suit only to beneficial owners as of a certain date, and certainly not to
former beneficial owners who long ago sold their entire beneficial ownership in the
security.  Yet the Republic would read into this language that (a) only a beneficial
owner as of a historical date not specified in the contract can bring suit, and (b)
such former beneficial owner can do so even after it has traded out of the security
in the public markets and has no current ownership interest.  That makes no sense,
and given the lack of any specified date, the only natural reading of the contract is
that the beneficial owner at the time the suit is brought—i.e., when the Holder's
right delegated to the beneficial owner is exercised—is the one endowed by that
delegation.

This Court has heard countless suits by holders of the Republic's
defaulted bonds, yet never has the Republic made the assertion it makes now.[22]
For good reason, because it would lead to absurd results.

---

[22] The Court has handled a massive universe of suits brought to enforce the
Republic's bonds that defaulted in 2002.  To the best of Plaintiffs' knowledge,
every one of those suits was brought by the beneficial owner at the time the suit
was commenced, and none was brought by former beneficial owners that held the

The delegation provision at issue is the same in pertinent respects for both the GDP Warrants and many series of bonds that were issued under the same Indenture.  Friedman Decl. Ex. 184 at C-9; PSoF ¶ 214.  Under the Republic's logic, if the Republic defaults on several different installments of principal and interest in a given series of those bonds, the investors that hold the bonds on one default date could sell them and still bring suit to collect on the missed payment.  Given active trading of each bond, it would be impossible to enforce the Republic's debt under that bond unless several successive beneficial holders of the same bond brought suit to enforce the multiple payment defaults.

And the Republic's position would mean that different beneficial owners could collect on the same payment depending upon how the payment was made.  If the Republic cures a payment default that occurred years ago, the payment will go (via the Holder) to the current beneficial owners; and if the indenture trustee enforces the debt, and the Republic pays the resulting judgment, the current beneficial owners will receive the defaulted payment.  But, if beneficial owners sue, and the Republic pays the judgment, the payment will go to the historic beneficial owner at the time of the default.  Such a basic inconsistency

---

bonds when the default occurred but later sold them.  Nor were there ever assignments from former beneficial owners.

3732035.1

would never be written into a contract and surely should not be read into it where the words do not appear.

The Republic's position is wholly incompatible with any kind of functioning securities market. With microscopically rare exception, publicly traded securities never trade with an explicit assignment of a particular right from the selling beneficial owner to the buyer, as it is understood that the buyer is taking over all rights and interests of the beneficial owner pertaining to the issuer's obligations under the security. Indeed, the buyer rarely knows the identity of the seller, let alone the identities of the seller's predecessors-in-interest with respect to the security. In virtually every instance, it would be impossible for the buyer to know, let alone procure assignments from, let alone prove in court, the chain of beneficial ownership going back many years before a suit has been brought.

Endowing current beneficial owners with the right to bring suit against Argentina as issuer for claims arising under the Global Security also accords with New York law.[23]  Pursuant to N.Y. U.C.C. LAW § 8-302, "a purchaser

---

[23] Although the Court need not reach the issue, New York law would apply to Plaintiffs' purchases under a "center-of-gravity" analysis because, *inter alia*, the GDP Warrants are governed by New York law; the Republic has consented to jurisdiction in New York, and no other state has an interest in determining who may bring suit in New York's courts; the Holder for the 2005 GDP Warrants is located in New York; several plaintiffs or their managing entities are located in New York; numerous purchases of GDP Warrants were made through New York-based brokers; and the GDP Warrants held by multiple Plaintiffs are held in New York-based accounts.  PSoF ¶¶ 216-23.  *See Schwimmer v. Allstate Ins. Co.*, 176

