```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
```

| | |
|---|---|
| AURELIUS CAPITAL MASTER, LTD., | |
|          Plaintiff, | |
| -against- | No. 19 Civ. 351 (LAP) |
| THE REPUBLIC OF ARGENTINA, | |
|          Defendant. | |
| NOVORIVER S.A., | |
|          Plaintiff, | |
| -against- | No. 19 Civ. 9786 (LAP) |
| ARGENTINE REPUBLIC, | |
|          Defendant. | |
| ACP MASTER, LTD., | |
|          Plaintiff, | |
| -against- | No. 19 Civ. 10109 (LAP) |
| THE REPUBLIC OF ARGENTINA, | |
|          Defendant. | |
| 683 CAPITAL PARTNERS, LP, | |
|          Plaintiff, | |
| -against- | No. 19 Civ. 10131 (LAP) |
| THE REPUBLIC OF ARGENTINA, | |
|          Defendant. | |

<table>
<tr><td>

ADONA LLC, et al.,

                   Plaintiffs,

-against-

THE REPUBLIC OF ARGENTINA,

                   Defendant.

</td><td>

No. 19 Civ. 11338 (LAP)

</td></tr>
</table>

| | |
|---|---|
| APE GROUP SPA, et al.,<br><br>            Plaintiffs,<br><br>-against-<br><br>THE REPUBLIC OF ARGENTINA,<br><br>            Defendant. | No. 20 Civ. 10409 (LAP)<br><br><u>OPINION & ORDER</u> |

LORETTA A. PRESKA, Senior United States District Judge:

Before the Court are the parties' cross-motions for summary judgment.[1]  Defendant Republic of Argentina ("the Republic") moves for summary judgment on breach-of-contract claims based on the Republic's alleged failure to issue payment under the Global Security for the year of 2013.[2]  Plaintiffs Aurelius Capital

---

[1] The docket entry numbers referenced herein use the numbers of the lead case, <u>Aurelius Capital Master, Ltd. v. The Republic of Argentina</u>, Case No. 19-Civ-351 (LAP).

[2] (<u>See</u> Republic of Arg. Notice of Mot. for Summ. J., dated Apr. 14, 2023 [dkt. no. 132]; Republic of Arg. Mem. of Law in Supp. of Mot. for Summ. J. ("Def.'s Br."), dated Apr. 14, 2023 [dkt. no. 136]; Decl. of Robert J. Giuffra, Jr. ("Giuffra Decl."), dated Apr. 14, 2023 [dkt. no. 134]; Decl. of Sebastian Katz, dated Apr. 14, 2023 [dkt. no. 135]; Republic of Arg. Local Rule 56.1 Statement of Undisputed Facts for Summ. J. ("Def.'s 56.1"), dated Apr. 14, 2023 [dkt. no. 137]; Republic of Arg. Reply Mem. of Law in Further Supp. of Mot. for Summ. J. & in Opp'n to Pls.' Mot. for Summ. J. ("Def.'s

Master, Ltd. ("Aurelius"); Novoriver S.A. ("Novoriver"); ACP Master, Ltd. ("ACP"); 683 Capital Partners, LP ("683 Capital"); Adona LLC, Egoz I LLC, Egoz II LLC, Mastergen, LLC, Erythrina, LLC, AP 2016 1, LLC, AP 2014 3A, LLC, AP 2014 2, LLC, and WASO Holding Corporation ("WASO"); and Ape Group SPA, Romano Consulting SPA, Icaro SRL, and Elazar Romano ("Romano," collectively with Aurelius, Novoriver, ACP, 683 Capital, and WASO, the "Plaintiffs") oppose the Republic's motion and cross-move for summary judgment.[3] For the reasons set forth below, the Republic's motion is GRANTED, and Plaintiffs' cross-motion is DENIED.

---

Reply"), dated Aug. 23, 2023 [dkt. no. 154]; Republic of Arg. Suppl. Local Rule 56.1 Statement of Undisputed Facts for Summ. J. ("Def.'s Suppl. 56.1"), dated Aug. 23, 2023 [dkt. no. 151]; Republic of Arg. Counter to Pls.' Rule 56.1 ("Def.'s Counter 56.1"), dated Aug. 23, 2023 [dkt. no. 152]; Decl. of Robert J. Giuffra, Jr. in Opp'n to Pls.' Mot. for Summ. J. ("Giuffra Suppl. Decl."), dated Aug. 23, 2023 [dkt. no. 153].)

[3] (See Pls.' Joint Notice of Cross-Mot. for Summ. J., dated June 13, 2023 [dkt. no. 142]; Pls.' Mem. of Law in Opp'n to Republic of Arg. Mot. for Summ. J. & in Supp. of Pls.' Cross-Mot. for Summ. J. ("Pls.' Br."), dated June 13, 2023 [dkt. no. 147]; Decl. of Edward A. Friedman ("Friedman Decl."), dated June 13, 2023 [dkt. no. 144]; Pls.' Local Rule 56.1 Statement of Undisputed Facts for Summ. J. ("Pls.' 56.1"), dated June 13, 2023 [dkt. no. 146]; Pls.' Counter to Republic of Arg. Rule 56.1 ("Pls.' Counter 56.1"), dated June 13, 2023 [dkt. no. 148]; Pls.' Reply Mem. of Law in Further Supp. of Pls.' Cross-Mot. for Summ. J. ("Pls.' Reply Br."), dated Oct. 2, 2023 [dkt. no. 158]; Pls.' Resp. to Republic of Arg. Suppl. Rule 56.1 ("Pls.' Suppl. Counter 56.1"), dated Oct. 2, 2023 [dkt. no. 157]; Decl. of Edward A. Friedman in Further Supp. of Pls.' Cross-Mot. for Summ. J. ("Friedman Suppl. Decl.), dated Oct. 2, 2023 [dkt. no. 156].)