70

of a certificated or uncertificated security acquires all rights in the security that the transferor had or had the power to transfer."  All "rights in the security" include "rights against the issuer under the contract."  *R.A. Mackie & Co. v. Petrocorp Inc.*, 329 F. Supp. 2d 477, 507 (S.D.N.Y. 2004) (warrant holders who purchased after challenged transaction can bring suit against issuer); *see also Consol. Edison Inc. v. Ne. Utils.*, 318 F. Supp. 2d 181, 192 (S.D.N.Y. 2004) (8-302 "includes rights vis-à-vis the issuer arising out of the security itself," including right to receive dividends); *Petersen Energía Inversora, S.A.U. v. Argentine Republic*, 2023 WL 2746022, at *10 (S.D.N.Y. Mar. 31, 2023) (participatory rights against issuer, including right to dividends, "automatically transfer" upon sale).[24]

   Notably, none of the authorities relied on by the Republic address the transfer of claims against an issuer arising under the terms of the security itself, as is the case here.  All involved claims against trustees.  *Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co.*, 585 F. Supp. 3d 540, 551 (S.D.N.Y 2022); *Racepoint Partners, LLC v. JPMorgan Chase Bank*, 2006 WL 3044416, at *1 (S.D.N.Y. Oct.

---

F.3d 648, 650 (2d Cir. 1999); *Commerzbank AG v. U.S. Bank Nat'l Ass'n*, 457 F. Supp. 3d 233, 243 (S.D.N.Y. 2020).

[24] N.Y. GEN. OBLIG. LAW § 13-107(1) establishes that this is the default rule in the corporate bond context.  It provides that "[u]nless expressly reserved in writing, a transfer of any bond shall vest in the transferee all claims or demands of the transferor…for damages or rescission against the obligor."

26, 2006); *Royal Park Investments SA/NV v. Wells Fargo Bank, N.A.*, 2018 WL 739580, at *1 (S.D.N.Y. Jan. 10, 2018).  And none of these cases involved provisions that specifically vested "any beneficial owner" with the right to bring suit, as here.

## VIII.

## THE REPUBLIC'S AFFIRMATIVE
## DEFENSES SHOULD ALL BE DISMISSED

The Republic asserts champerty and a dozen other affirmative defenses in conclusory terms.  These defenses all lack merit and should be dismissed as a matter of law based on the undisputed facts.

As to champerty, Plaintiffs' acquisitions fall within the champerty statute's "safe harbor" for purchases with an "aggregate purchase price of at least five hundred thousand dollars."  Each Plaintiff, or group of jointly managed Plaintiffs, has an aggregate purchase price significantly in excess of $500,000. Section 489(2).[25]  For the two Aurelius Plaintiffs, for example, the aggregate purchase prices of the 2005 and 2010 GDP Warrants are, respectively over $38 million and over $85 million.  *See* PSoF ¶¶ 224-25; *see also id*. ¶¶ 226-35.

---

[25] Purchases are aggregated across transactions.  *See* New York Bill Jacket, 2004 A.B. 7244, Ch. 394 (safe harbor "focuses on the size of the transaction or series of transactions."); *see also Justinian Cap. SPC v. WestLB AG*, 43 Misc. 3d 598, 601 (N.Y. Sup. 2014), *aff'd*, 128 A.D.3d 553 (1st Dep't 2015).

72

Even apart from the safe harbor, if the Court were to consider the merits of the Republic's champerty defense, the defense would be without merit. The purpose of the champerty statute—N.Y. JUD. LAW § 489(1)—is "to prevent attorneys and solicitors from purchasing debts, or other things in action, for the purpose of obtaining costs by a prosecution thereof[.]" *Tr. For the Certificate Holders of Merrill Lynch Mortg. Invs., Inc. v. Love Funding Corp.*, 13 N.Y.3d 190, 199 (2009). If a party "acquires a debt instrument for the purpose of enforcing it, that is not champerty simply because the party intends to do so by litigation." *Id*. at 200.[26]