I.   **Background**[4]

The Court presumes familiarity with this dispute, the facts of which are set out at length in this Court's prior decisions.[5] Unless otherwise noted, the facts recounted herein are undisputed.

A.   **The Debt Exchanges**

In 2005 and 2010, the Republic initiated voluntary debt exchange programs whereby holders of the Republic's 152 different series of defaulted debt could exchange their nonperforming bonds for new performing bonds with lower interest rates, reduced principal, and/or longer maturities.  (See Def.'s 56.1 ¶ 41; Pls.' 56.1 ¶ 62.)  Through the 2005 debt exchange, the Republic issued thirteen new securities.  (Def.'s 56.1 ¶ 43; Giuffra Decl., Ex. 37 (2005 Global Security), Schedule B.)  One of these securities was the US-Dollar denominated GDP-linked securities at issue here (the "GDP-Linked Securities").  (Def.'s 56.1 ¶ 43.)

These new securities were issued pursuant to the trust indenture dated June 2, 2005 ("Indenture") between the Republic, as Issuer, and the Bank of New York Mellon, as Trustee.  (Id. ¶ 42;

---

[4]  Unless otherwise defined herein, capitalized terms used throughout this Opinion retain the meanings given to them in the Indenture and the Global Security.

[5]  See Aurelius Cap. Master, Ltd. v. Republic of Arg., No. 19-Civ-351 (LAP), 2020 WL 70348 (S.D.N.Y. Jan. 7, 2020) (hereinafter "Aurelius I"); Aurelius Cap. Master, Ltd. v. Republic of Arg., No. 19-Civ-351 (LAP), 2021 WL 1177465 (S.D.N.Y. Mar. 29, 2021) (hereinafter "Aurelius II"); Ape Grp. SPA v. Republic of Arg., No. 20-Civ-10409, 2022 WL 463309 (S.D.N.Y. Feb. 15, 2022).

Giuffra Decl., Ex. 35 at 1; Friedman Decl., Ex. 184 at 1.)
Pursuant to the 2010 debt exchange, the Indenture was subsequently
amended by the first supplemental trust indenture dated April 30,
2010 ("2010 Indenture Supplement"). (See Friedman Decl., Ex. 114
(2010 Indenture Supplement) at 1.)

By its terms, the Indenture governs the issuance,
authentication, delivery, and administration of each of the new
securities issued as part of the 2005 and 2010 debt exchanges.
(Indenture at 1; Def.'s Suppl. 56.1 ¶ 1.)  That is, the Indenture
governs issuances of "debentures, notes, bonds, other evidences of
indebtedness[, and] its GDP-Linked Securities," which are
collectively defined therein as "Debt Securities." (See Indenture
at 1; Def.'s Suppl. 56.1 ¶ 2.)

Included in the Indenture is a "no-action clause," set out in
Section 4.8, which restricts the ability of an individual
bondholder to bring suit under the Indenture or the Debt
Securities, unless that bondholder first either satisfies the five
conditions precedent detailed therein or qualifies for the
exception set forth in Section 4.9 of the Indenture. (Indenture
§ 4.8.)  These preconditions are that:  (1) the bondholder must
have previously given the Trustee written notice of default and
its continuance under the Debt Securities; (2) the bondholders of
not less than 25% in the aggregate principal amount of the
outstanding Debt Securities must have made a written request to

the Trustee to institute an action, suit, or proceeding in its own name; (3) the bondholders must have provided the Trustee with reasonable indemnification and/or security; (4) the Trustee must have failed to institute the requested action, suit, or proceeding within 60 days after its receipt of such notice; and (5) the Trustee must not have received inconsistent directions pursuant to Section 4.11 of the Indenture.  (Id.)

Section 4.9, which is located immediately below Section 4.8 in the Indenture, carves out a narrow path for bondholders to bring individual actions without first complying with the five preconditions.  (Id. § 4.9.)  Pursuant thereto, individual bondholders may institute an action only "to receive payment of the principal of and interest on [their] Debt Securit[ies] on the stated maturity date for such payment . . . . " (Id., emphasis added.)

**B.    The Global Security**

Additionally, appended to the Indenture as exhibits are various forms of agreement designed to supplement the Indenture with additional, security-specific terms and conditions.  (Id., Exs. A-I.) Pertinent to this dispute is Exhibit G, which is the form of 2005 registered security ("2005 Global Security"). (Def.'s 56.1 ¶ 44; Giuffra Decl., Ex. 37; Friedman Decl., Ex. 60.)  Its counterpart is the form of 2010 registered security ("2010 Global Security"), which governs GDP-Linked Securities issued pursuant to

the 2010 debt exchange.  As the terms of both the 2005 and 2010 Global Securities are materially identical, see Aurelius II, 2021 WL 1177465, at *2, the Court refers to them as a singular Global Security for simplicity's sake.  The Global Security and the Indenture, together, constitute the governing documents for the GDP-Linked Securities. (Pls.' 56.1 ¶ 19.)  Moreover, each contains an unambiguous choice-of-law provision establishing New York law as the applicable law.  (Indenture § 12.7; Global Security § 16 at R-14.)

Several provisions of the Global Security are critical to this discussion.  First, the face of the Global Security provides, in relevant part, that:

> THE ONLY AMOUNTS PAYABLE IN RESPECT OF THIS SECURITY ARE THE PAYMENTS CONTINGENT UPON AND DETERMINED ON THE BASIS OF THE PERFORMANCE OF THE GROSS DOMESTIC PRODUCT OF THE REPUBLIC OF ARGENTINA (THE "REPUBLIC") REFERRED TO HEREIN . . . . HOLDERS OF THIS SECURITY ARE NOT ENTITLED TO RECEIVE PRINCIPAL IN THE AMOUNT OF, OR INTEREST BASED ON, SUCH NOTIONAL AMOUNT.