Plaintiffs purchased the GDP Warrants because they perceived them to be good investments, and in doing so, they evaluated the potential return over the lengthy remaining life of the Warrants, not just with respect to 2013. PSoF ¶¶ 1-16. The Aurelius Plaintiffs (and other holders) repeatedly sought to resolve the claim at issue here more than a year before bringing litigation, but the Republic dismissed those overtures. *Id*. ¶¶ 171-82. These undisputed facts doom any champerty defense. *See SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 139

---

[26] *See also Bluebird Partners, L.P. v. First Fid. Bank, N.A.*, 94 N.Y.2d 726, 736 (2000) (acquisition of debt with intent to bring suit not champertous)*; Elliott Associates, L.P. v. Banco de la Nacion*, 194 F.3d 363, 372 (2d Cir. 1999) (same).

73

(2d Cir. 2009) (dismissing champerty defense where defendants failed to satisfy debt after plaintiff's collection efforts).[27]

The defenses labeled as failure to state a claim, intervening or superseding causes, assumption of risk, failure to mitigate, speculative damages, and no-right-to-attorney's fees are not affirmative defenses at all, and should be treated as nothing more than denials. *See Etienne v. Wal-Mart Stores, Inc.*, 197 F.R.D. 217, 223 (D. Conn. 2000) (treating a defense that simply negated an element of a plaintiff's claim as a denial, not as an affirmative defense).

With respect to the balance of the affirmative defenses—mutual and unilateral mistake, impossibility, estoppel, waiver, laches, unclean hands and unjust enrichment—the Republic makes only conclusory assertions. None are supported by any facts. *See In re Livent, Inc. Noteholders Sec. Litig.*, 355 F. Supp. 2d 722, 729 (S.D.N.Y. 2005) (defendant must "come forward with evidence supporting each essential element of the defense[s]"). And the last three are not even available where, as here, a plaintiff asserts legal (as compared to equitable)

---

[27] That some purchases occurred after the Republic breached is irrelevant. *See Lightwater Corp. v. Republic of Argentina*, 2003 WL 1878420 (S.D.N.Y. Apr. 14, 2003) (dismissing champerty defense where plaintiff purchased debt after default); *Mazzini v. Republic of Argentina*, 2005 WL 743090 (S.D.N.Y. Mar. 31, 2005), *aff'd*, 282 F. App'x 907 (2d Cir. 2008) (same); *Espadarte Partners, LLC v. Riverside Gulf Coast Banking Co.*, 2020 WL 1955672, at *6 (N.Y. Sup. Ct. Apr. 23, 2020) (same).

claims.  *See Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 607 (2d

Cir. 2005) (unclean hands); *Cognetta v. Valencia Devs., Inc.*, 8 A.D.3d 318, 319

(2d Dep't 2004) (laches); *Van de Walle v. Van de Walle*, 68 Misc. 3d 1224(A), at

*11-12 (N.Y. Sup. Ct. 2020) (unjust enrichment).

## IX.

## THE ENTIRETY OF WASO'S CLAIM IS TIMELY AND PROPER[28]

The Republic contends a portion of WASO's claim is time-barred by

a five-year prescription clause in Section 14 of the 2005 Global Security (the

"Prescription Clause").  The Republic's arguments fail for the reasons below.

### A.    WASO's Notice of Claim Satisfies the Prescription Clause

To the extent the Prescription Clause is applicable and enforceable

here (it is not, as discussed below), WASO provided a proper and timely notice of

claim to the Republic sufficient to satisfy the Prescription Clause.  As this Court

has already concluded, the Prescription Clause is akin to a "mere notice provision"

that "does not supersede New York's six-year statute of limitations."  *Ape Grp.*

*SPA v. Republic of Argentina,* 2022 WL 463309, at *1, 3 (S.D.N.Y. Feb. 15,

2022).[29]  It is undisputed that WASO's December 11, 2019 complaint gave a

---

[28] This section of the brief relates to arguments the Republic has advanced as to
Plaintiff WASO only, and is submitted by WASO's counsel only.

[29] The Ape complaint and WASO's Letter Motion for Supplemental Amended
Complaint were both filed prior to expiration of the statute of limitations.