(See Global Security at 1).  The Global Security also adopts a version of the no-action clause set forth in Section 4.8 of the Indenture, the terms of which are set out in Section 11 of the 2005 Global Security and Section 9 of the 2010 Global Security (the "No-Action Clause").[6]

---

[6] To avoid redundancy, the Court refers only to the language of the 2005 Global Security throughout this Opinion.

Like Section 4.8 of the Indenture, the No-Action Clause of the Global Security is styled to reduce the likelihood of individual actions. The No-Action Clause establishes almost identical barriers to suit as Section 4.8, requiring an individual holder (or beneficial holder) of GDP-Linked Securities to comply with the following five preconditions before that holder (or beneficial holder) can bring an action:  (1) the holder must have previously given the Trustee written notice of default and its continuance under the GDP-Linked Securities; (2) the holders of not less than 25% in the aggregate notional amount of the outstanding GDP-Linked Securities must have made a written request to the Trustee to institute an action, suit, or proceeding in its own name; (3) the holders must have provided the Trustee with reasonable indemnification and/or security; (4) the Trustee must have failed to institute the requested action, suit, or proceeding within 60 days after its receipt of such notice; and (5) the Trustee must not have received inconsistent directions pursuant to Section 4.11 of the Indenture.  (Global Security § 11 at R-13.)

The No-Action Clause, like Section 4.8 of the Indenture, also creates a possible basis for individual action.  (Id.)  Pursuant thereto, holders (and beneficial holders) of GDP-Linked Securities can bring an action, without first complying with the No-Action Clause, only "as provided in Section 4.9 of the Indenture with respect to the right of any [h]older of a [GDP-Linked] Security to

enforce the payment of any amounts due [t]hereunder on any Payment Date (as this [GDP-Linked] Security may be amended or modified pursuant to Paragraph 22) . . . . " (Id.)

### C.   The Contingent Payments

Also at issue here, and core to the underlying claims, are separate questions regarding payment terms under the Global Security.  When GDP-Linked Securities were first issued, they were attached to underlying debt instruments – discount, par, and quasi par bonds.  (See Def.'s 56.1 ¶ 45.)  After 180 days, they detached from the underlying bonds and began to trade independently on the secondary market.  (See id.)

The GDP-Linked Securities, themselves, provide holders with a contingent right to payment for a given year (a "Contingent Payment"), through 2035, where Argentina's economic performance satisfies certain conditions and calculations set out in the Global Security.  (Global Security § 2(b) at R-5-6; Pl.'s Counter 56.1 ¶ 47.)  Specifically, holders are not entitled to payment for any given year, unless:  "(i) Actual Real GDP for such Reference Year is greater than Base Case GDP for such Year, (ii) Actual Real GDP Growth for such Reference Year is greater than Base Case GDP Growth for such Reference Year, and (iii) the aggregate amount of all payments made by the Republic [under the Global Security], when added to the amount of such payment, does not exceed the Payment Cap."  (Global Security § 2(b) at R-5-6.)

The parties' disagreement boils down to the first two conditions.  See Aurelius I, 2020 WL 70348, at *3.  Significant to their dispute are the definitions of and calculations regarding "Actual Real GDP" and "Base Case GDP."  (Id.)  "Actual Real GDP" is the gross domestic product for Argentina for a given year measured in constant prices for the "Year of Bases Prices" (i.e., a base year), as published by the Republic's Instituto Nacional de Estadistica y Censos ("INDEC").  (Global Security § 1(e) at R-2, R-4.)  Notably, the Global Security only permits for INDEC to calculate and publish "Actual Real GDP" figures.  (Id. at R-2.) The "Base Case GDP" figures are listed in a chart within the Global Security.  (Id. at R-2-3.)

In 2005 and 2010, when the GDP-Linked Securities were issued, Actual Real GDP and Base Case GDP were calculated using 1993 as the base year.  (Id.; Def.'s 56.1 ¶ 49.)  The Global Security also permits INDEC, in its discretion, to elect to change the base year through a process known as "rebasing" the GDP calculations. Aurelius I, 2020 WL 70348, at *3.

If a rebasing occurs, the Base Case GDP figures in the Global Security must be multiplied by an Adjustment Fraction – "the numerator of which shall be the Actual Real GDP for such Reference Year measured in constant prices of the Year of Base Prices, and the denominator of which shall be the Actual Real GDP for such Reference Year measured in constant 1993 prices."  (Global Security

§ 1(e) at R-3, emphasis added.)  All this to say, in an overly simplified fashion, the definitions inform the calculations, which, in turn, inform whether a Contingent Payment is owed for any given year.  Broadly, based on the 1993 series data, Contingent Payments were initially expected to be made when the Argentine economy grew by 3% or more in a given year.  (Pls.' Counter 56.1 ¶ 22.)

In March of 2014, the Minister of Economy, Axel Kicillof, announced that INDEC had elected to switch the base year from 1993 to 2004.  (Pls.' 56.1 ¶ 134.)  On March 27, 2014, INDEC released the 2004 series data, including figures for the years of 2012 and 2013.  (Pls.' Counter 56.1 ¶ 121; Def.'s Counter 56.1 ¶¶ 136-37.) INDEC immediately ceased publication of the data measuring Actual Real GDP figures in 1993 prices. (Pls.' Counter 56.1 ¶¶ 132-33.)

On November 1, 2014, the Republic calculated whether a Contingent Payment was due for 2013.  (Def.'s 56.1 ¶¶ 67, 177.) The Republic applied the 2004 series data and, on December 15, 2014, announced that no payment was due for 2013.  (Pls.' Counter 56.1 ¶¶ 178, 183.)