3732035.1

notice of claim to the Republic that "the GDP Warrants require Argentina to pay, at minimum, USD $1,320,255,073.65 to holders of the GDP Warrants" for Reference Year 2013.  Friedman Decl. Ex. 233 ¶ 15.  WASO's complaint detailed the step-by-step calculation underlying the basis of the entire Payment Amount due. *Id.* ¶¶ 84-92.  Moreover, WASO's first claim for relief for breach alleges that "Argentina was contractually obligated to make a Payment Amount of at least USD $0.07680 per notional dollar on December 15, 2014."  *Id*. ¶ 109 (emphasis added).  Therefore, the Republic had actual notice of the *total* Payment Amount due, including a detailed calculation, within the five-year prescription period.  This is more than sufficient to "make" a "claim" under the Prescription Clause for all amounts now in controversy in this litigation.[30]

The Republic's argument that "claims based on . . . additional Securities were already time-barred under the Prescription Clause when WASO acquired them," Arg. Br. at 28-29, conflates the claim for the Payment Amount due with the right of any beneficial holder to sue to enforce such claim.  The Payment

---

[30] *See Powermat Techs., Ltd. v. Belkin Int'l Inc.,* 2020 WL 2892385, at *13 (S.D.N.Y. Apr. 2, 2020) ("The pertinent Black's Law Dictionary definitions of 'claim' are '[t]he assertion of an existing right; any right to payment or to an equitable remedy, even if contingent or provisional,' and '[a] demand for money, property, or a legal remedy to which one asserts a right . . . [a]lso termed claim for relief.'" (emphasis added) (citing Claim, Black's Law Dictionary (11th ed. 2019)); Claim, Merriam-Webster (2022) ("a demand for something due or believed to be due" (emphasis added)).

Amount due is a single claim of the sole "Holder," Cede & Co., which has continuously held the right to enforce payment under the 2005 Global Security.[31] Section 11 of the 2005 Global Security vests "any beneficial holder" with the remedial right to bring suit to enforce payment of such claim.  Having provided the Republic with timely notice of the total Payment Amount due within the five-year period in satisfaction of the Prescription Clause, the Holder's claim is preserved.  WASO needed only to institute suit with regard to its beneficial holdings within New York's six-year statute of limitations, which it did.[32]

The Prescription Clause does not prescribe the manner in which a "claim" must be "made" or who must make it.  Rather, as this Court previously noted, "[t]he only sensible construction is to attribute to the word 'claim' its

---

[31] WASO's beneficial ownership of GDP Warrants all relates to the single issuance of the 2005 Global Security. PSoF  ¶ 13.

[32] It is for this reason that the Republic's reliance on *Phoenix Light SF ltd. v. Deutsche Bank Nat'l Trust Co.*, 585 F. Supp. 3d 540 (S.D.N.Y. 2022) and *U.S. Bank Nat'l Ass'n* v. *GreenPoint Mortg. Funding, Inc.*, 147 A.D.3d 79 (1st  Dep't 2016) is misguided.  Arg. Br. at 29-30.  In *Phoenix Light*, a consent right was a condition precedent to instituting suit, but consent was not obtained until after the applicable statute of limitations expired.  585 F. Supp. at 568.  Further, plaintiffs sold securities prior to commencing litigation.  Similarly in *U.S. Bank Nat'l Ass'n*, a breach notice was a condition precedent to a claim predicated on actual notice of default, but breach notices were not sent until after the applicable statute of limitations expired.  147 A.D.3d at 13-14.  The Republic's citation to *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 55 (2d Cir. 2011), which states the general rule of first in time, first in right priority among competing creditors, is simply inapposite.

ordinary, everyday meaning: an assertion of a right to something." *Ape,* 2022 WL

463309, at *3.  Where the Republic sought to distinguish between actions that must

be taken by the Trustee, the Holder, and any beneficial owner, it did so explicitly.