### D.   Procedural History

Plaintiffs are a group of financial institutions that beneficially hold GDP-Linked Securities.[7]  Plaintiff Aurelius filed suit first on January 14, 2019, alleging that a Contingent Payment was owed for 2013 and, therefore, that the Republic had breached its obligation to pay them.  (See dkt. no. 1 ("Aurelius Complaint") ¶¶ 5, 42.)  Aurelius based its claim on calculations using substitute economic data due to INDEC's decision to cease publication of Actual Real GDP in 1993 prices.  (Id. ¶ 25 n.3.) The Republic moved to dismiss the Aurelius Complaint, arguing (1) that Aurelius had failed to plead bad faith, willful misconduct, or manifest error, and (2) that, under the terms of the Global Security, Aurelius had relied upon improper data to calculate the amount allegedly owed for 2013.  (See dkt. nos. 15-17.)  While the Republic's motion to dismiss was pending, Plaintiffs Novoriver, ACP, 683 Capital, and WASO commenced related litigation against the Republic.[8]

On January 7, 2020, the Court granted the Republic's motion to dismiss the Aurelius Complaint without prejudice, concluding

---

[7] Cede & Co. serves, and has always served, as the holder of GDP-Linked Securities.  (Pls.' 56.1 ¶ 218.)

[8] (Complaint, Novoriver S.A. v. Argentine Republic, No. 19-Civ-9786 (LAP) (S.D.N.Y. filed Oct. 23, 2019), ECF No. 1; Complaint, ACP Master, Ltd. v. The Republic of Arg., No. 19-Civ-10109 (LAP) (S.D.N.Y. filed Oct. 31, 2019), ECF No. 1; Complaint, 683 Cap.

that because the Global Security expressly requires that INDEC publish the figure for Actual Real GDP, Aurelius' reliance on substitute figures necessitated dismissal of its claims. Aurelius I, 2020 WL 70348, at *6-8.  Approximately three weeks after the Court's ruling in Aurelius I, Plaintiffs Aurelius, Novoriver, ACP, 683 Capital, and WASO stipulated to coordinate their actions for pretrial purposes but to maintain individual dockets.  (See dkt. no. 30.)

Each of these five Plaintiffs filed amended complaints shortly thereafter,[9] asserting that the Republic (1) had willfully decided not to publish (through INDEC) Actual Real GDP for 2013 in 1993 prices to frustrate Global Security holders' efforts to calculate payment and (2) had failed to apply the correct calculations in breach of the Global Security's "Modifications"

---

Partners, LP v. The Republic of Arg., No. 19-Civ-10131 (LAP) (S.D.N.Y. filed Oct. 31, 2019), ECF No. 1; Complaint, Adona LLC v. The Republic of Arg., No. 19-Civ-11338 (LAP) (S.D.N.Y. filed Dec. 11, 2019), ECF No. 1.)

[9] (Amended Complaint, Aurelius Cap. Master, Ltd. v. The Republic of Arg., No. 19-Civ-351 (LAP) (S.D.N.Y. filed Mar.9, 2020), ECF No. 28; Amended Complaint, Novoriver S.A. v. Argentine Republic, No. 19-Civ-9786 (LAP) (S.D.N.Y. filed Mar. 18, 2020), ECF No. 13; Amended Complaint, ACP Master, Ltd. v. The Republic of Arg., No. 19-Civ-10109 (LAP) (S.D.N.Y. filed Mar. 9, 2020), ECF No. 14; Amended Complaint, 683 Cap. Partners, LP v. The Republic of Arg., No. 19-Civ-10131 (LAP) (S.D.N.Y. filed Mar. 23, 2020), ECF No. 14; Amended Complaint, Adona LLC v. The Republic of Arg., No. 19-Civ-11338 (LAP) (S.D.N.Y. filed Mar. 23, 2020), ECF No. 8. (together, the "Amended Complaints").)

provision.   (Dkt. no. 28 ¶¶ 39, 67-69.)   On June 8, 2020, the Republic filed a motion to dismiss the Amended Complaints.   (See dkt. nos. 32-34.)   On March 29, 2021, the Court denied the Republic's motion to dismiss, concluding that Plaintiffs had alleged sufficient facts to plead claims for (1) breach of the implied covenant of good faith and fair dealing and (2) breach of the "Modifications" provision under the Global Security. (See Aurelius II, 2021 WL 1177465, at *7-8.)

While the second motion to dismiss was pending, the Romano Plaintiffs filed the last of these six related actions against the Republic, alleging similar breach-of-contract claims with respect to the Contingent Payment for 2013.[10]  On May 19, 2021, the Republic moved to dismiss the Romano Complaint, arguing that the prescription clause of the Global Security time-barred the Romano Plaintiffs' claims.   Ape Grp. SPA, 2022 WL 463309, at *1.   The Court denied the Republic's motion to dismiss on February 15, 2022, concluding that the prescription clause did not supersede New York's six-year statute of limitations, and the Romano Plaintiffs' claims could therefore proceed.   (Id., at *4.)

The Court subsequently found all six actions to be related and directed the parties to confer and submit a joint discovery

---

[10]  Complaint ("Romano Complaint"), Ape Grp. SPA v. Republic of Arg., Case No. 20-Civ-10409, (S.D.N.Y. filed December 10, 2020), ECF No. 1.

schedule.  The parties, now having completed discovery, cross-move for summary judgment on procedural grounds as well as whether the Republic breached (1) an implied covenant of good faith and fair dealing and (2) the "Modifications" provision under the Global Security.

## II. <u>Legal Standards</u>

### A.   Summary Judgment

Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden to show the absence of a dispute as to a material fact.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  Where the non-moving party bears the burden of proof at trial, the moving party may discharge its summary judgment burden in "two ways: (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim."  <u>Nick's</u> <u>Garage, Inc. v. Progressive Cas. Ins. Co.</u>, 875 F.3d 107, 114 (2d Cir. 2017); <u>see also</u> <u>Goenaga v. March of Dimes Birth Defects</u> <u>Found.</u>, 51 F.3d 14, 18 (2d Cir. 1995) ("In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to

an absence of evidence to support an essential element of the nonmoving party's claim.").