The Republic could have easily articulated strict requirements in the Prescription

Clause, *which it drafted*.  Having failed to do so, the Court should not now read

such terms and requirements into the Global Security that do not otherwise exist.

*See CCM Rochester, Inc. v. Federated Invs., Inc.*, 2014 WL 6674480, at *6

(S.D.N.Y. Nov. 25, 2014)); *Mineroff v. Lonergan*, 152 A.D.3d 506, 509 (2017)

(declining to "add[] a term to the contract that the parties chose not to include").

Here, it is undisputed that WASO commenced litigation with respect

to all of its current beneficial holdings within the applicable six-year statute of

limitations governing breach claims.  Having complied with both the Prescription

Clause and New York's statute of limitations, the inquiry into WASO's claim is

over.[33]

**B.**     **WASO's Claim Arising from the Republic's
Systemic Breaches is Not Covered Under the Prescription Clause**

Even if WASO had not provided proper notice of claim (it has), the

Republic cannot use the Prescription Clause to avoid liability here.  As previously

---

[33] Given that the relevant six-year statute of limitations has now passed, there is no
risk that a ruling in WASO's favor will invite the filing of any additional claims
that were not previously timely filed within the relevant period.

3732035.1

discussed by this Court in *Ape*, 2022 WL 463309, the Prescription Clause is not a broad suit limitation provision.  It does not absolve the Republic from liability for its systemic breaches of contract, including breach of the Adjustment Provision, *supra* Section I, breach of the Modifications Provision, *supra* Section III, and breach of the implied covenant of good faith and fair dealing, *supra* Section IV. This is not a case involving unclaimed funds deposited with the Trustee, or even a case where the Republic acknowledged that payment was due but failed to deposit funds with the Trustee.  Rather, here the Republic ignored the contract, unilaterally changed the calculation methodology without consent, and failed to publish contractually necessary data in order to avoid payment for Reference Year 2013 and frustrate the ability of holders to show their entitlement to payment. Accordingly, WASO's claim for the Payment Amount arising from the Republic's systemic breaches is not covered under the Prescription Clause.

**C.**      **The Prescription Clause is Ambiguous**

Reading the contract as a whole, the Prescription Clause cannot have the meaning pushed by the Republic, as Section 2(e) explicitly contemplates a right to payment after the five-year prescription period.  This Court has previously recognized that the Prescription Clause works "in tandem" with the "prescription period" in Section 2(e) of the Global Security, which deals with the return of "unclaimed" funds deposited with the Trustee to the Republic.  *Ape,* 2022 WL

463309, at *3.  Section 2(e) is the only other section in the Global Security that references "prescription," reflecting the Republic's drafting intent as to its scope and application.[34]  Section 2(e) states that "[a]ny monies deposited with the Trustee in respect of payments . . . on this Security remaining unclaimed for five years or any shorter prescription period provided by law after such money in respect of payments shall have become due and payable shall be repaid to the Republic . . . , and the Holder of any such Security may ***thereafter*** look only to the Republic for any payment to which such Holder may be entitled."  Friedman Decl. Ex. 60 (emphasis added).  Had the Republic intended that all claims for payment be time-barred after five-years, it would not have drafted Section 2(e) to provide a right to seek recovery "thereafter" from the Republic.

The Prescription Clause is therefore at best ambiguous as to its scope and application.  In cases of ambiguity, New York courts consistently have held that the contract should be construed against the drafter—in this case, the Republic.  *See Zaremba v. Interface Flooring Sys., Inc.*, 195 A.D.2d 471, 473 (2d Dep't. 1993) ("A document is to be strictly construed against its drafter, and any ambiguity will be resolved against him or her" (citation omitted)); *see also Atif v.*

---

[34] Likewise, the Trust Indenture provides that deposited funds "remaining unclaimed for ten years (in the case of principal) or five years (in the case of interest)" may be repaid to the Republic, which mirrors the prescription periods for principal and interest.  *See* Friedman Decl. Ex. 184 § 11.4 and § 4.13.