In assessing whether summary judgment is proper, the Court construes the evidence in the light most favorable to the non-moving party. <u>Lucente v. IBM Corp.</u>, 310 F.3d 243, 253 (2d Cir. 2002). Here, because each party is moving for summary judgment, the moving party bears the initial burden of providing the basis for the motion and of identifying the evidentiary materials, if any, supporting the moving party's position. <u>See Grady v. Affiliated Cent., Inc.</u>, 130 F.3d 553, 559 (2d Cir. 1997). The non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). Mere speculation and conjecture will not suffice. <u>See Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986) (explaining that "the mere existence of some alleged factual dispute" is not enough to prevent summary judgment); <u>Johnson v. Killian</u>, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam) (alterations omitted); <u>Niagara Mohawk Power Corp. v. Jones Chem. Inc.</u>, 315 F.3d 171, 175 (2d Cir. 2003).

**B.  Contract Principles**

The legal principles governing this Court's role in contract disputes are well settled under New York law, which governs the agreements at issue here. "The primary objective in contract

interpretation is to give effect to the intent of the contracting parties 'as revealed by the language they chose to use.'" Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan, 7 F.3d 1091, 1094 (2d Cir. 1993) (citation omitted).  "In interpreting contractual language, a court must accord the words of the agreement a 'fair and reasonable meaning,' which includes consideration of 'not merely literal language, but whatever may be reasonably implied therefrom.'"  Telemundo Grp., Inc. v. Alden Press, Inc., 580 N.Y.S.2d 999, 1000 (App. Div. 1992) (citation omitted).

Under New York law, "[c]onstruing an unambiguous contract provision is a function of the court, rather than a jury, and matters extrinsic to the agreement may not be considered when the intent of the parties can fairly be gleaned from the face of the instrument." Cruden v. Bank of N.Y., 957 F.2d 961, 976 (2d Cir. 1992).  "Contract language is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages[,] and terminology as generally understood in the particular trade or business." Sayers, 7 F.3d at 1095 (quoting Walk-In Med. Ctrs., Inc. v. Breuer Cap. Corp., 818 F.2d 260, 263 (2d Cir. 1987)) (internal quotation marks and citation omitted).

Conversely, no ambiguity exists when the language employed has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself[] and concerning which there is no reasonable basis for a difference of opinion." Id. (quoting Breed v. Ins. Co. of N. Am., 385 N.E.2d 1280, 1282 (N.Y. 1978)) (internal quotation marks omitted). The law is clear that a contractual provision is not rendered ambiguous simply because two interpretations are technically possible; both interpretations must also be reasonable. See State v. Home Indem. Co., 66 N.Y.2d 669, 671 (1985).

Moreover, parties to a contract may not create an ambiguity merely by urging different interpretations of the language in question. See Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992).

## III. **Discussion**

The parties cross-move first on threshold questions of whether Plaintiffs' claims are properly before this Court. The Republic argues, in part, that Plaintiffs should have satisfied the five preconditions set forth in the No-Action Clause of the Global Security before filing their actions.[11]   (Def.'s Br. at

---

[11] The timing of the Republic's argument is curious to say the least.  These actions each commenced between four and five years ago, during which time the Court has had opportunity to rule on three separate motions to dismiss. See Aurelius I, 2020 WL 70348, at *6-8; Aurelius II, 2021 WL 1177465, at *7-12; Ape Grp. SPA,

25-26; Def.'s Reply at 9-12.)  Plaintiffs assert that Section 4.9 of the Indenture creates a right to sue that is separate and apart from the requirements of the No-Action Clause. (Pls.' Br. at 63.)

Accordingly, the issue before the Court is whether the No-Action Clause applies to Plaintiffs' actions, and, if it does, whether Section 4.9 of the Indenture creates an exception for Contingent Payments that would excuse Plaintiffs from complying with the five preconditions of the No-Action Clause.

For the following reasons, the Court concludes that the No-Action Clause applies, and Plaintiffs were required to comply therewith before commencing this litigation.  The No-Action Clause thus bars Plaintiffs' claims, and the Republic is entitled to summary judgment.

### A.    Threshold Issues

As this Court has previously observed, "[s]tripped down to the studs, this is a dispute about contractual interpretation." Aurelius I, 2020 WL 70348, at *1.  As the Indenture and the Global Security include clear choice-of-law provisions, the Court applies New York law.  Welsbach Elec. Corp. v. MasTec N. Am., Inc., 7 N.Y.3d 624, 629 (2006).  The initial step in assessing a contract

---

2022 WL 463309, at *1-4.  One would think that an argument concerning a threshold defect of this nature would have made its way into at least one of the three motions to dismiss and would not have appeared, for the very first time, in briefing on a motion for summary judgment after the completion of discovery.

claim is to assess "whether the contract is unambiguous with respect to the question disputed by the parties." Law Deben. Tr. Co. v. Maverick Tube Corp., 595 F.3d 458, 465 (2d Cir. 2010) (quoting Int'l Multifoods Corp. v. Com. Union Ins. Co., 309 F.3d 76, 83 (2d Cir. 2002)).

The parties' arguments are unique insofar as they do not appear to dispute that the No-Action Clause would ordinarily prohibit suit. (See Def.'s Br. at 26; Pls.' Br. at 64-65.) Nor do they appear to dispute that Plaintiffs have not satisfied the preconditions set out in the No-Action Clause. (Pls.' Br. at 64-65; Def.'s Reply at 9-10; Pls.' Reply at 25-26.)