80

*Ctr. of World Car Serv. Corp.*, 58 Misc. 3d 156 (A), 2 (N.Y. App. Term. 2018) ("It is well settled that any ambiguity which might exist must be construed against the defendant as drafter of the agreement." (citation omitted)).

## D.   **The Prescription Clause is Unenforceable**

The Prescription Clause is also unenforceable here given the Republic's own contract breaches.  For instance, the Republic breached its notice obligations under the Global Security.  Friedman Decl. Ex. 60, at R-5 ("The Republic shall announce any payments hereunder prior to the relevant Payment Date by notice to the Trustee or through publication as provided [herein].").  The Republic not only failed to provide the required contractual notice of payment due, but also published the No Payment Announcement actively denying any payment due.[35]  PSoF ¶ 168.  Further, the Republic failed to publish contractually necessary data, frustrating the ability of holders to show their entitlement to payment.  In these circumstances, the Republic should not now be allowed to avail itself of a contractually shortened notice provision where it breached its own notice obligations in the first instance, and where its unilateral actions destroyed the right of holders to receive the fruits of the contract.  *See Merrill Lynch & Co. Inc. v.*

---

[35] The Republic's contractual notice obligations are especially significant here since the GDP Warrants are contingent-pay securities and the calculation of the Payment Amount is determined by MECON under the Global Security.

*Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007) ("Under New York law, a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach.").

### E.   WASO's Updated Beneficial Holdings Relate Back to its Timely Notice of Claim Under the Prescription Clause

As discussed above, WASO provided notice to the Republic in its original complaint of the total Payment Amount as well as the amount due per notional dollar for Reference Year 2013, in satisfaction of the Prescription Clause. WASO's assertion of a right to payment was provisional, and subject to amendment at any time prior to expiration of New York's six-year statute of limitations, after which date all claims are time-barred.  It is undisputed that WASO instituted suit on all its beneficial holdings within the relevant statute of limitations period, establishing proper standing.

While the relation back doctrine is typically applied to allow amendment of a claim after the relevant statute of limitations period, WASO seeks a narrower application to allow amendment of a claim after the five-year contractual prescription period but within the relevant six-year statute of limitations period.  In arguing that a hypothetical "plaintiff who acquired a single dollar's worth of Securities to timely sue could then later acquire and recover for *all* of the remaining outstanding Securities," Arg. Br. at 31 (emphasis in original),

the Republic misapprehends the relief sought.  The "finality and repose" that the

Republic seeks is controlled by New York's six-year statute of limitations, which

has already passed.  *Id*.

Courts, adopting the relation back doctrine, routinely allow

amendment to a claim in instances where the amendment "asserts a claim or

defense that arose out of the conduct, transaction, or occurrence set out—or

attempted to be set out—in the original pleading," FED. R. CIV. P. 15(c)(1)(B),

particularly where the "defendant had notice of the subject matter of the dispute

and was not prejudiced in preparing his defense."  *See Aktiebolag v. Andrx Pharm.,*

*Inc.*, 695 F. Supp. 2d 21, 27, 28 n.2 (S.D.N.Y. 2010) (internal citations omitted).

That is the case here.  The Republic was already well aware of the complete

financial liability stemming from the failure to make payment for Reference Year

2013 on the GDP Warrants due to WASO's complaint, similar claims brought by

several U.S. Plaintiffs, and a parallel litigation in the United Kingdom.  *See*

*generally* Friedman Decl. Ex. 217; *id.* Ex. 233.