Rather, the parties primarily disagree over how to interpret the narrow exception to the No-Action Clause set forth in Section 4.9 of the Indenture and whether, under these facts, Plaintiffs' actions for Contingent Payments fit within the scope of Section 4.9. (Pls.' Br. at 65-67; Def.'s Reply at 9-12.) Both Plaintiffs and the Republic urge the Court to find that the plain and unambiguous language of the Indenture and the Global Security supports their positions. (See Pls.' Br. at 63; Def.'s Reply at 9.)

The starting point for the analysis is therefore the language of the Indenture and the Global Security. The Court first assesses whether the No-Action Clause applies. To the extent that it does,

the Court next considers whether Section 4.9 of the Indenture carves out a basis for Plaintiffs to bring suit.

### 1.   The No-Action Clause

No-action clauses are frequently included in indentures "to limit suits arising from those agreements." See McMahan & Co. v. Wherehouse Ent., Inc., 65 F.3d 1044, 1050 (2d Cir. 1995).  Under New York law, no-action clauses are to be "strictly construed." Quadrant Structured Prods. Co. v. Vertin, 23 N.Y.3d 549, 560, 565-66 (2014) (explaining that no-action clauses are created to "protect against the risk of strike suits" and to make it more challenging for individual bondholders "to bring suits that are unpopular with their fellow bondholders").

Starting with the Indenture, Section 4.8 operates as a no-action clause.  Section 4.8 provides that:

> Except as provided in this Section 4.8 and Section 4.9 of this Indenture, no Holder of any Debt Securities of any Series shall have any right by virtue of or by availing itself of any provision of this Indenture or of the Debt Securities of such Series to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Indenture or of the Debt Securities or for any other remedy hereunder or under the Debt Securities unless:
>
> > (a)  such Holder previously shall have given to the Trustee written notice of default and of the continuance thereof with respect to the Debt Securities;
> >
> > (b)  the Holders of not less than 25% in aggregate principal amount of the Outstanding Debt Securities shall have made written request to the Trustee to institute such action, suit or

proceeding in its own name as Trustee under this Indenture;

(c) such Holder or Holders shall have provided to the Trustee such reasonable indemnity and/or security as it may require against the costs, expenses and liabilities to be incurred therein or thereby;

(d) the Trustee for 60 days after its receipt of such notice, request and provision of indemnity and/or security shall have failed to institute any such action, suit or proceeding; and

(e) no direction inconsistent with such written request shall have been given to the Trustee pursuant to Section 4.11 of this Indenture;

it being understood, intended, and agreed by each Holder of Debt Securities of a Series that no one or more Holder shall have any right in any manner whatever by virtue or by availing itself of any provision of this Indenture or of the Debt Securities to affect, disturb or prejudice the rights of any other Holder of Debt Securities of such Series or to obtain priority over or preference to any other such Holder, or to enforce any right under this Indenture or under the Debt Securities of such Series, except in the manner herein provided and for the equal, ratable and common benefit of all Holders of Debt Securities of such Series.  For the protection and enforcement of this Section, each and every Holder and the Trustee shall be entitled to such relief as can be given either at law or in equity.  The Republic expressly acknowledges, with respect to the right of any Holder to pursue a remedy under this Indenture or the Debt Securities, the right of any beneficial holder of Debt Securities to pursue such remedy with respect to the portion of the Global Security that represents such beneficial holder's Debt Securities as if definitive Debt Securities had been issued to such Holder.

(Indenture § 4.8, emphasis added.)  Section 4.9 immediately follows

that:

Notwithstanding Section 4.8, each Holder of Debt Securities shall have the right, which is absolute and

> unconditional, to receive payment of the principal of
> and interest on its Debt Security on the stated maturity
> date for such payment expressed in such Debt Security
> (as such Debt Security may be amended or modified
> pursuant to Article Seven) and to institute suit for the
> enforcement of any such payment, and such right shall
> not be impaired without the consent of such Holder.

(Id. § 4.9, emphasis added).  These provisions are best understood
when read together in the context of the entire Indenture.  In
broad strokes, Sections 4.8 and 4.9 set out that holders of the
Debt Securities – i.e., debentures, notes, bonds, and other
evidences of indebtedness or GDP-Linked Securities – retain an
absolute and unconditional right to sue, on an individual basis,
for payments of the principal of and interest on the Debt
Securities on a stated maturity date.  Key to this analysis is a
recognition that the Indenture, by its terms, applies to various
instruments, including traditional bonds that pay principal and
bear interest.

The Global Security includes a No-Action Clause with
substantially the same language as Section 4.8 of the Indenture.
(See Global Security § 11 at R-13.)  The No-Action Clause of the
Global Security sets out that:

> Except as provided in Section 4.9 of the Indenture with
> respect to the right of any Holder of a Security to
> enforce the payment of any amounts due hereunder on any
> Payment Date (as this Security may be amended or modified
> pursuant to Paragraph 22), no Holder of a Security shall
> have any right by virtue of or by availing itself of any
> provision of the Indenture, the GDP-Linked Securities
> Authorization, or the Securities to institute any suit,
> action or proceeding in equity or at law upon or under

or with respect to the Indenture, the GDP-Linked
Securities Authorization or the Securities, or for any
other remedy hereunder or under the GDP-Linked
Securities Authorization or the Indenture, <u>unless</u>:

> (a)   such Holder previously shall have given to the
> Trustee written notice of default and of the
> continuance thereof with respect to the
> Securities;

> (b)   the Holders of not less than 25% in aggregate
> notional amount of the Outstanding Securities
> shall have made [a] written request to the
> Trustee to institute such action, suit or
> proceeding in its own name as Trustee under this
> Indenture;

> (c)   such Holder or Holders shall have provided to
> the Trustee such reasonable indemnity and/or
> security as it may require against the costs,
> expenses and liabilities to be incurred therein
> or thereby;