While the Republic claims that the relation back doctrine "only allows

for the correction of 'inconsequential pleading error[s],'" Arg. Br. at 30-31, it is the

longstanding principle of this Court that "the relation back provision . . . is to be

liberally construed to insure that claims are decided on the merits rather than on

procedural technicalities."  *Merican Curtis, Inc. v. Meg-Na Transp.*, Inc., 1986 WL

10291, at *2 (S.D.N.Y. Sept. 10, 1986).  Here, as in similar contexts where relation

back doctrine has been applied, the Supplemental Amended Complaint only served

to update the Republic with respect to WASO's beneficial holdings and bring the

claim "up to date."  *Kemper Ins. Co. v. United States*, 2004 WL 1811390, at *4

(W.D.N.Y. Aug. 13, 2004).  And, despite the Republic's contentions to the

contrary, Arg. Br. at 31, no additional claim has been made and the theory of

recovery has not changed.

The Republic is not prejudiced by allowing the amended claim, and

increased damages is not a basis for declining to apply relation back.  *See Perez v.

MVNBC Corp*, 2016 WL 6996179, at *5 (S.D.N.Y. Nov. 29, 2016) ("Courts have

held that being exposed to greater potential damages is not prejudicial if the

conduct relied upon for the theory of damages does not change substantially.");

*Merican Curtis*, 1986 WL 10291, at *2 ("The fact that an amendment increases the

amount of recovery sought has no bearing on the question of relation back.").  The

concept of relation back therefore provides an additional, independent reason why

WASO's claim to recover on its full beneficial holdings is timely and proper.[36]

---

[36] The English court reached a similar conclusion.  Friedman Decl. Ex. 107 ¶ 276
("All that the Second Claimant has done since the proceedings were begun is
amend its holdings.  That does not amount to a new claim . . . .  In any event, . . .
the doctrine of relation back applies.").

3732035.1

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully submit that the

Republic's motion for summary judgment should be denied, and Plaintiffs' Cross-

Motion for summary judgment granted.

New York, New York
June 13, 2023

| | |
|---|---|
| *s/ Edward A. Friedman* | *s/ Matthew S. Salerno* |
| Edward A. Friedman | Matthew S. Salerno |
| Daniel B. Rapport | |
| Michael S. Palmieri | LATHAM & WATKINS LLP |
| | 1271 Avenue of the Americas |
| FRIEDMAN KAPLAN SEILER | New York, New York  10020 |
|   ADELMAN & ROBBINS LLP | Telephone:  (212) 906-1200 |
| 7 Times Square | Facsimile:    (212) 751-4864 |
| New York, New York  10036 | |
| Telephone:  (212) 833-1100 | |
| Facsimile:    (212) 373-7902 | *Counsel for Plaintiffs Adona LLC, Egoz I* |
| | *LLC, Egoz II LLC,* |
| | *Mastergen, LLC, Erythrina, LLC,* |
| *Counsel for Plaintiffs* | *AP 2016 1, LLC, AP 2014 3A, LLC,* |
| *Aurelius Capital Master, Ltd. and* | *AP 2014 2, LLC, and* |
| *ACP Master, Ltd.* | *WASO Holding Corporation* |

***[COUNSEL CONT'D ON NEXT PAGE]***

3732035.1

_____s/ Matthew M. Riccardi_____
Matthew M. Riccardi
H. Rowan Gaither IV
Jacob Taber

PERKINS COIE LLP
1155 Avenue of the Americas,
22nd Floor
New York, New York 10036-2711
Telephone:   (212) 262-6900
Facsimile:    (212) 977-1649

*Counsel for Plaintiff*
*683 Capital Partners, LP*


_____s/ Eric J. Grannis_____
Eric J. Grannis

LAW OFFICES OF ERIC J. GRANNIS
11 Broadway, Suite 615
New York, New York  10004
Telephone:  (212) 903-1025

*Counsel for Plaintiffs Ape Group SpA,*
*Romano Consulting SpA, Icaro SRL and*
*Elazar Romano*

_____s/ Javier Bleichmar_____
Javier Bleichmar
Evan A. Kubota

BLEICHMAR FONTI &
   AULD LLP
7 Times Square, 27th Floor
New York, New York  10036
Telephone:   (212) 789-1341
Facsimile:    (212) 205-3961

*Counsel for Plaintiff Novoriver S.A.*

86