> (d)   the Trustee for 60 days after its receipt of
> such notice, request and provision of indemnity
> and/or security shall have failed to institute
> any such action, suit or proceeding; and

> (e)   no direction inconsistent with such written
> request shall have been given to the Trustee
> pursuant to Section 4.11 of this Indenture;

<u>it being understood and intended, and being expressly
covenanted by every Holder of Securities with every
other Holder of Securities and the Trustee, that no one
or more Holder shall have any right in any manner</u>
whatever by virtue or by availing itself of any provision
of the Indenture, the GDP-Linked Securities
Authorization or of the Securities to affect, disturb or
prejudice the rights of any other Holder of Securities
or to obtain priority over or preference to any other
such Holder, or <u>to enforce any right under the Indenture,
the GDP-Linked Securities Authorization or under the
Securities, except in the manner herein provided</u> and for
the equal, ratable and common benefit of all Holders of
the Securities.   Subject to the foregoing, for the
protection and enforcement of this Paragraph, each and

> every Holder and the Trustee shall be entitled to such relief as can be given either at law or in equity. <u>The Republic expressly acknowledges</u>, with respect to the right of any Holder to pursue a remedy under the Indenture, the GDP-Linked Securities Authorization or the Securities, <u>the right of any beneficial owner of Securities to pursue such remedy with respect to the portion of this Global Security that represents such beneficial owner's interest in this Security</u> as if Certificated Securities had been issued to such beneficial owner.

(<u>Id.</u>, emphasis added).

This No-Action Clause specifically limits the ability of individual holders (and any beneficial holders) to initiate "any suit, action[,] or proceeding in equity or at law" under the Indenture, GDP-Linked Securities Authorization, or the GDP-Linked Securities. Under New York law, "where the no-action clause refers to both the indenture and the securities, the securityholder's claims are subject to the terms of the clause, whether those claims be contractual in nature and based on the indenture agreement, or arise from common law and statute." <u>Quadrant Structured Prods. Co.</u>, 23 N.Y.3d at 561. Given the sweeping reach of the No-Action Clause to encompass any suit regarding any claim arising under the Indenture or GDP-Linked Securities, these actions seeking to enforce Contingent Payments under the GDP-Linked Securities clearly fall within the ambit of the No-Action Clause.

### 2. Exception to the No-Action Clause

The Court considers next whether Section 4.9 of the Indenture excuses Plaintiffs' noncompliance.

As an initial matter, reading Section 4.9 in the full context of the Indenture, the Court notes the import of its placement immediately below the no-action clause in Section 4.8.  Taking the provisions together, the drafters clearly intended for Section 4.9 to carve out a narrow ground to the broader bar on individual actions under Section 4.8.  The only real and remaining question is the exception's scope.

Plaintiffs argue first and foremost that the "sole and obvious purpose" of the No-Action Clause is "to confirm that the Section 4.9 right to sue for principal and interest on stated maturity dates applies to holders of GDP-Linked Securities . . . .'" (Pls.' Br. at 66.)  Plaintiffs hang their hats on excerpted language in the No-Action Clause that allows for enforcement of "the payment of any amounts due hereunder on any Payment Date . . . . " (Id. at 65-66.)

Plaintiffs' reading of the excerpted language, though, overlooks the provision's prelude, which states, "[e]xcept as provided in Section 4.9 of the Indenture with respect to the right of any Holder of a Security to enforce [] payment . . . . " (Global Security § 11 at R-13.)  The use of "[e]xcept as provided in Section 4.9" cabins the subsequent text to the parameters set forth in Section 4.9 of the Indenture.  That is, Section 4.9 allows for individual holders to enforce their right to bring suit to receive payment for principal of and interest on their bonds.

25

Two leaps are required to square Plaintiffs' argument with the plain text of the Indenture and the Global Security.  The first is that the excerpt on which Plaintiffs rely in fact refers to Payment Amounts under the Global Security, and the second is that Payment Amounts indeed fit within the meaning of "principal" or "interest" under Section 4.9 of the Indenture.

Starting with the first, had the drafters intended the meaning Plaintiffs assert, they presumably would have used the defined term of "Payment Amount" instead of the language they did use – "amounts due hereunder on any Payment Date (as this Security may be amended or modified pursuant to Paragraph 22)."  See Vermont Teddy Bear Co. v. 538 Madison Realty Co., 1 N.Y.3d 470, 475 (2004) (cautioning courts not to interpret an agreement "as impliedly stating something which the parties have neglected to specifically include").

Second, although "principal" and "interest" are not defined in the Indenture, "principal" is commonly understood to mean "the amount of a debt, investment[,] or other fund, not including interest, earnings, or profits."  Black's Law Dictionary (11th ed.); see also Fed. Ins. Co. v. Am. Home Assur. Co., 639 F.3d 557, 567 (2d Cir. 2011) (noting that it is "common practice" for the courts of New York State "to refer to the dictionary to determine the plain and ordinary meaning of words to a contract").  "Interest," as the Republic also notes, (Def.'s Reply at 11), is

"money paid regularly at a particular rate for the use of money lent, or for delaying the repayment of a debt."  Oxford English Dictionary (3d ed. 2010).  Thus, under their natural and ordinary meanings, the terms "principal" and "interest" do not appear to apply here.

In any event, the face of the Global Security makes clear that the GDP-Linked Securities do not contemplate paying principal or bearing interest.  The Global Security set out, in capital letters, that "THE ONLY AMOUNTS PAYABLE IN RESPECT OF THIS SECURITY ARE THE PAYMENTS CONTINGENT UPON AND DETERMINED ON THE BASIS OF THE PERFORMANCE OF THE GROSS DOMESTIC PRODUCT OF THE REPUBLIC OF ARGENTINA REFERRED TO HEREIN."  (Global Security at 1.)  It continues that "HOLDERS OF THIS SECURITY ARE NOT ENTITLED TO RECEIVE PRINCIPAL IN THE AMOUNT OF, OR INTEREST BASED ON, SUCH NOTIONAL AMOUNT."  (Id.)  As words are ordinarily accorded the same meaning throughout a contract, see Two Farms, Inc. v. Greenwich Ins. Co., 993 F. Supp. 2d 353, 362 (S.D.N.Y. 2014), aff'd, 628 F. App'x 802 (2d Cir. 2015), "principal" and "interest" must hold the same meanings when used in the Global Security as they do in the Indenture.  It is therefore clear that the Contingent Payments provided for under the Global Security are distinct from principal and interest.

Plaintiffs' remaining arguments are equally unpersuasive. Plaintiffs argue next that "the Republic's position would treat

27

[h]olders of the [GDP-Linked Securities] differently from [h]olders of all other Debt Securities by stripping away the right to sue for missed payments" – an outcome Plaintiffs assert cannot be intended. (Pls.' Br. at 66).  But language littered throughout the Indenture demonstrates, in several instances, that the parties did intend to treat the GDP-Linked Securities differently than other Debt Securities governed by the same document.[12]  By contrast, there is nothing in the plain text to suggest that all Debt Securities were issued with equal entitlements for individual holders.  Plaintiffs therefore cannot be stripped of rights they do not possess.  Furthermore, the Global Security still provides Plaintiffs a mechanism by which to sue for missed payments; Plaintiffs must merely satisfy five preconditions before they do so.  Plaintiffs thus conflate compliance with these steps and an absolute bar to suit.

The Court also observes that the drafters chose to incorporate into the Global Security a corollary to Section 4.8's no-action clause, but they declined to include a corollary to Section 4.9. Instead, the Global Security refers the parties to the Indenture

---

[12] See, e.g., Indenture § 2.1(b) ("Debt Securities of all Series other than the GDP-Linked Securities . . . .") (emphasis added); id. § 2.1(c) ("The specific terms of each Series of Debt Securities other than GDP-Linked Securities . . . .") (emphasis added); id. § 2.5(a) ("The face of the Debt Securities of each Series (other than GDP-Linked Securities) shall be substantially in the form of . . . .") (emphasis added).

to assess how Section 4.9 might apply.  The decision to omit from the Global Security a corollary to Section 4.9 suggests that the drafters did not intend to go beyond what is provided for in the text of the Indenture.

Last, Plaintiffs ask the Court to reach the same conclusion as the English court that "[S]ection 4.9 ought to be regarded as referring to a claim for the Payment Amount."  (Pls.' Reply at 26) (quoting Friedman Decl., Ex. 107 (the English Opinion) ¶ 300).  As stated supra, had the drafters intended for the No-Action Clause to apply to Payment Amounts, they presumably would have used the defined term.  See Vermont Teddy Bear Co., 1 N.Y.3d at 475.  But the drafters did not.  The Court is unwilling to go beyond the plain text of the Indenture and the Global Security to read into the provision what Plaintiffs propose "ought to be."  See MHR Cap. Partners LP v. Presstek, Inc., 12 N.Y.3d 640, 645 (2009) (noting that a clear and unambiguous contract must be enforced according to the plain meaning of its terms); see also Aurelius I, 2020 WL 70348, at *7 (previously observing that "[u]nfortunately . . . , there is no theory of 'second best' when it comes to express contractual terms").

Accordingly, the Court finds that Section 4.9 means exactly what it says – that Section 4.9 creates an individual right of action as applied to payments for principal of and interest on a stated maturity date.  Adopting Plaintiffs' suggested expansion of

the provision would allow the exception to swallow the No-Action Clause.   Section 4.9 unambiguously authorizes individual action only on the narrow grounds set forth therein, and the Court declines to expand its scope beyond what the parties first negotiated nearly twenty years ago.   Plaintiffs' failure to take the contractually required steps precludes them from bringing suit now, and, accordingly, their claims are not properly before the Court.

### B.    Remaining Arguments

In light of the foregoing conclusion, it is unnecessary to reach the remaining threshold issues or the merits of Plaintiffs' breach-of-contract claims.

## IV.   Motion for Oral Argument

On August 23, 2023, the Republic filed a letter motion requesting oral argument on its motion for summary judgment.  (See dkt. no. 150.)  Because the Court decides the cross-motions on the briefs, the Republic's request for oral argument is DENIED as moot.

## V.   Conclusion

For the foregoing reasons, the Republic's motion for summary judgment [dkt. no. 132] is GRANTED, and Plaintiffs' cross-motion for summary judgment [dkt. no. 142] is DENIED.  The Clerk of the Court shall enter a judgment for the Republic and close the open motions filed at Docket Entries 109 and 119 in Case No. 19-cv-9786, Docket Entries 114 and 124 in Case No. 19-cv-10109, Docket

Entries 115 and 125 in Case No. 19-cv-10131, Docket Entries 119 and 130 in Case No. 19-cv-11338, and Docket Entry 46 in Case No. 20-cv-10409.

Moreover, the Republic's letter motion for oral argument [dkt. no. 150] is DENIED as moot.  The Clerk of the Court is further directed to close the open letter motions for oral argument filed at Docket Entry 125 in Case No. 19-cv-9786, Docket Entry 131 in Case No. 19-cv-10109, Docket Entry 132 in Case No. 19-cv-10131, Docket Entry 137 in Case No. 19-cv-11338, and Docket Entry 57 in Case No. 20-cv-10409.

Finally, the Clerk of the Court is directed to mark the above-captioned cases as closed and any open motions denied as moot.

**SO ORDERED.**

Dated:      March 30, 2024
            New York, New York

_____
LORETTA A. PRESKA
Senior United States District Judge